# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. [ __22-cv-828__ ] |
| STATE OF CALIFORNIA, | **COMPLAINT** |
| STATE OF COLORADO, | **[PUBLIC REDACTED VERSION OF DOCUMENT FILED UNDER SEAL]** |
| STATE OF ILLINOIS, | |
| STATE OF INDIANA, | |
| STATE OF IOWA, | |
| STATE OF MINNESOTA, | |
| STATE OF NEBRASKA, | |
| STATE OF OREGON, | |
| STATE OF TEXAS, | |
| and | |
| STATE OF WISCONSIN, | |
| Plaintiffs, | |
| v. | |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, | |
| and | |
| CORTEVA, INC., | |
| Defendants. | |

1                                                    COMPLAINT

1.     For many years, Defendants Syngenta Crop Protection AG, Syngenta

Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta") and Corteva,

Inc. ("Corteva") have unfairly impeded competitors and artificially inflated the prices that

U.S. farmers pay for crop-protection products. Defendants do this by deploying a set of

so-called "loyalty programs," which are designed to severely limit the availability of

lower-priced generic products. Through this scheme, Defendants have suppressed generic

competition and maintained monopolies long after their lawful exclusive rights to

particular crop-protection products have expired. These unlawful business practices have

cost farmers many millions of dollars a year.

2.     Plaintiffs Federal Trade Commission and the states of California, Colorado,

Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Texas, and Wisconsin, by and

through their Attorneys General, petition this Court pursuant to Section 13(b) of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b); Section 16 of the

Clayton Act, 15 U.S.C. § 26; and applicable state laws to enter permanent injunctions,

other equitable relief, and monetary relief against Syngenta and Corteva to undo and

prevent their unlawful conduct in or affecting commerce in violation of Section 5(a) of

the FTC Act, 15 U.S.C. § 45(a); Section 3 of the Clayton Act, 15 U.S.C. § 14; Sections 1

and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; and state competition and consumer

protection laws.

## I.     NATURE OF THE CASE

3.     Every year, U.S. farmers purchase over ten billion dollars of crop-

protection products (also commonly known as agricultural "pesticides"), crucial farm

inputs that improve crop yields and food security for everyone in the United States. And every year, U.S. farmers collectively pay many millions of dollars more than they should for these products because of Defendants' so-called "loyalty programs," which function as unlawful exclusionary schemes. Defendants design those programs to exclude and marginalize competitive generic products even after relevant patent and regulatory exclusivity periods expire and thereby to maintain excessive, supracompetitive prices. This law enforcement action seeks to end those "loyalty programs" and restore competition in this vital sector of the economy.

4.     Congress has enacted a comprehensive regulatory regime for the crop-protection industry that promotes the twin goals of product innovation and price competition. "Basic" manufacturers like Defendants Syngenta and Corteva initially develop, patent, and register the active ingredients within crop-protection products. They may then exploit the commercial potential of their innovations through lawfully obtained exclusive rights for a period of years. After patent and regulatory exclusivity periods expire, generic manufacturers may enter the market with equivalent products containing the same active ingredients and relying upon the same toxicology and environmental impact data. Unimpeded competition from generic products predictably leads to dramatic price reductions. This regulatory structure thus incentivizes innovation while encouraging price and other competition—all of which benefits U.S. farmers and consumers.

5.     Defendants systematically undermine and frustrate the goals of this system. When exclusivity periods for crop-protection products expire and generic manufacturers

threaten to launch lower-priced competing products, Defendants use their loyalty programs to exclude generic manufacturers from the traditional distribution channel, which is a critical link between manufacturers and farmers.

6.      Under their respective programs, Defendants offer each participating distributor—collectively constituting over ▮▮ of all sales—substantial payments to exclude or minimize generic manufacturers. Defendants promise the distributor a complex set of incentive payments based on its purchases of branded crop-protection products, paid as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on one critical condition: the distributor must limit its purchases of comparable generic products to a set percentage share, usually ▮▮ or less, and sometimes as low as ▮. Defendants term this a "rebate" for "loyalty." In substance, however, these are exclusion payments to distributors. Defendants pay a portion of their elevated profits to distributors in exchange for the distributors excluding Defendants' generic competitors, resulting in near-exclusivity for Defendants.

7.      Defendants' loyalty programs are designed to hinder the entry and expansion of generic maufacturers, resulting in, among other things, higher prices than would have otherwise prevailed and costing farmers many millions of dollars in overcharges. Distributors participate in and comply with Defendants' loyalty programs because Defendants both offer rewards for participation and ▮▮▮▮▮▮▮▮ ▮▮▮▮. Distributors profit more from accepting Defendants' exclusion payments than they would from distributing lower-priced generic products in substantial volumes. The

4                                    COMPLAINT

loss of these payments can have severe financial consequences for distributors, ███████

████████████████████████████████████████████████████████

███████████████████ .

8.      A small number of large distributors dominate the sale of crop-protection products in the United States. ██████████████████████████████

████████████████████████████████████████████████████████

███████████████████ . Each Defendant's scheme almost entirely forecloses generic competitors from efficient distribution of their products, preventing generic competitors from making significant sales to national distributors that collectively account for approximately ███ or more of U.S. crop-protection product sales.

9.      Each Defendant expressly designs its program to maintain its ability to price its products above competitive levels while still retaining large market shares. Defendants thus enjoy outsized profits during the "post-patent" period—when prices would otherwise fall substantially.

10.     Defendants' loyalty programs enable Defendants to maintain high prices and dominant market positions years after exclusivity for an active ingredient has expired. Defendants' schemes have forced generic manufacturers to exit markets encumbered by loyalty programs or to decide not to enter due to those programs. Even when they offer competitive products, generic manufacturers are relegated to selling limited volumes, often through undesirable, less efficient channels of distribution.

11.     Absent Defendants' unlawful conduct, Defendants would face increased generic competition, which would lead to increased choice and lower prices for American farmers. Farmers would save many millions of dollars each year when paying for essential crop-protection products.

## II.   JURISDICTION

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. § 26, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). This Court's exercise of supplemental jurisdiction over Plaintiffs' state law claims will avoid unnecessary duplication and multiplicity of actions and will promote the interests of judicial economy, convenience, and fairness.

13.     This Court has personal jurisdiction over each Defendant because each has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b). This Court also has personal jurisdiction over each Defendant because each is engaged in substantial activity in North Carolina, pursuant to N.C. Gen. Stat. §1-75.4.

14.     Defendants' general business practices and the unfair methods of competition alleged herein are activities in or affecting "commerce" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

15.     Defendants are, and at all times relevant herein have been, corporations, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

### III.   VENUE

16.   Venue in this District is proper under 15 U.S.C. § 22; Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); and 28 U.S.C. §§ 1391(b), (c) and (d). Each Defendant is found, resides, transacts business, and/or has agents in this State and District, and a portion of the affected commerce described herein has been carried out in this State and District.

### IV.   THE PARTIES

17.   Plaintiff Federal Trade Commission ("FTC") is an independent administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices in Washington, D.C. The FTC is vested with authority and responsibility for enforcing, *inter alia*, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 3 of the Clayton Act, 15 U.S.C. § 14, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

18.   Plaintiff State of California is a sovereign state. Rob Bonta is the Attorney General of the State of California, the chief legal officer for the state, and brings this action on behalf of the people of the State of California to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

19.   Plaintiff State of Colorado is a sovereign state. Philip J. Weiser is the Attorney General of the State of Colorado, the chief legal officer for the state, and brings

7

COMPLAINT

this action on behalf of the people of the State of Colorado to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

20.     Plaintiff State of Illinois is a sovereign state. Kwame Raoul is the Attorney General of the State of Illinois, the chief legal officer for the state, and brings this action on behalf of the people of the State of Illinois to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The Attorney General also has authority to seek treble damages and civil penalties under state law to compensate those injured and punish and deter those engaged in unlawful conduct.

21.     Plaintiff State of Indiana is a sovereign state. Theodore E. Rokita is the Attorney General of the State of Indiana, the chief legal officer for the state, and brings this action on behalf of the people of the State of Indiana to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also

has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

22. Plaintiff State of Iowa is a sovereign state. Tom Miller is the Attorney General of the State of Iowa, the chief legal officer for the state, and brings this action on behalf of the people of the State of Iowa to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct.

23. Plaintiff State of Minnesota is a sovereign state. Keith Ellison is the Attorney General of the State of Minnesota, the chief legal officer for the state, and brings this action on behalf of the people of the State of Minnesota to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

24. Plaintiff State of Nebraska is a sovereign state. Douglas J. Peterson is the Attorney General of the State of Nebraska, the chief legal officer for the state, and brings this action on behalf of the people of the State of Nebraska to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable

relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek damages and civil penalties under state law to punish and deter those engaged in unlawful conduct.

25.     Plaintiff State of Oregon is a sovereign state. Ellen F. Rosenblum is the Attorney General of the State of Oregon, the chief legal officer for the state, and brings this action on behalf of the people of the State of Oregon to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

26.     Plaintiff State of Texas is a sovereign state. Ken Paxton is the Attorney General of the State of Texas, the chief legal officer for the state, and brings this action on behalf of the people of the State of Texas to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

27.     Plaintiff State of Wisconsin is a sovereign state. Joshua L. Kaul is the Attorney General of the State of Wisconsin, the chief legal officer for the state, and

brings this action to protect the state, its general economy, and its residents from Defendants' unlawful business practices. The Attorney General has authority under federal and state law to pursue injunctive and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in unlawful conduct.

28.     Defendant Syngenta Crop Protection AG is a for-profit company headquartered in Basel, Switzerland and is organized and existing under the laws of Switzerland. Since in or about May 2021, Syngenta Crop Protection AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a global chemical company based in Beijing, China. Syngenta Crop Protection AG's North American headquarters is located in Greensboro, North Carolina.

29.     Defendant Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG and is headquartered in Wilmington, Delaware. Syngenta Corporation is a corporation organized and existing under the laws of the State of Delaware.

30.     Defendant Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG and is headquartered in Greensboro, North Carolina. Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware.

31.     Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC each transacts or has transacted business in this District, and each is engaged in the development, manufacture, and sale of crop-protection products.

32.     Corteva, Inc. is a publicly held, for-profit corporation headquartered in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"). Corteva is a corporation organized and existing under the laws of the State of Delaware.

33.     Corteva transacts or has transacted business in this District and is engaged in the development, manufacture, and sale of crop-protection products.

## V.     INDUSTRY BACKGROUND

### A.     Crop-Protection Products

34.     A pesticide is a chemical used to kill or control a "pest"—a disease, weed, insect, or other unwanted organism. The large majority of pesticides sold in the United States are used for crop protection.

35.     Farmers (or "growers") use pesticides to control pests that would otherwise harm their crops. Pesticides used for crop protection are referred to herein as "crop-protection products." Crop-protection products are vitally important inputs for American farmers. Use of effective crop-protection products allows farmers to dramatically increase crop yields and quality, contributing to a stable food supply.

36.     Crop-protection products fall into three main categories: herbicides, which target unwanted plants or weeds; insecticides, which target insect infestations (including nematicides, which target nematodes (roundworms)); and fungicides, which target fungal diseases.

37.     A crop-protection product contains at least one active ingredient, which is the chemical substance that kills or controls the targeted pest. Active ingredients are

combined with inert components such as water, adjuvants, surfactants, and in some cases other active ingredients, to formulate finished crop-protection products. Finished crop-protection products that contain only one active ingredient are referred to as "straight goods," while products containing two or more active ingredients are called "mixtures."

38.     An active ingredient may also be sold in "technical grade" or for "manufacturing use," before being formulated into a finished crop-protection product. Active ingredients sold in this form require additional processing before they can be used by farmers in finished crop-protection products.

39.     Several criteria serve to distinguish active ingredients from each other. These include the pest(s) targeted by an active ingredient; the effectiveness of an active ingredient at controlling the targeted pest, which is often measured in terms of crop yield improvements; the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; the stage of the growing cycle at which an active ingredient may be used; and the performance of an active ingredient under prevailing climate and weather conditions.

40.     Each active ingredient has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest. While active ingredients that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or in a given condition. Farmers may prefer one active ingredient over another for various reasons,

including the specific performance characteristics of the active ingredient or a farmer's past success with an active ingredient. As a result, a chemically equivalent generic crop-protection product is a closer substitute for a given branded product than is a product containing a different active ingredient.

### B.    Crop-Protection Product Manufacturers

41.    Crop-protection product manufacturers create, market, and sell crop-protection products. They may synthesize the active ingredients for their formulated products in their own facilities or purchase the active ingredients from other chemical manufacturers.

42.    A crop-protection product manufacturer that researches, develops, and patents new active ingredients is known as a "basic" manufacturer. Syngenta and Corteva are basic manufacturers, and they are among the largest crop-protection product manufacturers in the United States and globally. In 2020, Syngenta was the ███-largest crop-protection product manufacturer in the United States by revenue, and Corteva was the ███-largest.

43.    Generic manufacturers primarily sell crop-protection products containing active ingredients initially developed by others and as to which patent and regulatory exclusive-use periods have expired (sometimes called "post-patent" active ingredients). More than a dozen generic manufacturers sell crop-protection products in the United States.

### C.    The Regulatory Process for Crop-Protection Products

44.    The Congressionally enacted patent and regulatory framework governing crop-protection products rewards innovation by granting the developer of a new active ingredient protection from competition in that active ingredient for a period of years. But the governing legal framework also contains mechanisms intended to facilitate generic entry and price competition when exclusivity periods end.

45.    When a basic manufacturer develops a new active ingredient, it can apply for U.S. patent protection for a term beginning when the patent issues and expiring twenty years after the initial patent application.

46.    The basic manufacturer also benefits from exclusive rights under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). To ensure the safety of crop-protection products, FIFRA requires submission, review, and approval by the United States Environmental Protection Agency ("EPA") of detailed toxicology and environmental impact data prior to the sale or distribution of any pesticide in the United States.

47.    Following EPA approval of a new active ingredient, the original registrant (generally a basic manufacturer) receives the exclusive right to cite the data it submitted in support of the active ingredient for a baseline period of ten years. This regulatory exclusive-use period often extends beyond the basic manufacturer's patent term and effectively extends the basic manufacturer's right to be the exclusive supplier of products containing that active ingredient.

48.     When the basic manufacturer's relevant patent and regulatory exclusive-use terms expire, a generic manufacturer may enter the market with crop-protection products containing the same active ingredient. Those products may be generic equivalents of branded crop-protection products or may combine the active ingredient with other active ingredients to create new mixtures. A generic entrant must apply to register its product for sale in the United States under FIFRA, but FIFRA permits generic entrants to rely on data that the original registrant submitted to the EPA. The original registrant, in turn, may be entitled to receive data "compensation" payments from the generic firm, depending on the timing of the generic entrant's reliance on the data. This reflects FIFRA's objective of facilitating generic entry and thus encouraging competition.

### D.     The Traditional Distribution Channel

49.     In general, crop-protection product manufacturers sell to distributors that in turn sell to (and in some cases are integrated with) a much larger number of retail outlets dispersed across the country in close proximity to farmers. This path to market is referred to as the traditional distribution channel, or just the "channel." Sales through the traditional distribution channel account for approximately 90% or more of all sales of crop-protection products in the United States. Just seven distributors account for over 90% of sales through the traditional channel, and thus account for approximately 80% or more of all sales of crop-protection products in the United States.

COMPLAINT

50.     Selling through distributors is the most efficient way for a crop-protection product manufacturer to reach farmers.

(a)     Distributors typically offer services and functions such as warehousing, transportation, credit, and marketing.

(b)     Distributors give manufacturers access to a network of retail and farmer customers, and to the logistics networks required to service widely dispersed customers. By selling through a relatively small number of distributors, a crop-protection product manufacturer can reach thousands of retailers, and in turn, hundreds of thousands of farms.

(c)     Distributors provide scale and services that would require substantial investments for a manufacturer to replicate. Crop-protection product manufacturers cannot efficiently compete by circumventing the traditional distribution channel and focusing primarily on direct sales to local retailers or farmers.

**E.     Life Cycle Management of Crop-Protection Products**

51.     Generic crop-protection products are generally sold at significantly lower prices than equivalent branded products. Accordingly, to the extent generic manufacturers are able to gain market access with respect to a given active ingredient, their entry generally sparks price competition and causes the price and sales volume of branded products containing that active ingredient to decline. This in turn causes the associated profits of basic manufacturers to decline.

17                                              COMPLAINT

52.     In response to actual or expected generic entry with respect to an active ingredient, Defendants have employed "████████████" strategies (sometimes also referred to as "█████████" strategies). These strategies are designed to inhibit generic entry after the end of patent and regulatory exclusivity, and to minimize the competitive impact of such entry on the prices and market shares of branded products containing the same active ingredient. For both Syngenta and Corteva, loyalty programs have been █ ████████████████████████████████████.

## VI.    DEFENDANTS' UNLAWFUL CONDUCT

53.     Syngenta and Corteva each operates a so-called "loyalty program" that is designed to severely limit the distribution of—and ultimately, farmers' ability to purchase—competing generic products. Each Defendant designed and administers its loyalty program with the purpose, intent, and expectation that the program will impede generic competition and thereby maintain market prices and branded market share at levels higher than would otherwise prevail, despite the expiration of applicable patent and regulatory exclusive-use terms. Each does so for its own benefit and for the benefit of its distributor partners.

54.     Under its respective loyalty program, each Defendant offers substantial exclusion payments to distributors conditioned on distributors limiting their purchases of generic crop-protection products containing specified post-patent active ingredients. ███ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████



57.     Defendants' loyalty programs are designed to marginalize generic
manufacturers and enable Defendants to retain share while pricing their crop-protection
products above competitive levels. As to active ingredients that are the primary focus of
this Complaint, each Defendant has substantially achieved these goals. Through its
loyalty program, each Defendant has substantially impeded generic manufacturers from

providing effective competition and has maintained prices for crop-protection products above competitive levels.

### A.    Syngenta's Loyalty Program

58.    Syngenta refers to its loyalty program as the "Key AI" program. Syngenta operates this program with both distributors and retailers.

59.    Syngenta's loyalty program is designed to maintain supracompetitive profits, which Syngenta shares in part with its distributor and retailer partners, at the expense of farmers. Syngenta does this by restricting access to the traditional distribution channel for generic products, and thereby elevating both market prices and Syngenta share. ████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

████████████████████████

60.    Syngenta's Key AI program for distributors is implemented through written marketing agreements with participating distributors.

61.    ████████████████████████████████████████

█████████████████████████████████████████



62.

63.

21                                                    COMPLAINT



64.

65.

66.

22                                                    COMPLAINT

**B.    Corteva's Loyalty Program**

67.    Corteva operates ███████████████ that condition exclusion payments

to distributors on meeting loyalty thresholds for specified active ingredients. ████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

68.    ██████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████

69.    ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

COMPLAINT



70.

71.

24                                                        COMPLAINT

72. 

73.

COMPLAINT

## C.     Operation of and Adherence to Loyalty Programs

74.     For many years, each Defendant has maintained loyalty-program agreements with a group of distributors that collectively comprise approximately ███ or more of all sales of crop-protection products in the United States.

75.     Defendants' agreements with participating distributors have required distributors to meet very high loyalty thresholds for each active ingredient in exchange for exclusion payments—generally ███████████ . ████████████████████████

████████████████████████████████████████

██████████████████████████████████

76.     Syngenta has maintained its retail loyalty program ███████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████ . Syngenta's Key AI program with participating retailers has required retailers to meet very high loyalty thresholds—generally ██████████—in exchange for exclusion payments. ██████████████

████████████████████████████████████

████████████████████████████

77.     ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████

78.     Each Defendant enters loyalty-program agreements with substantially all

leading distributors, a fact broadly known in the industry. The participation of so many

leading distributors gives participating distributors increased confidence that no

significant competing distributor will partner closely with low-price generic

manufacturers to undercut them. ███████████████████████

█████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

█████████████████████████████████

████████████████████████████████

██████████████

79.     ████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████████████████

COMPLAINT



80.    Through these and other steps, Defendants have incentivized distributors to exercise extreme caution in dealings with generic manufacturers, lest they risk missing loyalty thresholds, and in some instances, distributors will not purchase from generic manufacturers at all. The consequences of missing a loyalty threshold can be so severe that distributors often have declined to purchase or promote generic products at all, have endeavored to exceed loyalty thresholds by a healthy margin, and have deferred purchases of generic products until the end of the season, in order to minimize the risk of inadvertently missing a loyalty threshold, such as due to late-season returns or shifts in demand.

81.    Defendants have strictly enforced the terms of their loyalty programs. ▮▮▮

82. 

### D.    Relevant Syngenta Active Ingredients

83.    Syngenta's loyalty program applies to active ingredients that are threatened by generic competition. These include three Syngenta active ingredients that are the primary focus of this Complaint: azoxystrobin, mesotrione, and metolachlor (together with Corteva active ingredients, identified below, "Relevant AIs").

84.    ***Azoxystrobin.*** Azoxystrobin is a broad-spectrum fungicide used to protect a wide variety of crops from fungal diseases. ███████████████████ ████████████████; it has annual global sales of over $1 billion. Sales of crop-protection products containing azoxystrobin in the United States totaled over ███ million in 2020.

85.    Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA expired no later than ████, and Syngenta's relevant patent protection for azoxystrobin expired in or about ███.

86. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

29                                    COMPLAINT



87.  Under its loyalty program, Syngenta has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic azoxystrobin products.

88.    Syngenta's loyalty program has substantially impeded and foreclosed generic manufacturers from providing effective competition in the sale of azoxystrobin products and as a result maintained supracompetitive prices for azoxystrobin products. Following the expiration of Syngenta's patent exclusivity, a number of generic manufacturers introduced azoxystrobin products in the United States. Generic azoxystrobin products were priced significantly below Syngenta's existing azoxystrobin

crop-protection products. In spite of this, generic manufacturers have struggled to make inroads with distributors.

89.    As a result of the incentives created by Syngenta's loyalty program, ███. ███████████████████████████████████████████████. To meet the threshold, distributors strictly manage their generic azoxystrobin open space under the loyalty program, steer their customers toward Syngenta azoxystrobin products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced azoxystrobin products. Generic manufacturers seeking to sell crop-protection products containing azoxystrobin have found distributors unwilling to purchase more than minimal amounts of their products because of loyalty requirements.

90.    ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ At least one other generic manufacturer decided against introducing an azoxystrobin product because of the lack of market access due to Syngenta's loyalty program. ████████ ████████████████████████████████

91.    ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████

31                                                                    COMPLAINT



92.    ██████████████████████████████████████

██████████████████████████████████████ Syngenta's prices remain

████████████████████████████████ significantly above

competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-

protection products containing azoxystrobin than would prevail in a competitive market.

93.    ***Mesotrione.*** Mesotrione is a widely used corn herbicide. Sales of crop-

protection products containing mesotrione in the United States totaled over ███ million

in 2020.

94.    Mesotrione was initially developed, patented, and registered with the EPA

by Syngenta (including Syngenta affiliates). Syngenta's relevant patent protection for

mesotrione expired in or about ████, and Syngenta's exclusive-use period under FIFRA

expired no later than ████.

95.    ██████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████



96. ██████████████████████████████

████████████████████████████████

████████████████████████████████

██ Under its loyalty program, Syngenta has made exclusion payments to distributors

and retailers to deter them from marketing significant volumes of competing, lower-

priced generic mesotrione products.

97.     Syngenta's loyalty program has substantially impeded generic

manufacturers from providing effective competition in the sale of mesotrione products.█

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████

98.     As a result of the incentives created by Syngenta's loyalty program, ████

██████████████████████████████ To meet the

threshold, distributors strictly manage their generic mesotrione open space under the

loyalty program and curtail marketing efforts associated with generic mesotrione. Some

distributors have removed generic mesotrione products from their price lists altogether

33                                      COMPLAINT

because of loyalty program considerations. Loyalty-program constraints have thus prevented distributors from purchasing more than minimal amounts of generic mesotrione (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

99.    Two generic manufacturers delayed or terminated their planned mesotrione entry due to loyalty-program concerns. 

100.

Syngenta's prices remain

significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-protection products containing mesotrione than would prevail in a competitive market.

101.    Following expiration of patent and regulatory exclusivity terms protecting mesotrione, Syngenta faced a threat not only from generic manufacturers, but also from Corteva. A Corteva predecessor company developed a mixture product containing mesotrione and two other active ingredients.

34                                                    COMPLAINT



102.

103.

104.

35                                                          COMPLAINT

█████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

105.    Together with Defendants' other anticompetitive conduct, ██████████████

█████████████████████████████████ has harmed competition in the sale of

crop-protection products containing mesotrione.

106.    ***Metolachlor.*** Metolachlor (which term is used herein to refer to both the

original metolachlor compound and the subsequent s-metolachlor variant, each as

described below) is an herbicide used on a wide variety of crops, including corn,

soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and

sugarbeets. Sales of crop-protection products containing metolachlor in the United States

totaled over ████ million in 2020.

107.    The original metolachlor compound was developed, patented, and

registered with the EPA by a Syngenta predecessor company in or about 1976, and

Syngenta's relevant patent protection for that compound expired in or about 1996. A

Syngenta predecessor company also developed, patented, and registered a variant of the

original metolachlor, known as s-metolachlor, ████████████████████████

████████████████████████████████████████████████████.

Syngenta's relevant patent protection for s-metolachlor expired in or about █████, and the

FIFRA exclusive-use period for s-metolachlor expired no later than ████. A patent held

36                                    COMPLAINT

by Syngenta relating to s-metolachlor manufacturing processes expired in or about July



108.

109.    Under its loyalty programs, Syngenta has made exclusion payments to

distributors and retailers to deter them from marketing significant volumes of competing,

lower-priced generic metolachlor products.

110.    Syngenta's loyalty program has substantially impeded generic

manufacturers from providing effective competition in the sale of metolachlor products.

As a result of the incentives created by Syngenta's loyalty program, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To meet the threshold,

distributors strictly manage and allocate their generic metolachlor open space under the

loyalty program and steer their customers toward loyalty-compliant metolachlor products,

despite customer demand for lower-priced generic products that exceeds the available open space. Loyalty-program constraints have thus prevented distributors from purchasing more than minimal amounts of generic metolachlor, despite generic products being of sufficient quality and supply availability.

111.    Although generic manufacturers introduced products containing original metolachlor in or about 2003, they were unable to achieve significant market success. Other generic manufacturers delayed or canceled introduction of metolachlor products as a result of Syngenta's loyalty program. There has also been more recent entry by generic manufacturers into the sale of crop-protection products containing s-metolachlor. But these manufacturers, too, have been marginalized by Syngenta's loyalty program.

112.    ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████

113.    ████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████

38                                    COMPLAINT

114. ███████████████████████████████

███████████████████████ Syngenta's prices remain

███████████████████████ significantly above

competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-

protection products containing metolachlor than would prevail in a competitive market.

115. ████████████████████████████████████



### E.      Relevant Corteva Active Ingredients

116.    Corteva's loyalty program applies to active ingredients that are threatened

by generic competition. These include three Corteva active ingredients that are the

primary focus of this Complaint: rimsulfuron, oxamyl, and acetochlor (together with

Syngenta active ingredients, identified above, "Relevant AIs").

117.    ***Rimsulfuron.*** Rimsulfuron is an herbicide used on crops such as fruit, tree

nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Sales of crop-protection products

containing rimsulfuron in the United States totaled over ████ million in 2020.

118.    Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection for rimsulfuron expired in or about ███, and the exclusive-use period under FIFRA expired no later than 2007.

119.    Prior to the 2017 Dow-DuPont merger that led to the formation of Corteva, DuPont successfully maintained a very high share of rimsulfuron sales through operation of its own loyalty program.

120.    

121.

COMPLAINT

122.    Under its loyalty program, Corteva has made exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic rimsulfuron products.

123.    Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of rimsulfuron products. Generic manufacturers have registered rimsulfuron products in the United States, but the marketing efforts of these manufacturers have generally been stifled due to Corteva's loyalty program.

124.    As a result of the incentives created by Corteva's loyalty program, ██████ ████████████████████████████████████████████████████████████████ ████, distributors carefully manage and allocate their generic rimsulfuron open space under Corteva's loyalty program, with some removing generic rimsulfuron products from their price lists altogether. Generic manufacturers have thus been unable to make significant sales through the traditional distribution channel.



125.    ████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████ In this way, Corteva has been ██████ ███████████████████████████████ maintaining volume, preserving margin, and slowing the decline in profits both for itself and for distributors.



126. ███████████████████████████████████████

███████████████████████████████ Corteva's prices remain

███████████████████████████████ significantly above

competitive levels. ████████████████████████████████

████████████████████████████████████████████████

Corteva's loyalty program has resulted in higher prices for crop-protection products

containing rimsulfuron than would prevail in a competitive market.

127. **_Oxamyl._** Oxamyl is an insecticide and nematicide used primarily on cotton

and potatoes, in addition to onions, apples, citrus fruits, pears, carrots, peppers, tomatoes,

and tobacco. Sales of crop-protection products containing oxamyl in the United States

totaled over ███ million in 2020.

128. Oxamyl was initially developed, patented, and registered with the EPA by a

Corteva predecessor company (DuPont). Corteva's relevant patent protection for oxamyl

expired in or about ███ and the exclusive-use period under FIFRA expired no later than

1987.

129. A Corteva plant outage between 2015 and 2017 interrupted the supply of

oxamyl products from Corteva. ███████████████████████████

██████████████ In response to the outage, the first generic oxamyl manufacturer entered

the market in or about the fall of 2017. Other generic manufacturers followed in or about

2018. Given Corteva's plant outage and ████████████████████, generic

entrants were at first relatively successful.

42                                                           COMPLAINT

130.  

Under its loyalty program, Corteva has made exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic oxamyl products.

131.   Corteva's loyalty program has had the ▮▮▮▮ effect of reversing the initial success of generic manufacturers selling crop-protection products containing oxamyl. ▮▮▮▮▮▮▮▮▮▮ Generic sales volumes plummeted, particularly at large distributors, and generic manufacturers could not retain distributor business even by lowering prices. ▮▮▮▮▮▮▮▮▮▮

132.   Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of oxamyl products. As a result of the

43                                                  COMPLAINT

incentives created by Corteva's loyalty program, ███████████████████████

████████████████████████ After Corteva placed oxamyl into its loyalty

program, in order to meet the threshold distributors began managing their compliance

with the oxamyl loyalty threshold, and drastically curtailed their purchases of generic

oxamyl. Loyalty-program constraints have thus prevented distributors from purchasing

more than minimal amounts of generic oxamyl (or in some cases, any at all) despite

generic products being of sufficient quality and supply availability.

133.   ██████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████ Corteva's prices are ████████████████████

██████████ significantly above competitive levels. Corteva's loyalty program has

resulted in higher prices for crop-protection products containing oxamyl than would

prevail in a competitive market.

134.   *Acetochlor.* Acetochlor is an herbicide that is used predominantly on corn,

but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Sales

of crop-protection products containing acetochlor in the United States totaled over ████

million in 2020.

135.   The EPA granted registration for acetochlor in 1994 to the Acetochlor

Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP

44                                   COMPLAINT

continues to hold the U.S. registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties.

136.   Relevant patent protection for acetochlor expired in or about ▮▮▮▮, and the exclusive-use period under FIFRA expired no later than ▮▮▮▮.

137. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



138. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

139. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Under its loyalty program, Corteva has made exclusion payments to

45                                      COMPLAINT

distributors to deter them from marketing significant volumes of competing, lower-priced generic acetochlor products.

140.   Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of acetochlor products. As a result of the incentives created by Corteva's loyalty program, ██████████████████████ ████████████████████████████████████ distributors strictly manage compliance with the acetochlor loyalty thresholds, whether by refusing to purchase any acetochlor products from generic manufacturers despite customer demand for the lower-priced products or by purchasing only limited quantities of generic acetochlor products. Loyalty-program constraints have prevented distributors from purchasing more than minimal amounts of generic acetochlor (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

141.   Since the first generic acetochlor sales in or about 2018, generic manufacturers have made little headway with distributors. ████████████████ ████████████████████████████████ ██████████████████████████████████████ ███████████

142.   Corteva's loyalty program has deterred generic manufacturers from introducing acetochlor products in the United States at all, or from offering innovative new products. ████████████████████████████████████



143. ██████████████████████████████████████

████████████████████████████████ Corteva's prices remain

██████████████████████████████ significantly above

competitive levels. Corteva's loyalty program has resulted in higher prices for crop-protection products containing acetochlor than would prevail in a competitive market.

## VII.   DEFENDANTS' MARKET AND MONOPOLY POWER

144.    At all times relevant to this Complaint, Syngenta has had monopoly and market power with respect to azoxystrobin, mesotrione, metolachlor, and with respect to crop-protection products containing those Relevant AIs. Both direct and indirect evidence demonstrates Syngenta's monopoly and market power.

145.    At all times relevant to this Complaint, Corteva has had monopoly and market power with respect to rimsulfuron, oxamyl, and with respect to crop-protection products containing those Relevant AIs. At all times relevant to this Complaint, Corteva has had market power with respect to acetochlor and with respect to crop-protection products containing acetochlor. Both direct and indirect evidence demonstrates Corteva's monopoly and market power.

146.    Direct evidence of each Defendant's monopoly and market power includes each Defendant's ability to price Relevant AIs and crop-protection products containing those Relevant AIs above competitive levels, and to exclude competition from generic manufacturers through operation of its loyalty program.

147.    Each Defendant's monopoly and market power is also shown through circumstantial evidence, including dominant or substantial market shares in relevant markets with substantial barriers to entry.

148.    For the purposes of assessing the competitive effects of Defendants' conduct, each relevant market is defined by reference to a Relevant AI. For each of azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, and acetochlor:

(a)    A relevant product market exists that is no broader than the active ingredient, consisting of (1) active ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States, and (2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States; and

(b)    A relevant product market(s) also exists that is no broader than EPA-registered crop-protection products for sale in the United States that contain the active ingredient.

As to each Relevant AI, allegations herein relating to product markets, including market share and foreclosure allegations, apply to both sets of product markets described above. As used herein, the term "Relevant Market" refers to each of the markets described above.

149.    For each Relevant AI, absent the restraints imposed by Syngenta's or Corteva's loyalty program, as applicable, unconstrained competition from generic crop-protection product manufacturers would have a significant and non-transitory downward

effect on prices in the applicable Relevant Market. ███████████████████

██████████████████████████████████████████████

████████████████████

150.    Each Relevant AI has particular characteristics and uses that differentiate it

from other active ingredients.

(a)    *Azoxystrobin.* Azoxystrobin can be used across all major row crops,

which simplifies pesticide management. Syngenta also claims that azoxystrobin

has growth-enhancing effects not proven in other active ingredients.

(b)    *Mesotrione.* Compared to other, similar herbicide active ingredients,

mesotrione has superior efficacy and crop safety, and a low use rate.

(c)    *Metolachlor.* Compared to other, similar herbicide active

ingredients, metolachlor has superior water solubility, and so tends to perform

better in dry conditions. Metolachlor also outperforms other active ingredients in

warmer conditions, is more "crop friendly," and can be used on a broader

spectrum of crops.

(d)    *Rimsulfuron.* Compared to other, similar herbicide active

ingredients, rimsulfuron can be used on a broader range of crops, controls a wider

spectrum of weeds, can be used both pre- and post-emergence, and has more

application methods, no dormancy restrictions, and a lower use rate. Further,

rimsulfuron is inexpensive to produce compared to other, similar herbicide active

ingredients.

49                                          COMPLAINT

(e) **_Oxamyl._** Oxamyl products can be sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the root level or mixed into the soil. Oxamyl is also safer for crops and better for soil health than other, similar insecticide active ingredients.

(f) **_Acetochlor._** Compared to other similar, herbicide active ingredients, acetochlor tends to perform better in wetter and cooler conditions. Acetochlor also tends to have better weed control early in the growing season and is more effective against certain weed species.

151.    For each Relevant AI, other active ingredients are not close enough substitutes to prevent Syngenta or Corteva, as applicable, from maintaining prices of crop-protection products containing the Relevant AI above competitive levels.

152.    The relevant geographic market as to all products is the United States. Crop-protection products are largely sold and regulated on a nationwide basis. Because the EPA must approve and register all crop-protection products prior to sale or distribution in the United States, United States farmers may not lawfully use crop-protection products manufactured and labeled for use outside the United States.

153.    There are substantial barriers to entry into each Relevant Market. Entry is difficult, costly, and time-consuming. Potential generic manufacturers face significant capital, technical, regulatory, and legal barriers. Those barriers include obtaining registration from the EPA, developing manufacturing processes and sourcing active ingredient, and paying data compensation costs to the initial active ingredient registrant.

Syngenta's and Corteva's use of loyalty programs also imposes a substantial barrier to entry by, among other things, limiting generic manufacturers' access to the traditional distribution channel.

154.    Syngenta has maintained dominant shares of the U.S. Relevant Markets for azoxystrobin, mesotrione, and metolachlor. Each year from at least 2017 through 2020, Syngenta's share of sales in each of these markets exceeded ██ .

155.    Corteva has maintained dominant shares of the U.S. Relevant Markets for rimsulfuron and oxamyl. Each year from at least 2017 through 2020, Corteva's share of sales in each of these markets exceeded ██ .

156.    Corteva has maintained a substantial share of the U.S. Relevant Market for acetochlor. Each year from at least 2017 through 2020, Corteva's share of sales in that market exceeded ██ . Bayer, ████████████████████████████████ ████████████████████ accounts for roughly ██ of sales in the Relevant Market. Bayer imposes limited constraints on Corteva's pricing of acetochlor products compared to generic manufacturers, and Bayer's presence in the market has not prevented Corteva from maintaining prices of crop-protection products containing acetochlor above competitive levels.

## VIII.   EACH DEFENDANT'S CONDUCT HAS HARMED COMPETITION AND CONSUMERS

157.    Through operation of its so-called "loyalty program," each Defendant has harmed competition and consumers. Each Defendant has also harmed competition through other anticompetitive conduct deployed in conjunction with loyalty programs.

COMPLAINT

████████████████████████████████████████

████████████████████████████████████████

████████████. Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors from the applicable Relevant Markets, has caused generic competitors to exit the applicable Relevant Markets or to abandon plans to enter, and has significantly impaired the competitiveness of generic competitors even when they have been able to enter. Each Defendant's anticompetitive conduct has led to higher prices and reduced innovation and farmer choice in the applicable Relevant Markets.

158.   Each Defendant's anticompetitive conduct may substantially lessen competition or tend to create or maintain monopolies in the Relevant Markets.

159.   Each Defendant's anticompetitive conduct has harmed competition and end-consumers—farmers—both within and outside the applicable Relevant Markets.

160.   Each Defendant's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

161.   Each Defendant's unlawful conduct is ongoing. Each Defendant continues to operate its loyalty program, including by enforcing loyalty thresholds and making exclusion payments to distributors and retailers for meeting these thresholds and thus excluding generic competition. Absent injunctive relief by this Court, each Defendant is likely to continue to harm competition and the public interest.

COMPLAINT

A.   **Each Defendant's Unlawful Conduct Has Substantially Foreclosed Generic Manufacturers From Each Applicable Relevant Market**

162.   A seller can harm competition and consumers in circumstances such as those present here by foreclosing actual or potential competitors from access to distribution services, or by foreclosing actual or potential competitors from access to efficient distribution services.

163.   The most efficient channel of distribution for each Relevant Market is the traditional distribution channel. Each Defendant's so-called "loyalty program" has almost entirely foreclosed generic manufacturers from access to the traditional channel. With respect to each Relevant Market, this exclusion of generic competitors from the traditional channel has harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, lower-cost distribution.

164.   By excluding generic competitors from the traditional channel, each Defendant's loyalty program has foreclosed a substantial share of each applicable Relevant Market to generic competition. This is because a high percentage of all crop-protection product sales are made through the traditional channel (over 90%), a high proportion of the traditional channel participates in Defendants' loyalty programs (over ▮%), and Defendants' loyalty programs have high market share thresholds (over ▮%). Thus, each Defendant's program has effectively foreclosed generic competitors from approximately ▮% or more of each applicable Relevant Market.

165.   The market foreclosure created by Defendants' loyalty programs has been of substantial duration. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████

████   Generic manufacturers of crop-protection products containing the applicable

Relevant AIs have been substantially foreclosed from the Relevant Markets for five years

or more.

166.    A seller's program of offering and providing exclusion payments to

distributors can foreclose equally efficient competitors from the market and harm

competition in circumstances such as those present here. This is true even when

distributors do not agree or otherwise commit, in advance, to meet the share threshold

that the seller specifies as a condition to payment. The prospect of receiving a payment—

as well as the prospect of other profit opportunities associated with the market-wide

exclusion of generics—can, in circumstances such as those present here, serve as a

sufficient incentive to induce distributors to participate in the program and to limit or

forgo purchases from competitors.

167.    Distributors adhere to Defendants' loyalty-program thresholds in

significant part due to the prospect of receiving substantial payments under the programs.

In addition, structural features of each Defendant's loyalty program promote adherence.

These include ███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

54                                    COMPLAINT

 Taken together with Defendants' strict enforcement efforts, these features of Defendants' loyalty programs incentivize distributors to meet applicable loyalty thresholds by forgoing or severely limiting purchases from generic manufacturers. Distributors' incentive to comply with loyalty-program thresholds is enhanced by the fact that substantially all major distributors participate in the programs. Distributors profit more when prices to retailers and farmers are higher, and the distributors' collective participation in the loyalty programs has the effect of maintaining higher prices to retailers and farmers.

168.    A seller's program of offering and providing exclusion payments to distributors can benefit the participating distributors and harm end-consumers, including by enabling distributors to retain exclusion payments, in circumstances such as those present here. There are several scenarios in which distributors will not pass on exclusion payments to end-consumers. There are also various means by which a seller can—and each Defendant does—discourage distributors from passing on exclusion payments to end-consumers.

169.    ████████████ distributors recognize that loyalty-program complexity, lack of transparency to farmers and generic manufacturers, and deferred payment timing

55

COMPLAINT

cause distributors to be more likely to retain exclusion payments as profit, and less likely to pass them on to farmers in the form of reduced downstream pricing.

170.   A seller's program of offering and providing exclusion payments to distributors can, in circumstances such as those present here, exclude equally efficient competitors from the market and harm competition even when the seller's net price for the product, after accounting for the payments, is not below the seller's cost of producing the product.

171.   As a result of Syngenta's and Corteva's respective loyalty programs, distributors have severely limited their purchase, promotion, and sale of generic crop-protection products containing each applicable Relevant AI. To meet applicable loyalty thresholds, distributors have omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered retailers and farmers toward branded products.

172.   As a result of Syngenta's and Corteva's respective loyalty programs, distributors have declined to buy more than minimal amounts of crop-protection products containing each applicable Relevant AI from generic manufacturers even though (1) generic products are of sufficient quality and availability; (2) generic manufacturers work to create demand for their products at the farmer and retailer levels; and (3) absent Defendants' loyalty programs, demand for generic products containing each applicable Relevant AI would exceed the open space allowed under Defendants' respective loyalty programs. This unwillingness is caused by the limited open space available under the

applicable Syngenta or Corteva loyalty program. According to one generic manufacturer, this dynamic is so well established in the industry that it is futile to even approach a large distributor that is subject to loyalty requirements. In contrast, when selling products containing active ingredients that are not subject to loyalty programs, generic manufacturers are able to make all or nearly all of their sales through traditional-channel distributors.

173.   With respect to each Relevant AI, in the absence of the applicable Syngenta or Corteva loyalty program, generic manufacturers would make significantly more sales to distributors, which would enable them to realize distribution efficiencies and scale benefits. These benefits would increase price competition, innovation, and choice in Relevant Markets, which in turn would benefit American farmers.

174.   In the absence of Defendants' respective loyalty programs, sales of generic crop-protection products containing active ingredients subject to the programs, including each Relevant AI, would be significantly higher and would exceed the open space allowed by the programs. American farmers would benefit from having an increased amount of lower-price generic products available in Relevant Markets.

175.   In the applicable Relevant Markets (azoxystrobin, mesotrione, and metolachlor), Syngenta has added an additional layer of foreclosure to that created by its distributor program through its retail loyalty program. As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient distribution of their products, given the participation of leading retailers in the program.

B.   **Each Defendant's Unlawful Conduct Has Prevented Generic Entry and Expansion and Caused Generic Exit**

176.   Each Defendant's so-called "loyalty program" has prevented, delayed, and diminished entry and expansion by generic manufacturers of crop-protection products containing applicable Relevant AIs, and caused generic exit as to products containing applicable Relevant AIs, even when generic manufacturers can otherwise satisfy regulatory conditions and overcome other barriers to entry.

177.   Multiple generic manufacturers that have assessed the competitive landscape and evaluated whether to enter a particular Relevant Market have concluded that entry is not economically feasible due to the artificial constraints created by applicable Syngenta or Corteva loyalty programs.

178.   In some cases, Syngenta's or Corteva's loyalty program has caused foreclosure of sales opportunities that have led a generic manufacturer already competing in a Relevant Market not to re-register its product, or to stop offering a product containing the Relevant AI.

179.   In the absence of Defendants' respective loyalty programs, generic manufacturers would compete more effectively and compete for more sales in each Relevant Market.

C.   **Each Defendant's Unlawful Conduct Has Resulted in Fewer Innovative Products**

180.   Each Defendant's so-called "loyalty program" has reduced the ability and incentive of generic manufacturers to bring new differentiated crop-protection products

containing applicable Relevant AIs to market, harming innovation and restricting farmer choice.

181.    Generic manufacturers often create new active-ingredient mixtures or other new offerings that meet farmer needs. Generic manufacturers also often innovate on the non-active-ingredient components of crop-protection product sales in ways that are beneficial to farmers.

182.    Because of the barriers to entry created by Syngenta's and Corteva's respective loyalty programs, generic manufacturers have in several instances abandoned attempts to develop innovative products containing applicable Relevant AIs. For the same reason, when determining whether to bring to market an innovative product, such as a new mixture, generic manufacturers have sought to avoid using active ingredients that are subject to either Defendant's loyalty program.

183.    In the absence of Defendants' respective loyalty programs, there would be more innovative products from generic manufacturers in the applicable Relevant Markets, leading to more farmer choice.

### D.    Each Defendant's Unlawful Conduct Has Resulted in Supracompetitive Prices

184.    Each Defendant's so-called "loyalty program" has resulted in higher prices to retailers and farmers for crop-protection products containing applicable Relevant AIs than would prevail in competitive markets. Each Defendant's anticompetitive conduct has thwarted the downward pressure that generic manufacturers' entry and expansion

with access to efficient distribution would otherwise impose on prices in markets for crop-protection products containing applicable Relevant AIs.

185.    Generic crop-protection products are generally priced lower than branded equivalents, and as to each Relevant AI, farmers pay more for crop-protection products containing the active ingredient because the applicable loyalty program artificially limits the availability of lower-priced generic alternatives. In many cases, farmers buy the more expensive, branded product because that is what is available and/or what is promoted by the traditional distribution channel, and not because that is what they prefer. Defendants' loyalty programs thus result in unmet and unrealized demand for lower-priced equivalent generic products.

186.    When generic manufacturers are able to access the market for an active ingredient, they put downward pressure on the prices of branded products containing that active ingredient, and they exert more pressure the more access they achieve. This downward pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the active ingredient, including higher-end mixture products. Defendants' loyalty programs, however, inhibit generic manufacturers' ability to access relevant markets and thus limit downward pricing pressure from generic competition.

187.    Even where generic manufacturers enter and sell at low prices to distributors, Defendants' loyalty programs result in higher prices to farmers by limiting the amount of available generic product. This in turn enables distributors or retailers to

price generic products just under branded products and to maintain branded prices, thus preventing the full benefits of generic price competition from flowing to farmers.

188. ██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████

189. ██████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████

190. █████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████
████████████████████████████████████████
██████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████

COMPLAINT

191. 

192.

193.

COMPLAINT



194. ███████████████████████████████████

195.    In countries where loyalty programs for crop-protection products do not exist, generic manufacturers have been able to compete more effectively and farmers pay correspondingly lower prices.

196.    Even where generic manufacturers have been able over time to enter a given Relevant Market and have provided some measure of price competition, Defendants' loyalty programs have limited the effects of this competition. Defendants' respective price responses, and responses of prices more generally in the applicable Relevant Market, have been less significant, and slower, than they would have been absent operation of the applicable loyalty program.

## COUNT I

### UNFAIR METHODS OF COMPETITION
### IN VIOLATION OF SECTION 5 OF THE FTC ACT (15 U.S.C. § 45(a))

197.    Plaintiff FTC re-alleges and incorporates by reference the allegations in all of the paragraphs above.

198.    Each Defendant's course of conduct as alleged herein—including (i) entering and maintaining agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms; (ii) enforcing and threatening enforcement of loyalty conditions or otherwise threatening penalties for disloyalty; and (iii) ███████████████████████████ ██████████████████████—constitutes an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### UNLAWFUL CONDITIONING OF PAYMENTS
### IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14)

199.    Plaintiffs re-allege and incorporate by reference the allegations in all of the paragraphs above.

200.    Each Defendant has provided payments in the form of rebates in the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in accordance with "loyalty" terms. This conduct may substantially lessen competition or tend to create monopolies in each applicable Relevant Market, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

## COUNT III

## UNREASONABLE RESTRAINTS OF TRADE
## IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

201.    State Plaintiffs re-allege and incorporate by reference the allegations in all

of the paragraphs above.

202.    Each Defendant's agreements with distributors and retailers for the sale of

crop-protection products that condition exclusion payments on compliance with "loyalty"

terms, ███████████████████████████████████████████

██████████ are unreasonable restraints of trade, in violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1.

## COUNT IV

## UNLAWFUL MONOPOLIZATION
## IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)

203.    State Plaintiffs re-allege and incorporate by reference the allegations in all

of the paragraphs above.

204.    At all times relevant to assessing its conduct, Syngenta has had monopoly

power in Relevant Markets for azoxystrobin, metolachlor, and mesotrione. At all times

relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets

for rimsulfuron and oxamyl.

205.    Each Defendant has maintained its monopoly power through a course of

anticompetitive and exclusionary conduct—including (i) entering and maintaining

agreements with distributors and retailers that contain loyalty requirements; (ii) enforcing

and threatening enforcement of loyalty requirements or otherwise threatening penalties

for disloyalty; and (iii) ██████████████████████████████████████████

████████████████████████████████████████—in violation of Section 2

of the Sherman Act, 15 U.S.C. § 2.

**COUNT V**

**VIOLATIONS OF CALIFORNIA STATE LAW**

206.    Plaintiff State of California re-alleges and incorporates by reference the

allegations in all of the paragraphs above.

207.    Defendants' agreements constitute anticompetitive contracts, agreements,

and arrangements in violation of California's Cartwright Act, California Business and

Professions Code § 16700 *et seq*.

208.    Defendants' agreements with distributors and downstream purchasers

constitute anticompetitive contracts, agreements, and arrangements in violation of

California's Unfair Competition Law, California Business and Professions Code § 17200

*et seq*.

209.    Plaintiff State of California is entitled to an injunction, disgorgement,

equitable remedies, and any other remedy available at law for these violations.

**COUNT VI**

**VIOLATIONS OF THE COLORADO ANTITRUST ACT (C.R.S. § 6-4-104-105)**

**A. ILLEGAL RESTRAINT OF TRADE (C.R.S. § 6-4-104)**

210.    Plaintiff State of Colorado re-alleges and incorporates by reference the

allegations in all of the paragraphs above.

211.    The acts alleged above constitute illegal restraints of trade or commerce in Colorado pursuant to the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-104.

212.    Colorado seeks all remedies available under federal law or the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-101, *et seq*., including, without limitation, the following:

(a)    Injunctive and other equitable relief, including restitution in the form of disgorgement, pursuant to Colo. Rev. Stat. § 6-4-111(1) and Colorado common law;

(b)    Civil penalties pursuant to Colo. Rev. Stat. § 6-4-112(1) which provides that the Court may impose civil penalties in an amount up to "two hundred fifty thousand dollars for each such violation";

(c)    Costs and attorney's fees pursuant to Colo. Rev. Stat. § 6-4-111(4); and

(d)    Other remedies as the court may deem appropriate under the facts and circumstances of the case.

213.    Colorado does not seek damages on behalf of any governmental or public entity.

**B.  UNLAWFUL MONOPOLY MAINTENANCE (C.R.S. § 6-4-105)**

214.    Plaintiff State of Colorado re-alleges and incorporates by reference the allegations in all of the paragraphs above.

215.    The acts alleged above constitute unlawful monopoly or attempt to monopolize trade or commerce in Colorado pursuant to the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-105.

216.    Colorado seeks all remedies available under federal law or the Colorado Antitrust Act of 1992, Colo. Rev. Stat. § 6-4-101, *et seq.*, including, without limitation, the following:

(a)    Injunctive and other equitable relief, including restitution in the form of disgorgement, pursuant to Colo. Rev. Stat. § 6-4-111(1) and Colorado common law;

(b)    Civil penalties pursuant to Colo. Rev. Stat. § 6-4-112(1) which provides that the Court may impose civil penalties in an amount up to "two hundred fifty thousand dollars for each such violation";

(c)    Costs and attorney's fees pursuant to Colo. Rev. Stat. § 6-4-111(4); and

(d)    Other remedies as the court may deem appropriate under the facts and circumstances of the case.

217.    Colorado does not seek damages on behalf of any governmental or public entity.

## COUNT VII

## VIOLATIONS OF THE ILLINOIS ANTITRUST ACT

218.    Plaintiff State of Illinois re-alleges and incorporates by reference the allegations in all of the paragraphs above.

(a)     Defendants' agreements with distributors and retailers, as alleged herein, for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms and ████████████████████ ████████████████████ are unreasonable restraints of trade or commerce in violations of 740 ILCS 10/3(2).

(b)     Defendants' conduct as alleged herein was done with the purpose of maintaining monopoly power over a substantial part of trade of commerce of Illinois in Relevant Markets for azoxystrobin, metolachlor, mesotrione, rimsulfuron, and oxamyl, in violation of the Illinois Antitrust Act, 740 ILCS 10/3(3).

(c)     Each Defendant has provided rebates, as alleged herein, in the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in accordance with "loyalty" terms, resulting in a substantial lessening of competition and tending to create monopolies in Relevant Markets for azoxystrobin, metolachlor, mesotrione, rimsulfuron, and oxamyl, as applicable, in violation of the Illinois Antitrust Act 740 ILCS 10/3(4).

(d)     Plaintiff State of Illinois, under its antitrust enforcement authority in 740 ILCS 10/7, seeks relief, including but not limited to treble damages, for Illinois consumers and Illinois state entities that paid for one or more products containing one or more of the active ingredients identified in this Complaint

during the relevant period, and thereby paid more than they would have paid but for Defendants' unlawful conduct. Plaintiff State of Illinois also seeks, and is entitled to, injunctive relief, civil penalties, other equitable relief (including equitable monetary relief), fees and costs, and any other remedy available for these violations under sections 7(1), 7(2), and 7(4) of the Illinois Antitrust Act. 740 ILCS 10/1 *et seq.*

## COUNT VIII

## VIOLATIONS OF INDIANA STATE LAW

219.    Plaintiff State of Indiana re-alleges and incorporates by reference the allegations in all of the paragraphs above.

(a)    The acts, omissions, or practices alleged in the Complaint constitute violations of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*

   i. The acts, omissions, or practices alleged in the Complaint occurred in connection with consumer transactions within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

   ii. The acts, omissions, or practices alleged in the Complaint are unfair, abusive, or deceptive within the meaning of Ind. Code § 24-5-0.5-3(a).

   iii. Indiana seeks all remedies available under the Indiana Deceptive Consumer Sales Act including, without limitation, the following:

70

COMPLAINT

1. Civil penalties pursuant to Ind. Code § 24-5-0.5-4(g) for knowing violations of the Indiana Deceptive Consumer Sales Act.

2. Disgorgement and restitution pursuant to Ind. Code § 24-5-0.5-4(c)(2);

3. Injunctive and other equitable relief pursuant to Ind. Code § 24-5-0.5-4(c)(1);

4. Costs pursuant to Ind. Code § 24-5-0.5-4(c)(4); and

5. Other remedies as the Court find necessary to redress and prevent recurrence of each Defendant's violations.

(b)     The acts alleged in the Complaint constitute violations of the Indiana Antitrust Act, Ind. Code § 24-1-2-1.

i.   The acts alleged in the Complaint constitute schemes, contracts, or combinations in restraint of trade or commerce or are otherwise illegal under Ind. Code § 24-1-2-1.

ii.  Indiana seeks all relief available under the Indiana Antitrust Act including, without limitation, the following:

1. Disgorgement and restitution pursuant to Ind. Code § 24-1-2-5;

2. Injunctive and other equitable relief pursuant to Ind. Code § 24-1-2-5;

71                                                        COMPLAINT

3. Costs pursuant to Ind. Code § 24-1-2-5; and

4. Other remedies as the Court find necessary to redress and prevent recurrence of each Defendant's violations.

(c) The acts alleged in the Complaint also constitute violations of the Indiana Antitrust Act, Ind. Code § 24-1-2-2.

i. The acts alleged in the Complaint constitute monopolization of a part of trade or commerce within the state under Ind. Code § 24-1-2-2.

ii. Indiana seeks all relief available under the Indiana Antitrust Act including, without limitation, the following:

1. Disgorgement and restitution pursuant to Ind. Code § 24-1-2-5;

2. Injunctive and other equitable relief pursuant to Ind. Code § 24-1-2-5;

3. Costs pursuant to Ind. Code § 24-1-2-5; and

4. Other remedies as the Court find necessary to redress and prevent recurrence of each Defendant's violations.

## COUNT IX

## VIOLATIONS OF IOWA STATE LAW

220. Plaintiff State of Iowa re-alleges and incorporates by reference the allegations in all the paragraphs above.

221.    Defendants' conduct violates the Iowa Competition Law, Iowa Code Chapter 553.

222.    For violations of the Iowa Competition Law, Plaintiff State of Iowa seeks an injunction and all other available relief provided by Iowa Code Chapter 553, including but not limited to relief contained in Iowa Code §§ 553.12 and 553.13.

223.    Defendants' conduct constitutes deceptive and unfair practices in violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16.

224.    For violations of the Iowa Consumer Fraud Act, Plaintiff State of Iowa seeks all available relief provided by Iowa Code § 714.16, including but not limited to relief contained in Iowa Code §§ 714.16(7) and 714.16(11).

## COUNT X

## VIOLATIONS OF MINNESOTA STATE LAW

### A.  UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF MINNESOTA STATUTES SECTION 325D.51

225.    Plaintiff State of Minnesota re-alleges and incorporates by reference the allegations in all of the paragraphs above.

226.    Each Defendant's agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms and ███████████████████████████████████████ ███████████ are unreasonable restraints of trade, in violation of Minnesota Statutes Section 325D.51. Minn. Stat. § 325D.51 ("A contract, combination, or conspiracy

between two or more persons in unreasonable restraint of trade or commerce is

unlawful.").

## B. UNLAWFUL MONOPOLY MAINTENANCE AND USE OF MONOPOLY POWER IN VIOLATION OF MINNESOTA STATUTES SECTION 325D.52

227.    Plaintiff State of Minnesota re-alleges and incorporates by reference the

allegations in all of the paragraphs above.

228.    At all times relevant to assessing its conduct, Syngenta has had monopoly

power in Relevant Markets for azoxystrobin, metolachlor, and mesotrione. At all times

relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets

for rimsulfuron and oxamyl.

229.    Each Defendant has maintained and used its monopoly power through a

course of anticompetitive and exclusionary conduct—including (i) entering and

maintaining agreements with distributors and retailers that contain loyalty requirements;

(ii) enforcing and threatening enforcement of loyalty requirements or otherwise

threatening penalties for disloyalty; and (iii) ████████████████████████

████████████████████████████████████████████—in

violation of Minnesota Statutes Section 325D.52. Minn. Stat. § 325D.52 ("The

establishment, maintenance, or use of, or any attempt to establish, maintain, or use

monopoly power over any part of trade or commerce by any person or persons for the

purpose of affecting competition or controlling, fixing, or maintaining prices is

unlawful.").

## C. PROHIBITED CONTRACT, COMBINATION, OR CONSPIRACY IN VIOLATION OF MINNESOTA STATUTES SECTION 325D.53

230.    Plaintiff State of Minnesota re-alleges and incorporates by reference the allegations in all of the paragraphs above.

231.    Each Defendant's course of conduct as alleged herein—including (i) entering and maintaining agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on loyalty, (ii) enforcing and threatening enforcement of loyalty conditions or otherwise threatening penalties for disloyalty, and (iii) ███████████████████████████████ ████████ restrain trade, in violation of Minnesota Statutes Section 325D.53. Minn. Stat. § 325D.53, subd. 1(1) ("[T]he following shall be deemed to restrain trade or commerce unreasonably and are unlawful: . . . [a] contract, combination, or conspiracy between two or more persons in competition: (a) for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price, rate, or fee of any commodity or service; (b) affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service; or (c) allocating or dividing customers or markets, functional or geographical, for any commodity or service."); Minn. Stat. § 325D.53, subd. 1(3) ("[T]he following shall be deemed to restrain trade or commerce unreasonably and are unlawful . . . A contract,

combination, or conspiracy between two or more persons refusing to deal with another person . . . .").

## D.  REQUEST FOR RELIEF

232.    Defendants' acts as alleged herein violate the Minnesota Antitrust Law of 1971, Minnesota Statutes sections 325D.49-.66. Plaintiff State of Minnesota seeks relief, including but not limited to the following:

(a)    Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents, or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from engaging in conduct in violation of Minnesota Statutes sections 325D.49-.66;

(b)    Awarding judgment against Defendants for disgorgement under the *parens patriae* doctrine, the general equitable powers of this Court, Minnesota Statutes section 8.31, and any other authority;

(c)    Awarding judgment against Defendants for civil penalties pursuant to Minnesota Statutes sections 8.31, subd. 3, and 325D.56; and

(d)    Costs and reasonable attorneys' fees under Minnesota Statutes sections 325D.57 and 8.31, subd. 3a.

## COUNT XI

## VIOLATIONS OF NEBRASKA STATE LAW

233.    Plaintiff State of Nebraska re-alleges and incorporates by reference the

allegations in all of the paragraphs above.

(a)    *Unfair Methods of Competition*. Each Defendant's course of conduct

as alleged herein—including (i) entering and maintaining agreements with

distributors and retailers for the sale of crop-protection products that condition

exclusion payments on loyalty; (ii) enforcing and threatening enforcement of

loyalty conditions or otherwise threatening penalties for disloyalty; and (iii)

██████████████████████████████████

████████—constitutes an unfair method of competition, in violation of § 59-

1602 of the Nebraska Consumer Protection Act.

(b)    *Unlawful Rebates*. Each Defendant has provided rebates in the sale

of crop-protection products on the condition that distributors and retailers not use

or deal in the goods of generic competitors in accordance with loyalty terms,

resulting in a substantial lessening of competition in all applicable Relevant

Markets and tending to create monopolies in Relevant Markets for azoxystrobin,

metolachlor, mesotrione, rimsulfuron, and oxamyl, as applicable, in violation of §

59-1605 of the Nebraska Consumer Protection Act.

(c)    *Unreasonable Restraint of Trade*. Each Defendant's agreements

with distributors and retailers for the sale of crop-protection products that

condition exclusion payments on loyalty and ███████████████████ ████████████████████████████████ are unreasonable restraints of

trade, in violation of § 59-1603 of the Nebraska Consumer Protection Act.

(d)  *Unlawful Monopoly Maintenance.* At all times relevant to assessing

its conduct, Syngenta has had monopoly power in Relevant Markets for

azoxystrobin, metolachlor, and mesotrione. At all times relevant to assessing its

conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron

and oxamyl. Each Defendant has maintained its monopoly power through a course

of anticompetitive and exclusionary conduct—including (i) entering and

maintaining agreements with distributors and retailer that contain loyalty

requirements; (ii) enforcing and threatening enforcement of loyalty requirements

or otherwise threatening penalties for disloyalty; and (iii) ████████████████

████████████████████████████████████████████████

██████████—in violation of § 59-1604 of the Nebraska Consumer Protection

Act.

(e)  These violations have had direct and indirect impacts upon the State

of Nebraska, and its citizens have been injured and continue to be injured by

Defendants' unlawful conduct. Accordingly, Plaintiff State of Nebraska, on behalf

of it itself and as *parens patriae* for all citizen within the state, seeks all relief

available under the Nebraska Unlawful Restraint of Trade Act, the Nebraska

COMPLAINT

Consumer Protection Act, Neb. Rev. Stat. § 84-212, 15 U.S.C. 15c, and 15 U.S.C. § 26.

(f)     Plaintiff State of Nebraska is entitled to relief including, but not limited to, treble damages, disgorgement, civil penalties, equitable relief, injunctive relief, and its costs and attorney's fees pursuant to Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1610, 59-1614, 84-212; 15 U.S.C. 15c, and 15 U.S.C. § 26.

## COUNT XII

## VIOLATIONS OF OREGON STATE LAW

234.    Plaintiff State of Oregon, acting by and through its Attorney General, Ellen Rosenblum (the "State of Oregon"), re-alleges and incorporates by reference the allegations in all of the paragraphs above.

235.    The acts alleged above constitute violations of the Oregon Antitrust Law, Oregon Revised Statutes ("ORS") 646.705 to ORS 646.836. These violations have had impacts within the State of Oregon and substantially affected the people of Oregon.

236.    The State of Oregon appears in its sovereign or quasi-sovereign capacities and under its statutory, common law, and equitable powers, and as *parens patriae* on behalf of natural persons residing in the State of Oregon pursuant to Section 4 C of the Clayton Act, 15 U.S.C. § 15c. The State of Oregon seeks all remedies available under federal law and the Oregon Antitrust Law, including, without limitation, the following:

(a)     Disgorgement and other equitable and monetary relief pursuant to federal law including Section 4 of the Sherman Act, 15 U.S.C. § 4, in addition to ORS 646.770 and ORS 646.775;

(b)     Injunctive and other equitable relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, ORS 646.760, ORS 646.770, and ORS 646.775.

(c)     Civil penalties pursuant to ORS 646.760(1) which provides that a court may assess for the benefit of the state a civil penalty of not more than $250,000 for each violation of the Oregon Antitrust Law,

(d)     Costs of suit, including expert witness fees, costs of investigation, and attorney's fees pursuant to Section 4 C of the Clayton Act, 15 U.S.C. § 15c(d), Section 16 of the Clayton Act, 15 U.S.C. § 26, ORS 646.760, ORS 646.770, ORS 646.775; and

(e)     Other remedies as the court may deem appropriate under the facts and circumstances of the case.

## COUNT XIII

## VIOLATIONS OF TEXAS STATE LAW

237.   Plaintiff State of Texas re-alleges and incorporates by reference the allegations in all of the paragraphs above.

238.   The acts alleged above constitute illegal restraints of trade or commerce in Texas pursuant to Tex. Bus. & Com. Code § 15.05(a) and § 15.05(b).

239.   Plaintiff State of Texas is entitled to an injunction, disgorgement, and civil penalties and any other remedy available at law for these violations.

80                                        COMPLAINT

## COUNT XIV

## VIOLATIONS OF WISCONSIN STATE LAW

240.    Plaintiff State of Wisconsin repeats and re-alleges each and every allegation in all of the paragraphs above.

241.    Defendants' acts violate Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 *et seq*. These violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

242.    Plaintiff State of Wisconsin, under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to an injunction, disgorgement, civil penalties, and any other remedy available at law for these violations pursuant to Wis. Stat. §§ 133.03, 133.14, and 133.16.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the FTC and the States of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Texas, and Wisconsin respectfully request that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; California's Cartwright Act, California Business and Professions Code § 16700 *et seq.*, and California's Unfair Competition Law, California Business and Professions Code § 17200 *et seq.*; the Colorado Antitrust Act, C.R.S. § 6-4-104 and C.R.S. § 6-4-105; Section 7 of the Illinois Antitrust Act 740 ILCS 10/1 *et seq.*; the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*; the Indiana Antitrust Act, Ind. Code § 24-1-2-1; the Iowa Competition Law, Iowa Code Chapter 553, and the Iowa Consumer Fraud Act, Iowa Code § 714.16; the Minnesota Antitrust Law of

81                                    COMPLAINT

1971, Minnesota Statutes Sections 325D.49-.66; the Nebraska Consumer Protection Act, §§ 59-1604 *et seq*. and Neb. Rev. Stat. § 84-212; the Oregon Antitrust Law, Oregon Revised Statutes 646.705 to 646.836; Sections 15.20(a) and 15.20(b) of the Texas Business and Commerce Code and Section 402.006 of the Texas Government Code; and the Wisconsin Antitrust Act, Wis. Stat. Ch. § 133.03 *et seq*.; and as authorized by its own equitable powers, enter final judgment against Defendants, declaring, ordering, and adjudging:

1. That each Defendant's conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

2. That each Defendant's conduct violates Section 3 of the Clayton Act, 15 U.S.C. § 14;

3. That each Defendant's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

4. That each Defendant's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

5. That each Defendant's conduct violates applicable California state law;

6. That each Defendant's conduct violates applicable Colorado state law;

7. That each Defendant's conduct violates applicable Illinois state law;

8. That each Defendant's conduct violates applicable Indiana state law;

9. That each Defendant's conduct violates applicable Iowa state law;

10. That each Defendant's conduct violates applicable Minnesota state law;

11.     That each Defendant's conduct violates applicable Nebraska state law;

12.     That each Defendant's conduct violates applicable Oregon state law;

13.     That each Defendant's conduct violates applicable Texas state law;

14.     That each Defendant's conduct violates applicable Wisconsin state law;

15.     That each Defendant is permanently enjoined from engaging in its unlawful conduct;

16.     That each Defendant is permanently enjoined from engaging in similar and related conduct in the future as to all crop-protection products and active ingredients;

17.     That the Court grant Plaintiff States equitable monetary relief pursuant to applicable state and federal law;

18.     That the Court grant such other equitable relief as the Court finds necessary to redress and prevent recurrence of each Defendant's violations, as alleged herein;

19.     That the Court issue civil penalties as sought by Plaintiff States of Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Texas, and Wisconsin, and grant monetary damages as sought by Plaintiff States of Illinois and Nebraska, as applicable;

20.     That the Court grant Plaintiff States an award of the cost of suit, including reasonable attorneys' fees and costs.

Dated: September 29, 2022   Respectfully submitted,

         /s/ James H. Weingarten

Of counsel:      JAMES H. WEINGARTEN (DC Bar No. 985070)
         Deputy Chief Trial Counsel
HOLLY VEDOVA    Federal Trade Commission
Director       Bureau of Competition
         600 Pennsylvania Avenue, NW
RAHUL RAO     Washington, DC 20580
Deputy Director    Telephone: (202) 326-3570
         Email: jweingarten@ftc.gov
Federal Trade Commission
Bureau of Competition   GEOFFREY M. GREEN
         Assistant Director

         MARK J. WOODWARD
         Deputy Assistant Director

         MICHAEL J. TURNER
         JOSEPH R. BAKER
         WESLEY G. CARSON
         RACHEL S. FRANK
         ELIZABETH A. GILLEN
         PHILIP J. KEHL
         LAUREN B. PATTERSON
         EDWARD H. TAKASHIMA
         Attorneys

         Bureau of Competition

         *Attorneys for Plaintiff Federal Trade Commission*

84

COMPLAINT

FOR PLAINTIFF STATE OF CALIFORNIA

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE MANZO
Supervising Deputy Attorney General

/s/ Nicole S. Gordon
NICOLE S. GORDON
California Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94610
Telephone: (415) 510-4400
Email: nicole.gordon@doj.ca.gov

*Attorneys for Plaintiff State of California*
*Notice of Special Appearance forthcoming*

FOR PLAINTIFF STATE OF COLORADO

PHILIP J. WEISER
Attorney General

/s/ Carla J. Baumel
JAN M. ZAVISLAN
Senior Counsel
CARLA J. BAUMEL
CONOR J. MAY
Assistant Attorneys General
Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Jan.Zavislan@coag.gov
        Carla.Baumel@coag.gov
        Conor.May@coag.gov

*Attorneys for Plaintiff State of Colorado*
*Notice of Special Appearance forthcoming*


FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General

/s/ Paul J. Harper
PAUL J. HARPER
Assistant Attorney General, Antitrust
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Telephone: (312) 814-3000
Email: paul.harper@ilag.gov

*Attorneys for Plaintiff State of Illinois*
*Notice of Special Appearance forthcoming*

86                                    COMPLAINT

FOR PLAINTIFF STATE OF INDIANA

THEODORE E. ROKITA
Attorney General

/s/ Matthew Michaloski
MATTHEW MICHALOSKI
Deputy Attorney General
SCOTT BARNHART
Chief Counsel and Director of Consumer
Protection
Office of the Indiana Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 234-1479
Email: matthew.michaloski@atg.in.gov
        scott.barnhart@atg.in.gov

*Attorneys for Plaintiff State of Indiana*
*Notice of Special Appearance forthcoming*


FOR PLAINTIFF STATE OF IOWA

TOM MILLER
Attorney General

/s/ Noah Goerlitz
NOAH GOERLITZ
BRYCE PASHLER
Assistant Attorneys General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Telephone: (515) 725-1018
Email: noah.goerlitz@ag.iowa.gov
        bryce.pashler@ag.iowa.gov

*Attorneys for Plaintiff State of Iowa*
*Notice of Special Appearance forthcoming*

COMPLAINT

FOR PLAINTIFF STATE OF MINNESOTA

KEITH ELLISON
Attorney General

JAMES W. CANADAY
Deputy Attorney General

/s/ Katherine Moerke
KATHERINE MOERKE
JASON PLEGGENKUHLE
ELIZABETH ODETTE
Assistant Attorneys General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Telephone: (651) 296-3353
Email: james.canaday@ag.state.mn.us
      katherine.moerke@ag.state.mn.us
      jason.pleggenkuhle@ag.state.mn.us
      elizabeth.odette@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*
*Notice of Special Appearance forthcoming*

FOR PLAINTIFF STATE OF NEBRASKA

DOUGLAS J. PETERSON
Attorney General

/s/ Joseph M. Conrad
JOSEPH M. CONRAD
COLIN P. SNIDER
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, NE 68509
Telephone: (402) 471-3840
Email: Joseph.conrad@nebraska.gov
          Colin.Snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*
*Notice of Special Appearance forthcoming*


FOR PLAINTIFF STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

/s/ Timothy D. Smith
TIMOTHY D. SMITH
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market St
Portland, OR 97201
Telephone: (503) 934-4400
Email: tim.smith@doj.state.or.us

*Attorneys for Plaintiff State of Oregon*
*Notice of Special Appearance forthcoming*

89                                    COMPLAINT

FOR PLAINTIFF STATE OF TEXAS

KEN PAXTON
Attorney General

/s/ Margaret Sharp
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney General
SHAWN E. COWLES
Deputy Attorney General for Civil Litigation
JAMES LLOYD
Chief, Antitrust Division
TREVOR YOUNG
Deputy Chief, Antitrust Division
MARGARET SHARP
WILLIAM SHIEBER
Assistant Attorneys General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, TX 78701
Telephone: (512) 936-1674
Email: Margaret.Sharp@oag.texas.gov

*Attorneys for Plaintiff State of Texas*
*Notice of Special Appearance forthcoming*

90                                        COMPLAINT

FOR PLAINTIFF STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General

/s/ Laura E. McFarlane
LAURA E. MCFARLANE
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-8911
Email: mcfarlanele@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*
*Notice of Special Appearance forthcoming*