# Exhibit F

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

CHUCK DAY FARMS
PARTNERSHIP,

     Plaintiff,

v.

SYNGENTA CROP PROTECTION
AG; SYNGENTA CORPORATION;
SYNGENTA CROP PROTECTION,
LLC; CORTEVA, INC.; BASF SE;
BASF CORPORATION; BASF
AGRICULTURAL PRODUCTS
GROUP; NUTRIEN AG
SOLUTIONS, INC., HELENA
AGRI-ENTERPRISES, LLC; and
DOE CO-CONSPIRATOR
DISTRIBUTORS AND RETAILERS
1-200,

     Defendants.

Case No. _____

## CLASS ACTION COMPLAINT

1.     Farmers in the United States have paid and continue to pay inflated prices for crop protection products due to the unlawful conduct of: (1) Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta"), BASF SE, BASF Corporation and BASF Agricultural Products Group (collectively "BASF"), and Corteva, Inc. ("Corteva") (referred to herein collectively as the "Manufacturer Defendants"); (2) Co-conspirator Distributor Defendants Nutrien AG Solutions, Inc. ("Nutrien"); and Helena Agri-Enterprises, LLC. ("Helena"); (collectively, "Distributor Defendants"); (3) Doe Defendant Co-conspirator Distributors (referred to, together with the Distributor Defendants, as the "Co-conspirator Distributors"); (4) and retailers that participate in the loyalty programs described

herein ("Retailers"). All of these of entities are referred to collectively herein as "Defendants"

2.      For many years, the Manufacturer Defendants unfairly impeded competitors and artificially inflated the prices that United States farmers pay for certain crop protection products. The Manufacturer Defendants developed what they called "loyalty" or "rebate" programs with cooperating Co-conspirator Distributors and Retailers. These programs are exclusive dealing arrangements that contravene Section 3 of the Clayton Act  (15 U.S.C. § 14). While Plaintiffs will use the nomenclature "loyalty programs" throughout this Complaint, their true unlawful nature should be kept in mind. These programs substantially hindered access by farmers to lower-cost generic alternatives.  The Manufacturer Defendants' respective loyalty programs have resulted in the stifling of generic competition and have preserved their monopoly power in connection with certain crop protection products, despite expired patent.  Such unlawful conduct has resulted in and continues to cause substantial monetary damages to farmers across the country.

3.      Chuck Day Farms Partnership (hereinafter "Plaintiff") seek to recover damages in the form of overcharges incurred by themselves and the Classes defined herein due to the Manufacturer Defendants', Co-conspirator Distributors', and Retailers' violations of the antitrust laws in the markets for certain crop protection products. The Manufacturer Defendants engaged in conspiracies to illegally extend and maintain their respective monopolies in certain crop protection products with the Co-conspirator Distributors and Retailers by entering into loyalty programs to delay generic competition, in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 14). For these claims, Plaintiff and members of the Classes described herein seek treble damages and injunctive relief under 15 U.S.C. §§ 15 and 26, and other just relief.

4.     As a result of Defendants' anticompetitive conduct, Plaintiff and Members of the Classes paid more for certain crop protection products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

5.     Plaintiff makes the allegations herein concerning themselves based on personal knowledge and upon investigation and information and belief as to all other matters.

## I.     NATURE OF THE CASE

6.     Every year, farmers in the United States purchase over ten billion dollars of crop protection products (which include agricultural "pesticides"), crucial farm inputs that improve crop yields and food security for everyone in the United States and its territories (hereinafter referred to as the "United States"). And every year, United States farmers pay more than they should for these products because of the Manufacturer Defendants' exclusive dealing arrangements.

7.     The Manufacturer Defendants have designed these loyalty programs specifically for the purpose of excluding and marginalizing competitive generic products, which enables the Manufacturer Defendants to maintain excessive, supra-competitive prices.

8.     The Manufacturer Defendants conspired with the Co-conspirator Distributors and Retailers to execute these programs.  This conspiracy caused and continues to cause farmers to overpay for these crucial inputs.

9.     As described in more detail below, Congress has enacted a comprehensive regulatory regime for the crop protection industry that promotes the twin goals of product innovation and price competition.

10.     "Basic" manufacturers like the Manufacturer Defendants initially develop, patent, and register the active ingredients ("AI") of crop protection products. They can then extend the

commercial potential of their innovations through lawfully obtained exclusive rights for a period of years. After those patent and regulatory exclusivity periods expire, generic manufacturers can enter the market with equivalent products containing the same AI, relying upon the same toxicology and environmental impact data first developed by those basic manufacturers. Once generic penetration is initiated, such competition from generic products predictably leads to dramatic price reductions, which benefits not only generic manufacturers, but also United States farmers and consumers.

11.     Defendants systematically undermined and frustrated the goals of this system. When patent exclusivity periods for their crop protection products expired and generic manufacturers threatened to launch lower-priced competing products, the Manufacturer Defendants used their loyalty programs to unlawfully boycott and or exclude generic manufacturers from the traditional distribution channel—a critical link between manufacturers and farmers.

12.     Under their respective programs, the Manufacturer Defendants offered each Co-conspirator Distributor—collectively comprising over 80% of all sales at the wholesale level—substantial payments conditioned on each Co-conspirator Distributor's or Retailer's sales of branded crop protection products and their agreement to limit sales by Co-conspirator Distributors of comparable generic products to a set low percentage share. These written loyalty program agreements explicitly identify these sales thresholds as provided below.

13.     The Manufacturer Defendants labeled these payments "rebates" or "incentives" for "loyalty." Indeed, these payments were rewards for excluding or limiting competition by the Manufacturer Defendants' generic competitors.

14.     This exclusion or limitation of generic competition predictably resulted in, among

other things, higher prices for the Plaintiff and United States farmers than would have otherwise prevailed. Co-conspirator Distributors and Retailers participated in the loyalty programs, both because the Manufacturer Defendants offered rewards for participation, and because these Co-conspirator Distributors and Retailers profited more highly than they otherwise would have by selling lower-priced generic products.

15.     The Co-conspirator Distributors and Retailers dominate the sale of crop protection products in the United States. Thus, the scheme among the respective Manufacturer Defendants, the Co-conspirator Distributors, and the Retailers has substantially foreclosed generic competitors from efficient distribution of their products.

16.     The Manufacturer Defendants expressly designed their programs to maintain their respective ability to price their respective products at issue above competitive levels while still unlawfully retaining large market shares. The Manufacturer Defendants thus enjoyed outsized profits at the expense of farmers during the "post-patent" period—when prices for farmers would otherwise fall substantially.

17.     The Manufacturer Defendants' loyalty programs enabled each of them to maintain high prices and dominant market positions years after exclusivity for an off-patent AI. The Manufacturer Defendants' schemes forced some generic manufacturers to exit markets encumbered by loyalty programs or to decide not to enter those markets directly as a result of those programs. Even when Co-conspirator Distributors or Retailers offered competing generics, their agreements with the Manufacturer Defendants restricted the sale of these generics to minimal volumes, forcing the generic manufacturers to market their products through less efficient channels of distribution.

18.     Absent the Manufacturer Defendants', the Co-conspirator Distributors', and the

Retailers' unlawful conduct, the Manufacturer Defendants would have faced increased generic competition, which would lead to increased choice and lower prices for U.S. farmers. Unless these practices are enjoined, U.S. farmers will be denied this access.

## II.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 26.

20.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c) because during the Class Period, Defendants transacted business throughout the United States, including in this Judicial District.

21.     During the Class Period, the Manufacturer Defendants sold and shipped certain crop protection products in a continuous and uninterrupted flow of interstate commerce, which included sales of certain crop protection products in the United States, including in this Judicial District.  The Manufacturer Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this Judicial District.

22.     Likewise, the Co-Conspirator Distributors and the Retailers are geographically dispersed across the United States. They sold and shipped certain crop protection products in a continuous and uninterrupted flow of interstate commerce, which included sales of certain crop protection products in the United States, including in this Judicial District.  The Co-Conspirator Distributors' and the Retailers' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States.

23.     In addition, Corteva, Inc. maintains its corporate headquarters in the state of Indiana.

## III.    THE PARTIES

24.    Plaintiff Chuck Day Farms Partnership is a partnership formed under the laws of Arkansas. Plaintiff Chuck Day Farms Partnership owns and operates farmland in Arkansas. Plaintiff Chuck Day Farms Partnership directly purchased products at issue in this action from one or more of the alleged Co-conspirator Distributors.

25.    Defendant Syngenta Crop Protection AG is a company headquartered in Basel, Switzerland with its North American headquarters in Greensboro, North Carolina.  Defendant Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG headquartered in Wilmington, Delaware. Syngenta Corporation is a corporation organized and operating under the laws of the State of Delaware.

26.    Defendant Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It is headquartered in Greensboro, North Carolina and is also a corporate affiliate of Syngenta Crop Protection AG.

27.    Defendant Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC all transact or have transacted business in this Judicial District. Furthermore, each engages in the development, manufacture, and sale of certain crop protection products.

28.    Defendant Corteva is a publicly held corporation with its headquarters in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"), which merged in 2017. Corteva is a corporation organized and existing under the laws of the State of Delaware.

29.    Corteva is located and transacts or has transacted business in this Judicial District and is engaged in the development, manufacture, and sale of certain crop protection products.

30.     Defendant BASF SE is a multinational global chemical company headquartered in Ludwigshafen, Germany. It is the largest chemical producer in the world. It transacts business in this Judicial District through its subsidiaries and divisions.

31.     Defendant BASF Corporation, headquartered at 100 Park Avenue, Florham Park, New Jersey 07932, is the North American affiliate of BASF SE.

32.     Defendant BASF Agricultural Products Group is a division of BASF SE and is headquartered at 14385 West Port Arthur Road, Beaumont, Texas. It transacts or has transacted business in this Judicial District.

33.     Defendant Nutrien is a national wholesale distributor and retailer of crop protection products, including some or all the products at-issue in this action, with its corporate offices located in Loveland, Colorado.  Nutrien transacts or has transacted business in this Judicial District.  Nutrien is a corporation organized and existing under the laws of the State of Delaware.

34.     Defendant Helena describes itself as one of the nation's foremost agricultural distributors.  It is headquartered in Collierville, Tennessee, and among other things, it distributes crop protection products, including some or all of the products at-issue in this action.  Helena transacts or has transacted business in this Judicial District.  Helena is a corporation organized and existing under the laws of the State of Delaware.

35.     The identities of the Doe Defendants referenced in this Complaint are unknown to the Plaintiff at this time, and Plaintiff will amend this complaint once they obtain more information allowing them to be identified. The Doe Defendants consist of additional Co-conspirator Distributors and Retailers who participated in and benefitted from the Manufacturer Defendants' loyalty programs.

## IV.    INDUSTRY BACKGROUND

### A.    Crop Protection Products.

36.    Most pesticides sold in the United States are used for crop protection.  They can kill or control pests, *i.e.*, diseases, weed, insects, and other organisms. As used herein, and consistently with industry practice, the term "pesticides" refers collectively to insecticides (including nemanticides), herbicides, and fungicides.

37.    Pesticides are frequently used by farmers to prevent the harm that pests cause to their crops.  The pesticides used for crop protection are referred to herein as "certain crop protection products."  Certain crop protection products are essential for farming as their use substantially boost quality and crop yields for reliable food supply.

38.    Crop protection products fall into the following three primary categories: (1) herbicides to target plants or weeds; (2) insecticides (including nematicides) to target insect infestations; and (3) fungicides to target fungal diseases. Though each type of crop protection product has a separate target, all are still referred to generally as pesticides in common vernacular and within this complaint.

39.    Every crop protection product includes one or more AI.  AIs are chemical substances that kill or reduce the targeted pest. A crop protection product contains at least one AI, which is the chemical substance that kills or controls the targeted pest. A finished crop protection product is comprised of an AI and an inert component (water, adjuvants, surfactants, or other active ingredients).  Final products with one active ingredient are considered "straight goods" and products with at least two active ingredients are considered "mixtures."

40.    AIs may be sold individually in "technical grade" or for "manufacturing use," before being formulated into a completed crop protection product. Additional processing,

however, is necessary before they can be used by farmers as final crop protection products.

41.     Several criteria serve to distinguish one AI from another. These include: (a) the pest(s) targeted by an AI; (b) the effectiveness of an AI at controlling the targeted pest, which is often measured in terms of crop yield improvements; (c) the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; (d) the stage of the growing cycle at which an active ingredient may be used; and (e) the performance of an active ingredient under prevailing climate and weather conditions.

42.     Each AI has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest. While AIs that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or a given condition. Farmers may prefer one AI over another for various reasons, including the specific performance characteristics of the active ingredient or a farmer's past success with an active ingredient. As a result, a chemically equivalent generic crop-protection product is a closer substitute for a given branded product than is a product containing a different AI.

43.     The market value for all Crop Protection Products was estimated to be $12.1 billion in 2019.  Herbicides accounted for about two-thirds of that amount, with sales estimated at $8.32 billion.  Insecticides had estimated sales of $1.7 billion, and fungicides at $1.95 billion.[1]

**B.      Crop Protection Product Manufacturers.**

44.     The Manufacturer Defendants formulate, market, and sell crop protection

---

[1] The US Agrochemical Market: Channel Facing Pressure of Profitability and Consolidation, New Commercial Approach Emerges, www.agropages.com (Oct. 16, 2020) (last accessed on Oct. 21, 2022).

products. Crop protection product manufacturers either synthesize the active ingredients for their formulated products in their own facilities or obtain the AI from other chemical manufacturers.

45.     The Manufacturer Defendants are called "basic" manufacturers. A basic manufacturer in the crop protection product market will research, develop, and patent new AIs. The Manufacture Defendants are among the largest crop protection product manufacturers in the United States, as well as globally.

46.     Generic manufacturers of crop protection products alternatively sell products that contain AI created by others following the expiration of any patents or regulatory exclusivity periods (also known as "post-patent" AI). Well over a dozen generic manufacturers sell crop protection products in the United States.

**C.     The Regulatory Process for Crop Protection Products.**

47.     Congress enacted a patent and regulatory framework to govern crop protection products.[2] The regulations grant developers of new AI exclusivity from competition for that active ingredient for a period of twenty years.

48.     The regulations also facilitate generic entry upon the expiration of the exclusivity periods. To ensure the safety of new, innovative crop protection products, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") requires submission, review, and approval by the United States Environmental Protection Agency ("EPA") prior to the sale or distribution of any pesticide to ensure product safety in the United States.

49.     After the EPA approves a new active ingredient, the original registrant (usually a basic manufacturer) gains the exclusive right to cite the data it submitted in support of the active ingredient for a baseline period of ten years. Frequently, this regulatory exclusive-use period

---

[2] *See* http://npic.orst.edu/reg/laws.html (last accessed on October 20, 2022).

extends the basic manufacturer's patent term and its right to the exclusive provision of products containing that AI. Following the patent and exclusivity, a generic manufacturer can enter the market with crop protection products containing the AI. In doing so, it has to pay the basic manufacturer of the branded product for access to its data concerning the product. The cost of such access is called data compensation costs and can be as high as multiple millions of dollars.

### D. The Traditional Distribution Channel.

50.     Within the crop protection products market, a manufacturer sells to a distributor who then sells to numerous retail outlets, including its own retailers, that have a strong farmer customer base. This method is known as the traditional distribution channel, or just the "channel." It is illustrated in the chart below.[3]



51.     Over ninety percent of crop protection product sales in the United States occur through the traditional distribution channel. More than ninety percent of the traditional distribution channel is composed of just seven distributors. Those seven distributors account for

---

[3] From Shane Thomas, The Implications of Suing Corteva and Syngenta (Oct. 7, 2022), available at https://upstreamaginsights.substack.com/p/the-implications-of-ftc-suing-corteva?utm_source=profile&utm_medium=reader2 (last accessed on Oct. 20, 2022),

roughly eighty percent of crop protection product sales in the United States.

52.    The most efficient way for a crop protection product manufacturer to sell its product is through this traditional channel because: (a) distributors provide access to a network of retail and farmer customers and the logistics networks to service a broad range of customers; (b) manufacturers can reach thousands of retailers and farmers through selling to only a limited number of distributors; and (c) distributors offer helpful services and functions including warehousing, transportation, credit, and marketing.

**E.    Life Cycle Management of Crop Protection Products.**

53.    When the market is operating without interference, generic crop protection products are typically priced substantially lower than their branded counterparts. When a generic manufacturer obtains market access through a traditional channel, its entry into the market initiates price competition. Both price and sales volume for the branded products then adjust downward.

54.    To protect against downward pricing and loss of product profits associated with generic entry, as alleged herein the Manufacturer Defendants have employed strategies designed to inhibit generic entry after the end of patent and regulatory exclusivity, and to minimize the competitive impact of such entry on branded products containing the same AI. Efforts by the Manufacturer Defendants to incentivize Co-conspirator Distributors and Retailers to circumvent that entry through so-called "loyalty programs" are an instrumental part of those strategies.

**V.    MANUFACTURER DEFENDANTS' UNLAWFUL CONDUCT**

55.    The Manufacturer Defendants all used "loyalty programs," that is, exclusive dealing agreements, to stifle the distribution of competitive generic crop protection products. This conduct directly impeded Plaintiff and other farmers' access to less expensive generic crop

protection products. Manufacturer Defendants and Co-conspirator Distributors or Retailers utilized these loyalty programs with the purpose, intent, and understanding that the programs would hinder generic competition and keep their AI prices higher than they would have been in a market free from interference. Using these loyalty programs, the Manufacturer Defendants retained market prices and market share of their branded products at levels higher than would otherwise be attainable following patent and regulatory expiry.

56.     Under their respective loyalty programs, the Manufacturer Defendants offer substantial exclusion payments to Co-conspirator Distributors and some Retailers conditioned on their limiting their sales of generic crop protection products containing specified post-patent AI.

57.     The Manufacturer Defendants are among the top 20 global agrochemical companies.  For example, in Fiscal Year 2021, Syngenta was reported to be number one (with $13.3 billion in sales), BASF was reported to be number three (with $7.7 billion in sales), and Corteva was reported to be number four (with $7.2 billion in sales).[4]

58.     The Manufacturer Defendants' loyalty programs sidelined generic manufacturers, allowing the Manufacturer Defendants to maintain market share despite pricing their crop protection products above competitive levels. The programs allowed Co-conspirator Distributors and Retailers to reap profits from prolonged elevated pricing of the Manufacturer Defendants' branded pesticides. As to AIs that are the primary focus of this Complaint, each Manufacturer Defendant has substantially achieved and maintained its monopolistic goals through its loyalty program with Co-conspirator Distributors and Retailers. The Manufacturer Defendants have kept generic manufacturers from supplying meaningful competition which allowed the Manufacturer

---

[4] Upstream AG Insights For October 16, 2022, available at
https://upstreamaginsights.substack.com/p/upstream-ag-insights-october-16th?utm_source=profile&utm_medium=reader2 (last accessed October 20, 2022).

Defendants and their co-conspirators to raise, fix, maintain, or stabilize prices for certain crop protection products above competitive levels.

A.      **The Loyalty Programs.**

59.      Syngenta's loyalty program is called the "Key AI" program. Syngenta operates this program by agreement with its Co-conspirator Distributors and Retailers. BASF operates a similar program through what it now calls its "Share of Wallet" ("SOW") program with its Co-conspirator Distributors and Retailers. Corteva likewise operates a similar program through what it now calls its "Retailer Advantage" program with its Co-conspirator Distributors and Retailers.

60.      Regardless of the program name, each Manufacturer Defendant's program generates supra-competitive profits, which each Manufacturer Defendant partially shares with the Co-conspirator Distributors and Retailers. Consequently, farmers are left with higher-priced brand products and limited or no choice of available generic substitutes. By employing the exclusionary agreements, the Manufacturer Defendants have restricted access of farmers to the traditional distribution channel for those generic products.

B.      **Operation of and Adherence to Loyalty Programs.**

61.      The Manufacturer Defendants retained unlawful loyalty-program agreements with specific Co-conspirator Distributors. Those distributors account for 80% or more of all sales of crop protection products in the United States.

62.      The top seven sellers of crop protection products in the United States are, according to Crop Life, www.croplife.com: (1) Nutrien; (2) Helena; (3) SGS; (4) Growmark, Inc., based in Bloomington, IL; (5) Wilbur-Ellis Co., based in Aurora, CO; (6) CHS, based in Inver Grove, MN; and (7) Greenpoint, AG, based in Decatur, AL. On information and belief, and subject to confirmatory discovery, these entities all participated in the Manufacturer

Defendants' loyalty programs and are therefore alleged to be Co-conspirator Distributors. The Plaintiff purchased at-issue products from one or more of these entities or their associated Retailers.

63. The Manufacturer Defendants' agreements with Co-conspirator Distributors and Retailers provide exclusion payments in exchange for selling (and by prerequisite stocking) certain volumes of specific AIs. Whether labeled as "loyalty thresholds", "loyalty requirements" or described in terms of "qualifying EDI products volumes" (where the acronym "EDI" refers to "Environmental Data Initiative") these programs incentivize Co-conspirator Distributors and Retailers to drastically limit both their supply and sales of generic products for specific AIs.

64. Because the loyalty program incentive payments are so important to the Co-conspirator Distributors' and the Retailers' profits, the loyalty programs ensure that they can only sell minimal amounts of generic products to ensure they reach the obligatory thresholds. In some instances, these distributors are forbidden by the loyalty program agreements from purchasing any products from generic manufacturers. Some have deferred generic product purchases until the end of the season to make sure they meet the required threshold under the loyalty programs, leaving farmers without a reasonable choice of product during the time farmers most need it. The Manufacturer Defendants, the Co-conspiring Distributors and Retailers have firmly upheld the terms of their loyalty programs. If a Co-conspirator Distributor or Retailer fails to so restrict its sales of generic product, pursuant to the loyalty program agreement, it will be monetarily penalized.

65. The volume of sales by co-conspiring distributors assures participating distributors that no significant competing distributor will partner closely with lower-priced generic manufacturers.

### C. Loyalty Agreements: Their Operation and Effect.

66.     Over several years, Plaintiff have purchased multiple products, which are subject of the programs described below, from Co-Conspirator Distributors and or Retailers. Although the Manufacturer Defendants have used varying terminology and varying threshold requirements and EDI volumes as their programs developed, the unlawful intent and nature of these agreements has remained consistent.

#### 1.     Syngenta's "Loyalty Program."

67.     As early as 2004, Syngenta acted with Co-conspirator Distributors and Retailers to incentivize their stocking and sale of certain of its selected brand products to U.S. farmers. (Excerpts from the 2004 Syngenta LP are attached as Exhibit 1). The 2004 agreement covered AI products that are at issue here, as seen below:[5]



**2004 SOUTHERN FIELD CROPS**
R E T A I L E R   P R O G R A M

**Portfolio Sales Support**
*Rewards Retailers for their stewardship of Syngenta brands.*

| BRANDS | ACTIVITY | INCENTIVE |
|---|---|---|
| All participating Syngenta Crop Protection brands and pack sizes. Corn and cotton seed commercially treated with the Syngenta Seed Treatment product - Cruiser®. | • Purchase and sell Syngenta brands to growers | 4% |

**Bulk Support**
*Rewards Retailers for stewardship and investment in facilities for all Syngenta bulk brands.*

| BULK PRODUCTS | INCENTIVE | KEY DATES | ACTIVITY |
|---|---|---|---|
| Bicep II MAGNUM® brands, Dual MAGNUM® brands, and LUMAX™ | 10% | Dec. 31st, 2003 | Stewardship of Syngenta bulk brands: • Bulk site inspection & compliance • Retailer agrees to accept a minimum shipment by the Key Dates • Evergreen commitment for each tank and brand at each location. |
| AAtrex®, Boundary®, Expert™, Princep®, Sequence™ and Touchdown® brands except CF | 7% | | |
| Bravo®, Caparol® and Gramoxone Max™ | | Mar. 14th, 2004 | |
| Touchdown® CF | 5% | | |

---

[5] EX 1, 2004 Southern Field Crops Retailer Program.

68. To further maintain its monopoly, in this 2004 Loyalty Program agreement, Syngenta unlawfully targeted generics, incentivizing Retailers to block generic infiltration into the critical traditional distribution channel for many of its AIs.[6] As seen below, Syngenta explicitly targeted generic exclusion by "[r]eward[ing] Retailers for their loyalty to Syngenta brands where a generic alternative exists."

## Key Active Ingredient Support
*Rewards Retailers for their loyalty to Syngenta brands where a generic alternative exists.*

| ACTIVE INGREDIENTS | BRANDS | SYNGENTA THRESHOLD SHARE | INCENTIVE |
|---|---|---|---|
| Abamectin | Agri-mek®, Zephyr®, and Clinch® | | |
| S-metolachlor | Boundary®, Bicep II MAGNUM® brands, Dual MAGNUM® brands, Expert™, LUMAX™ and Sequence™ | 98% | |
| Paraquat | Gramoxone Max™ | | 5% |
| Lambda Cyhalothrin | Warrior® and Karate® | | |
| Flumetralin | Prime+® | 95% | |
| Chlorothalonil | Bravo® brands and Tilt®/Bravo® | | |
| Propiconazole | Orbit™ and Tilt® | 90% | |
| Mefenoxam | Ridomil Gold® brands | | |
| Prometryn | Caparol® | 85% | |

69. This 2004 Loyalty Program protected multiple AIs, including s-metolachlor, paraquat, and lambda cyhalothrin—each of which were purchased by the Plaintiff—by requiring retailers to meet up to a 98% threshold share in order to collect a 5% incentive payment. The threshold requirement meant that the participating retailer could not carry or sell greater than 2% of generic competitor products containing these AIs, essentially blocking any meaningful competing generic products from entering this point in the distribution chain.

70. Through additional incentive programs, Retailers could also achieve massive profits by meeting each "support" programs' mandatory stocking, selling, or blocking incentive

---

[6] *Id.*

requirements. The profits from the maximum incentive programs shown below would have translated into the millions[7]:

**Summary of Maximum Potential Incentives under 2004 Syngenta Southern Field Crops Retailer Offer.**

| BULK BRANDS | MAXIMUM INCENTIVE POSSIBLE |
|---|---|
| Bicep II MAGNUM® brands, Dual MAGNUM® brands and LUMAX™ | 19% |
| AAtrex®, Bravo® brands, Boundary®, Caparol®, Expert™, Gramoxone Max™, Sequence™ and Touchdown® brands | 16% |
| Princep® | 11% |
| Touchdown CF™ | 9% |
| **PACKAGE BRANDS** | **MAXIMUM INCENTIVE POSSIBLE** |
| Karate®, Tilt® and Warrior® | 14% |
| AAtrex®, Abound®, Agri-mek®, Amistar™, Bicep II MAGNUM® brands, Boundary®, Bravo® brands, Carnix™, Caparol®, Callisto™, Centric®, Clinch®, Curacron®, Cruiser® on commercially treated cotton seed, Denim™, Dual MAGNUM® brands, Envoke™, Expert™, Flexstar®, Force® 3G, Fusilade®, Fusion®, Gramoxone Max™, LUMAX™, Omega®, Orbit®, Platinum®, Platinum®/Ridomil Gold®, Prime+®, Proclaim®, Quadris®, Quadris®/Bravo®, Quilt™, Reflex®, Ridomil Gold® brands, Ridomil®/Bravo®, Sequence™, Suprend™, Tilt/Bravo®, Touchdown® brands except CF, Uniform™ (Quadris®/Ridomil Gold®), Zephyr® | 9% |
| All other participating package brands | 4% |

71. Importantly, although billed as a "Retailer" program, the program is reflective of the industry's blurred distinction between retailers and distributors. Syngenta defined "Retailers" as "a retail business which purchases Syngenta products from Syngenta or an authorized Syngenta Distributor who has been appointed by Syngenta to sell and service eligible Syngenta products within the retailer's geographic area and resells such products to growers." *Id*.

72. The program then uses the term "distributors," as shown below, when delineating the qualifications for participation in the same program[8]:

---

[7] Id.
[8] Id.

19

- Qualification and performance for this program are determined based on net EDI sales transactions as reported by an authorized Syngenta distributor and then sold to growers. Net EDI sales are defined as purchases in weight or volume minus any returns from a contracted Syngenta Distributor. Purchases from ineligible entities or unauthorized distributors will be disqualified and not included in qualification or payment. Any volumes determined by Syngenta to be 'brokered' will be disqualified.

- Sales from Retailer-to-Retailer do not qualify for qualification levels or program incentives.

- Distributors and Distributor-owned Retailers cannot claim sales to or from independent Retailers for qualification and or incentive payment under this program. Any sales made by a Distributor must be reported to Syngenta with accurate Retailer or 'end user' designation. Reporting sales to Retailers as 'end users' is fraud and will result in data being declared ineligible for consideration in this program. Reporting of excessive quantities that equate to more products than an 'end user' can use on his acreage will result in data being declared ineligible for consideration in this program. Sales to 'brokers' (including Internet brokers), and others that are not considered Retailers by definition in this program will be disqualified. Syngenta reserves the right to be the final authority in determining the validity of data and the inclusion of said data in this program.

73.     A similar 2016 Syngenta loyalty program agreement shows the continued scheme to protect its monopoly of "key AIs" by rewarding retailers for supporting certain Syngenta AIs when a generic alternative exists. (Excerpts from the 2016 Syngenta LP are attached as Exhibit 2). The image below shows continuation of incentives on older AIs and inclusion of new AIs.

## Section 2. Key Active Ingredient Support
Reward Retailers for their support of Syngenta products where a generic alternative exists.

| ACTIVE INGREDIENTS | PRODUCTS | RETAILER SUPPORT THRESHOLD | INCENTIVE |
|---|---|---|---|
| Mesotrione | Acuron, Callisto 4SC, Callisto GT, Callisto Xtra, Halex GT, Lexar EZ, Lumax EZ, Zemax | 99% | 5% |
| Clodinafop | Discover NG | 98% | |
| Azoxystrobin | Abound, Quadris, Quadris Opti, Quadris Top, Quadris Top SB, Quadris Top SBX, Quilt, Quilt Xcel, Uniform | 94% | 10% |
| Diquat | Reglone | 90% | 5% |
| Flumetralin | Prime+ | | |
| Fomesafen | Flexstar, Flexstar GT, Flexstar GT 3.5, Prefix, Reflex | | |
| Mefenoxam | Quadris Ridomil Gold, Ridomil Gold brands, Ridomil Gold Bravo | | |
| S-metolachlor (S-MOC) | Bicep II Magnum brands, Bicep Lite II Magnum, BroadAxe XC, Boundary, Dual Magnum, Dual II Magnum brands, Expert, Sequence | | |
| Abamectin | Agri-Flex, Agri-Mek SC | 85% | |
| Lambda Cyhalothrin | Karate with Zeon Technology, Warrior II with Zeon Technology | | |
| Paraquat | Gramoxone SL, Gramoxone SL 2.0 | | |

20

74.     The products above are listed by AI, including mesotrione, azoxystrobin,  s-metolachor, lambda cyhalothrin, and paraquat, all of which have been purchased by Plaintiff. Retailers are required to support each Syngenta AI at a certain threshold through sales of Syngenta's AI in order to receive an incentive (*i.e.*, a rebate).

75.     Thus, for example, to obtain the 5% incentive applicable to mesotrione, the retailer must achieve a threshold of 99% Syngenta mesotrione sales.  For azoxystrobin, the threshold is 98% and the incentive is even higher—10%.  And for s-metalachor, it is 90%. Older AIs, such as paraquat and lambda cyhalothrin, that once required a 98% threshold in 2004, still required an 85% threshold in 2016. Thus, the threshold and incentive amounts changed, but the objective did not.

76.     The purpose and effect of the 2016 loyalty program remained the same: in order to obtain the incentive, a retailer must virtually exclude generic products containing the AI from its inventory.  Such incentive payments are substantial amounts of income for the participating Co-conspirator Distributors and Retailers.

77.     As reflected in these documents, Syngenta polices these requirements rigorously. It starts by collecting data from the Retailers, which must provide information about their total net sales to farmers of Syngenta and generic products before Syngenta will make incentive payments to the Retailers. Syngenta provides Retailers with a handy digital calculator app to assist them in making sure they have correctly calculated the necessary support threshold. Syngenta reserves the right to verify the accuracy of the Retailers' math and to independently audit the threshold figures to confirm to Syngenta's satisfaction that the retailers have earned Syngenta's incentive award by selling the required percentages of Syngenta AI. Syngenta has had these programs over many years.

78.     As also reflected in these documents, Syngenta can at will modify the incentive system based on its determination of changes in the market and has full discretion to change the AI calculator at any time to reflect what Syngenta believes are the current marketplace conditions.  Syngenta's loyalty program thus deprives generic competitors of the ability to gain meaningful market share, as is intended.  Such suppression of generic market penetration causes the Plaintiff and US farmers to pay artificially maintained higher prices for these products.

**2.      BASF's EDI program and SOW program.**

79.     BASF's history of acting with Co-conspirator Distributors and Retailers has included utilizing EDI volumes goals to disincentivize co-conspirator's stocking and selling of competitor generic products and later incorporating its "Share of Wallet" program to accomplish the same objective.

80.     Like Syngenta, and in accordance with industry practice, BASF's 2004 loyalty program agreement encompassed actions by participating Retailers and Co-conspirator Distributors. (Excerpts from the 2004 BASF LP are attached as Exhibit 3.) As seen below, though BASF's program is labeled as a "Retailer Package Program", it also explicitly includes distributors under "Eligibility":[9]

---

[9] 2004 BASF Retailer Package Program.

**2004 BASF Retailer Package Program**

Effective: October 1, 2003

**Objective:**
To strengthen long-term, strategic, business relationships between BASF and Retailer accounts by rewarding local demand creation efforts and stewardship of BASF package brands. BASF endeavors to assist Retailers in growing their business with grower customers through product technology, convenient packaging and product support.

**Program Period:**
October 1, 2003 through September 30, 2004

**Effective Area:**
All states in the U.S. marketing area

**Eligibility:**
☐ All Retailers meeting the minimum BASF net sales dollars required for its defined geography reported through EDI by October 8, 2004.

☐ Only purchases from BASF Authorized Distributors will be eligible.

81. Under its 2004 program, BASF sought to exclude generic competition by incentivizing Retailers to maintain at least 90% of specific brand BASF sales from year to year. Incentives were based on "Net EDI sales defined as Authorized Distributor transmissions of product movement transactions" from October 1, 2003, through September 30, 2004.[10]

82. If a participant failed to obtain a 90% repeat of sales from years 2003 to 2004, BASF's offered rebate was halved, causing a loss of profits within the millions for any participating Retailer or Co-conspirator Distributor. The program's associated schedules are detailed below:

---

[10] *Id.*

| Payment Incentive: Base Payment Incentive: | Schedule A | Schedule B |
| --- | --- | --- |
| *Participating Incentivized BASF Package Brands* | If 2004 Total Qualified BASF Net EDI Sales (Bulk + Package) is **90% or Greater** Than Retailer's 2003 Total Qualified BASF Net EDI Sales | If 2004 Total Qualified BASF Net EDI Sales (Bulk + Package) is **Less Than 90%** of Retailer's 2003 Total Qualified BASF Net EDI Sales |
| Apogee®, Beyond™*, Cabrio® EG, Cadre® DG, Clarity®, Conclude Xact®, Counter™ CR and 15G, Distinct®, Facet®, Frontier®, G-Max Lite™, Guardsman®, Guardsman Max™*, Newpath®, Nexter®, Pentia®, Pix® Plus, Pix® Ultra, Ponnax®, Outlook®, Prowl® EC, Prowl® H₂O, Pursuit®, Pursuit® Plus, Raptor®, Regent®, Rezult®, Scepter®, Squadron®, Sovran®. | *12%* | *6%* |
| Acrobat® 50WP, Backdraft® SL, Celebrity Plus®, Extreme™, Marksman®, Paramount®, Pyramite®, Ronilan®, Steel®, Weedmaster®. | *8%* | *4%* |

* Brands repacked by distributors or shuttles filled by BASF will be paid at the same percentage as the package payment for that brand
** Excluding the states of WA, OR, ID, MT, CA, UT, NV

**2004 BASF Retailer Package Program Rules and Conditions:**

❑   Payment Incentives will be calculated at a Retailer's Operating Unit level.

❑   All Payment Incentives will be based on Net EDI Sales defined as Authorized Distributor transmissions of product movement transactions via EDI (purchases less returns) from October 1, 2003 to September 30, 2004.

83.     The program's requirement that Retailers and distributors essentially repeat their percentage of participating brand product sales from 2003-04, worked to ensure that there would be little remaining room in the market for the AIs at issue for any additional sales by generic competitor.

84.     The pesticide market is, by its very nature, a limited one. In each geographical region, there is a finite number of acres that require crop-protection products. Distributors and Retailers providing crop-protection products in their respective geographical areas are not likely to experience substantial increases in demand due to an increase in overall acres needing protection. The total amount of pesticides purchased and sold in any given year are likely to remain stable from year to year.

85.     By incentivizing Retailers and Co-conspirator Distributors to repeat their purchases and sales of BASF's selected AI products from year to year, within a 90% threshold, ensures that newly competitive generic AI products for protecting those same acres are not available through the traditional distribution chain to the farmers that need them.

86.     Included in BASF's 2004 loyalty program are multiple AI products, including the AI pendimethalin and its associated product Prowl, a product which Plaintiff purchased during the relevant time-period. By meeting the terms of BASF's loyalty program, participating Retailers and Co-conspirator Distributors received a 12% base pay incentive for maintaining 90% of its Prowl sales from 2003-2004.[11]

87.     In 2022, BASF continued its efforts to thwart generic intrusion of its key AI market into the traditional distribution channel through its adapted loyalty program, which it now called "SOW".[12] The 2021 Retailer Base Program is attached in its entirety as Exhibit 4. The BASF 2022 National Program Summary, with similar incentive programs and thresholds, is attached in its entirety as Exhibit 8.

88.     The term SOW indicates the percentage of sales of BASF branded products that a Retailer must achieve in order to earn the "Base Incentive" for the "AI Loyalty Brands." As with Syngenta, the program is policed through having the Retailer submit SOW percentages to BASF in order to be entitled to any incentive payments.

89.     This BASF 2020-21 loyalty program agreement required participants to maintain 90% and 95% thresholds on multiple brand products to receive its valuable SOW incentive. On page three of that agreement, BASF listed those AI products, all believed to be off-patent, which

---

[11] 2004 BASF Retailer Package Program.
[12] 2021 Retailer Base Program.

were subject to 90% or higher threshold requirement:

4. **AI Loyalty Requirement:**

| AI | BRANDS | SOW REQUIREMENT | ACTIVITY |
|---|---|---|---|
| BOSCALID | **Endura EG** fungicide, **Pristine EG** fungicide | 90% | |
| F500 | **Cabrio** fungicide, **Headline AMP** fungicide, **Headline EC** fungicide, **Headline SC** fungicide, **Merivon** fungicide, **Nexicor** fungicide, **Priaxor** fungicide, **Pristine EG** fungicide, **Revytek** fungicide, and **Veltyma** fungicide | 90% | BASF Authorized Retailer is required to submit SOW% through enrollment tool by **October 15, 2021** |
| GLUFOSINATE-AMMONIUM* | **Liberty** herbicide, **Noventa™** herbicide, and BASF sourced private label Glufosinate-ammonium | 90% | |
| IMAZAMOX | **Beyond** herbicide, **Raptor** herbicide, and **Varisto** herbicide | 95% | |
| PENDIMETHALIN | **Prowl 3.3 EC** herbicide, **Prowl H2O** herbicide and BASF sourced private label Pendimethalin | 90% | |

\* Glufosinate-ammonium loyalty requirement is waived for: AZ, CA, FL, ID, NV, OR, UT and WA.

a. In order to earn the Base Incentive on AI Loyalty Brands (listed above) an active ingredient Share of Wallet (SOW) is required at the thresholds indicated as the SOW Requirement:

- 90% SOW on Boscalid containing brands
- 90% SOW on F500 containing brands
- 90% SOW on Glufosinate-ammonium containing brands
- 95% SOW on Imazamox containing brands
- 90% SOW on Pendimethalin containing brands

### 3. Corteva's, And Its Predecessor DuPont's, EDI Volumes Programs.

90. Corteva, and its predecessor DuPont, used EDI volumes as the basis of its various programs to incentive participating Retailers and Co-conspiring Distributors to limit generic competition to its key AIs.

91. Prior to the merger of Dow and DuPont, the latter had in place a "DuPont Agricultural Retailer Sales & Service Incentive Offers" program that offered to retailers with incentive payments through profiting on DuPont crop protection products. (Excerpts from the 2005-2006 Du Pont LP are attached as Exhibit 5).

92. The program was implemented by rebates calculated with reference to "base incentives" and "additional incentives" that allowed Retailers to engage in "stewardship" for DuPont branded products, which meant selling less generic competitive products. Additionally,

prior to the merger, Dow also had a similar program of Retailers' "Stocking" and "Stewardship" for its branded products.

93.     The Stocking incentive required retailers to stock and sale a certain threshold percentage of certain of its brand products. Like BASF's EDI volumes program, this Stocking program required participants to stock and sell an amount of certain AI products based on the previous year's EDI, ensuring that only a minimum percentage of generic competition to those specific products would be able to enter that participant's chain of distribution. As seen in the image below, the stocking threshold for certain AIs reached up to 75% of the previous year's EDI volume:

## Stocking

Once the minimum requirement is met by the stocking date and sold by the end of the Market Year, payment is made on all net purchases during the program year.

| Product | Stocking Pay Rate | Min. Volume Customer Must Stock & Sell in 2005-2006 | Date |
|---|---|---|---|
| Sonalan® 10G herbicide | 4.5% | 8,000 lbs. | 11/15/05 |
| Sonalan HFP Bulk | 4.0% | 1,000 gallons | 11/15/05 |
| Dow AgroSciences Branded Acetochlor Bulk | 4.0% | 1,000 gallons | 12/5/05 |
| Dow AgroSciences Branded Acetochlor Custom Repack | 4.0% | Minimum repack order | 12/5/05 |
| Lorsban® 15G insecticide | 10.0% | 75% of 2004-2005 EDI | 12/5/05 |
| Treflan® TR-10® herbicide | 4.5% | 70% of 2004-2005 EDI | 12/5/05 |
| Glyphomax® XRT herbicide & Durango™ herbicide Bulk | 4.0% | 1,000 gallons | 2/15/06 |
| FirstRate® herbicide | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Glyphomax XRT & Durango Custom Repack | 4.0% | Minimum repack order | 3/15/06 |
| Glyphomax XRT & Durango package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Hornet® WDG herbicide | 3.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Pendimax® 3.3EC herbicide Bulk | 6.0% | 1,000 gallons | 3/15/06 |
| Pendimax 3.3EC Custom Repack | 6.0% | Minimum repack order | 3/15/06 |
| Pendimax Package | 6.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Python® WDG herbicide 4x2.5 lbs. | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Sonalan HFP Package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |

94.     As seen below, the same 2005-2006 program also offered a Stewardship incentive program for certain products that met an 80% EDI threshold:

4. Dow AgroSciences may make program progress payments during the 2005-2006 Market Year:
   (a) Progress payments are based on 80% of the stewardship earnings of participating products calculated from EDI-reported data available to Dow AgroSciences.
   (b) Final payment issued by December 31, 2006.
   (c) Following the program end date and final payment for the 2005-2006 program, any change in an EDI product value resulting in a negative program earning will be deducted from future Dow AgroSciences Retail Program earnings.

95.     In a 2015 Dupont loyalty program agreement, participants had to exceed their prior year's sales of specific AIs and products in exchange an additional profitable bonus offer. (Excerpts from the 2015 Dupont LP are attached as Exhibit 6). The 105% threshold seen below, meant that even fewer generic competitor products would be allowed to complete than the small percentage allowed under the program's terms the previous year.[13]

**Sales and Service Pays**
The Sales and Service Pays incentive is a reward for achieving total portfolio growth vs the prior year.

**Criteria**
- Qualify for the Retail Advantage - Sales and Service Incentive
- Earn 1% on total portfolio sales with growth of 105% over prior year.
- Earn another 1% on the total portfolio if sales growth of the following products collectively total 105% over prior year.
  - Afforia™, Aproach® Prima, Coragen®, Envive®, Fontelis®, LeadOff®, Prevathon®, Realm® Q and Vydate® C-LV.

---

[13] Dupont 2015 Retail Sales Advantage Program.

96.     Programs similar to the 2005-06 DuPont program are carried on by Corteva. Corteva's loyalty program agreement is reflected in the following page taken from its 2020-21 Retail Offers brochure:



97.     In order to obtain the rebates promised under this program, the Retailer must be a significant force in the market, with a minimum of $50,000 in Corteva sales during the previous year. The Retailer must also work closely with a Corteva Territory Manager, which would necessarily impede it from making any purchases of generic crop protection products

manufactured by generics that compete with Corteva branded products.[14] And the Retailer must submit valid grower data to Corteva consisting of an Excel data sheet reflecting purchases from it by growers.

98.     The subsequent pages in the Corteva loyalty program agreement include rebate data, *inter alia,* as follows: (1) products containing  rimsulfuron, sold under such Corteva brand names as Instigate and Matrix SG, with respective 7% or 10% rebates; (2) products containing oxamyl, sold under the brand names such as  Vydate C-LVand Vydate L, with 4% rebates; and (3) products containing acetochlor, sold under brand names such as  Keystone LA and Keystone LA NXT, Surpass NXT, Fultime, Resicore, Resolve Q, and Steadfast Q with respective rebates of 10%, 10%, 10%, 10%, 11%, and 11%.

**D.     Exclusive Loyalty Programs Detrimentally Affect United States Farmers.**

99.     In September of 2022, the Federal Trade Commission ("FTC"), joined by multiple state Attorneys General ("AGs") filed a lawsuit against Syngenta and Corteva over these practices. *Fed Trade Comm'n, et al. v. Syngenta Crop Protection, LLC, et al*., No. 22-cv-828 (M.D.N.C. Sept. 29, 2019) ("FTC Action"). The lawsuit and the separate joinder statements of state AGs unequivocally assert that, after an extensive investigation, Corteva is engaged in a scheme to minimize generic penetration of the markets for AIs used in crop protection by bribing Retailers through incentives that ensure they will sell little, if any, generic alternatives.

100.     The consequences for farmers like the Plaintiff are significant because generic competition translates into lower retail prices for affected crop protection products; thus Plaintiff's and farmers' income is directly negatively affected.

101.     In announcing his state's joinder in this action, the Minnesota AG stated:

> To encourage innovation, companies such as Syngenta and Corteva can

---

[14] *See* Exhibit 7, Corteva 2020-2021 Retailer Offers Brochure.

initially develop, patent, and register active ingredients in their products and exploit their commercial potential for several years. After those protections expire, generic manufacturers may enter the market with products with the same active ingredients and relying on the same toxicology and environmental impact studies. *This competition ordinarily leads to dramatic price reductions, benefiting farmers and consumers.* (Emphases added).[15]

102.    An op-ed piece by FTC Chair Lina Khan ("Khan"), published in the *Des Moines Register* explained the issue in greater detail:

> The scheme starts with patents. Companies like Syngenta and Corteva are in the business of inventing new active ingredients for pesticides. Each time they do, they get to patent that invention. A patent entitles an inventor to a 20-year period where only they are allowed to sell the invention. But there's a compromise: Once the patent expires, anyone is free to bring a generic version into the market. That's why when you have a headache, for example, you can choose between Tylenol and generic acetaminophen. When someone holds a patent they can generally charge high prices, given that nobody else can sell that product. But once the patent expires and generics come in, the original patent holder should have to compete with them, including on price.
>
> Syngenta and Corteva weren't satisfied with this compromise. They wanted to keep raking in big profits even after the patents expired. To do that, our lawsuit alleges, each company plotted to cut farmers off from cheaper generic alternatives. In general, manufacturers don't sell pesticides directly to farmers. They sell to distributors. Syngenta and Corteva realized that these distributors were a potential choke point. So they each launched "loyalty programs" in which distributors who bought their products would receive large payments, styled as a rebate. The catch: If those middlemen distribute too many generic pesticides, they don't get the money. In other words, distributors get paid to exclude generics.
>
> This works out the way you'd expect. Distributors don't want to miss the payments, so they go along with the program. After all, it doesn't hurt them to spend more on brand-name pesticides, because they get to pass those costs on to retailers and, ultimately, to farmers. With distributors under-stocking generics, farmers end up having little choice but to buy Syngenta and Corteva. And here is the payoff to the whole scheme: Because farmers are locked into buying their stuff, Syngenta and Corteva can keep charging inflated prices, as if their products were still under patent. The pesticide giants can make more profits by blocking rival products from the market

[15] Minnesota AG Press Release (Sept. 30, 2022), available at https://www.ag.state.mn.us/Office/Communications/2022/09/30_SyngentaCorteva.asp (Last accessed Nov. 10, 2022).

than by competing with them.[16]

103.    While Khan in her op-ed piece discussed Syngenta's and Corteva's arrangements with distributors, paragraphs 58-59, 76-77, 87, 96, 109, and 161 of the complaint filed in the FTC Action refer to similar arrangements with retailers.

104.    The difference in price between the branded product subject to a loyalty program and its generic substitute can be substantial; in some instances, the generic product's retail price can be 8% of the branded product's retail price.

### E.    The Manufacturer Defendants' Anticompetitive Activities Are Ongoing and Show No Sign of Ceasing.

105.    The Manufacturer Defendants and the Co-conspirator Distributors had the opportunity to discuss and coordinate their respective loyalty programs through CropLife America ("CLA"), the national trade association that represents the manufacturers, formulators and distributors of crop protection products. Only manufacturers and distributors of crop protection products are eligible for full membership in CLA. Corteva, BASF, and Syngenta are members of this trade association; a representative of Corteva formerly chaired its Board of Directors and its current chair, elected in 2022, is Paul Rea of BASF Agricultural Products Group. Coordination with respect to loyalty programs was also available through the Agricultural Retailers Association ("ARA"). That organization "advocates, influences, educates and provides services to support its members in their quest to maintain a profitable business environment, adapt to a changing world and preserve their freedom to operate."[17] Current

---

[16] Lina Khan, "Opinion: AG companies' loyalty programs unfairly extract profits from Consumers" in *Des Moines Register* (Oct. 6, 2022) (available at https://www.desmoinesregister.com/story/opinion/columnists/2022/10/06/syngenta-corteva-farmers-lawsuit-unfairly-extract-profits-from-consumers/69542239007/) (last accessed Nov. 10, 2022).

[17] ARA, available at https://www.aradc.org/about/about-ara (last accessed Nov. 10, 2022).

members of the Board of ARA include representatives of Nutrien, Corteva, and Syngenta. The CRA cooperates extensively with the ARA.

106.    Syswato Das, a spokesperson for Syngenta, has said that the loyalty programs are part of a longstanding "*voluntary and industry-standard program*" (emphases added) and asserted that "[w]e are disappointed that the FTC has failed to appreciate the beneficial effects that these rebate programs provide to our channel partners and to growers."; Kris Allen of Corteva expressed similar views.[18] And Vern Hawkins, Syngenta's President of Crop Protection, has taken the extreme step of accusing Lina Khan of the FTC of lying in her aforementioned op-ed article.[19]

### F.    Relevant AIs.

### Syngenta AIs.

107.    Syngenta's loyalty program applies to a number of AIs, of which Plaintiff has purchased over several years. Those Syngenta AIs that are the primary focus of this Complaint are metolachlor (and s-Metolachlor), mesotrione, fomesafen, azoxystrobin, paraquat, and lambda cyhalothrin. These are referred to collectively as the "Syngenta Relevant AI(s)"

108.    *Metolachlor (s-Metolachlor).* Metolachlor (which term is used herein to refer to both the original metolachlor compound and the subsequent s-metolachlor variant, each as described below) is an herbicide used on a wide variety of crops, including corn, soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugar beets. Sales of crop

---

[18] Margey Eckelcamp, "8 Things To Know About The FTC Suing Syngenta and Corteva" (Oct. 10, 2022) (available at https://www.thepacker.com/news/produce-crops/8-things-know-about-ftc-suing-syngenta-and-corteva) (last accessed Nov. 11, 2022).

[19] Meghan Grabner, "Syngenta Pushes Back Against FTC Complaint" (Nov. 2, 2022) (available at https://brownfieldagnews.com/news/syngenta-pushes-back-against-ftc-complaint/) (last accessed Nov. 11, 2022).

protection products containing metolachlor in the United States exceeded $400 million in 2020.

109. Syngenta's relevant patent protection for its original metolachlor expired in or about 1996. A Syngenta predecessor company developed, patented, and registered a variant of the original metolachlor, known as s-metolachlor. Syngenta's relevant patent protection for s-metolachlor and subsequent exclusive-use period for s-metolachlor expired in 2003. As noted in the 2016 Syngenta document discussed above, s-metolachlor sales by a Retailer that reached the 90% threshold were subject to a 5% incentive rebate.

110. During the relevant period, Plaintiff purchased the following Syngenta products containing metolachlor from Co-conspirator Defendants Nutrien and/or Helena: Prefix Herbicide, BroadAxe XC, Dual, and Dual 8E.

111. *Mesotrione.* Mesotrione is a widely used corn herbicide. Sales of crop protection products containing mesotrione in the United States exceeded $200 million in 2020. Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). Syngenta's relevant patent protection for mesotrione has expired.

112. Under its loyalty program, Syngenta made exclusion payments to Co-conspirator Distributors and Retailers for their not marketing significant volumes of competing, lower-priced generic mesotrione products. As noted in the 2016 Syngenta document discussed above, Retailers who recorded 99% of branded mesotrione products could obtain a 5% loyalty rebate.

113. Generic manufacturers have made few inroads with distributors.[20] At least two generic manufacturers delayed or terminated their planned entry into the mesotrione market due

---

[20] Syngenta also posted misleading articles on its website, indicating that generic mesotrione and other generic crop protection products were inferior to its branded mesotrione. *See* Syngenta Products Offer Benefits That Generic Products Don't, available at https://www.syngenta-us.com/thrive/production/branded-products-over-generics.html (last accessed October 20, 2022).

to loyalty-program concerns.[21]

114.    *Azoxystrobin*. Azoxystrobin is a broad-spectrum fungicide that protects a wide variety of crops from fungal diseases. It has annual global sales of over $1 billion. Sales of crop-protection products containing azoxystrobin in the United States exceeded $100 million in 2020. Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA has expired. As noted in the 2016 Syngenta document discussed above, azoxystrobin was subject to a 98% loyalty threshold requirement for which a Retailer could obtain a 10% rebate.

115.    During the relevant period, Plaintiff purchased the following Syngenta products containing azoxystrobin from Co-conspirator Defendants Nutrien and/or Helena:  Quilt Fungicide, Quilt XCEL Fungicide, Quadris Top Fungicide, Quadris Top SBX, Activa Complete Corn 250, and Triviapro Fungicide.

116.    *Fomesafen.* Fomesafen is a widely used selective-applied and foliar herbicide for control of broadleaf weeds in soybeans. In 2018, approximately six million pounds of fomesafen were applied. Fomesafen was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). As noted in the discussion of the 2016 Syngenta document, fomesafen was subject to a 90% retailer support threshold for which Retailers received a 5% rebate.

117.    *Paraquat*. Paraquat is one of the most-widely used herbicides. It had annual global sales of over $90 million in 2021. Paraquat was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period

---

[21] Plaintiffs allege these facts based upon information recently made public in the FTC Action. The names of the generic manufacturers and the details of their delayed entry to the mesotrione market are redacted from the public filing.

under FIFRA has expired. As noted in the 2004 Syngenta document discussed above, paraquat was subject to a 98% loyalty threshold requirement for which a Retailer could obtain a 5% rebate.

118.    During the relevant period, Plaintiff purchased the following Syngenta products containing paraquat from Co-conspirator Defendants Nutrien and/or Helena: Gramoxone, Gramoxone SL and Gramoxone SL 2.0.

119.    ***Lambda Cyhalothrin***. Lambda cyhalothrin is an agricultural pesticide. Sales of Lambda Cyhalothrin in 2020 have been estimated at $1.25 billion worldwide. Lambda Cyhalothrin was initially developed by a Syngenta predecessor company and was registered by the EPA in 1988.  Syngenta has sold and sells products containing lambda cyhalothrin under the names Karate® and Warrior®, among others.  Lambda cyhalothrin was protected by patent until 2003.

120.    As noted in the 2004 Syngenta document discussed above, lambda cyhalothrin was subject to an 98% loyalty threshold requirement for which a Retailer could obtain a 5% incentive payment from Syngenta.  As noted in the 2016 Syngenta document discussed above, lambda cyhalothrin was subject to an 85% loyalty threshold in exchange for a 5% incentive payment from Syngenta.

121.    During the relevant period, Plaintiff purchased Karate, a Syngenta product containing lambda cyhalothrin from Co-conspirator Defendants Nutrien and/or Helena.

122.    Under its loyalty program, Syngenta has made exclusion payments to Co-conspirator Distributors and Retailers for their not marketing significant volumes of competing, lower-priced generic Syngenta Relevant AI products. As noted in the Syngenta documents discussed above, Syngenta Relevant AI sales by a Retailer that reached exceptional threshold

ranges, in some cases as high as 99%, were subject to significant incentive rebates worth millions to participating co-conspirators.

123.    During the relevant time period, Syngenta's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of Syngenta's Relevant AI products. As a result, Syngenta, Co-conspirator Distributors, and Retailers have benefitted from supra-competitive prices of Syngenta Relevant AI products even though generic manufacturers introduced competing AI products in the United States after the expiration of Syngenta's Relevant AI(s) patent exclusivity. Generic products of these same AIs were priced significantly below Syngenta's existing crop protection products.

124.    Under Syngenta's loyalty programs, Co-conspirator Distributors and Retailers strictly managed their generic AI(s) open space, focused marketing on Syngenta Relevant AI products rather than generic competitors to those same AI products, and in some cases, stopped selling generic products despite customers' continued demand for lower-priced Syngenta Relevant AI products. The loyalty program ensures Co-Conspirator Distributors and Retailers sell minimal amounts of, if any, generic Syngenta Relevant AI crop protection products in exchange for loyalty rebates predicated on their not selling the same AI crop protection products made by generic producers.

125.    Syngenta's prices remain significantly above competitive levels. Syngenta's and Co-conspirator Distributor's loyalty program has resulted in higher prices for crop protection products containing each of Syngenta's Relevant AI(s) than would prevail in a competitive market.

**BASF AIs.**

126.    As noted in the BASF's 2022 "Program Summary Guide" discussed above, BASF

37

loyalty program extends to five products, all of which are believed to be off patent.

127. They are: (1) **boscalid**, a broad spectrum carboxinide herbicide initially used with specialty crops and now extended to other crops such as cereals and oilseed rape; (2) **F500**, a speedy and long-lasting effectiveness in controlling a broad range of key fungal diseases in sensitive populations in over 60 crops; (3) **glufosinate ammonium**, one of the most widely-apploed broad spectrum herbicides, used in controlling weeds in a huge variety of worldwide crops; (4) **imazamoz**, a selective broad spectrum herbicide used for eliminating broadleaf and grassweed, particularly in connection with soybean crops; and (5) **pendimethalin**, a premergence and postmergence herbicide used to control grasses and broadleaf weeds. All these crop protection products are among BASF's most profitable. These five products are referred to herein as the "BASF Relevant AI(s)."

128. During the relevant period, Plaintiff purchased Liberty, a product containing glufosinate.

129. During the relevant time period, BASF's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of acetochlor products. As a result, BASF, Co-conspirator Distributors, and Retailers have benefitted from supra-competitive prices of acetochlor products. Generic manufacturers introduced acetochlor products in the United States after the expiration of BASF's patent exclusivity. Generic competitors to products containing the BASF Relevant AIs were priced lower than those products. Still, generic manufacturers have made few inroads with distributors.

130. Under the loyalty program, Co-conspirator Distributors and Retailers strictly managed their generic acetochlor open space, focused marketing on the BASF Relevant AI products rather than generic products, and in some cases, stopped listing generic products despite customers' continued demand for lower-priced counterparts. The loyalty program ensures Co-

Conspirator Distributors and Retailers sell minimal amounts of, if any, generic acetochlor crop protection products.

131.    BASF's loyalty program has deterred generic manufacturers from introducing counterparts to products containing the BASF Relevant AIs in the United States at all, or from offering innovative new products.

132.    BASF's prices for the BASF Relevant AIs and products containing them remain significantly above competitive levels. BASF's and Co-conspirator Distributor's loyalty program agreements have resulted in higher prices for crop protection products containing acetochlor than would prevail in a competitive market.

133.    BASF's prices remain significantly above competitive levels. BASF's and Co-conspirator Distributor's and Retailers' loyalty program agreements have resulted in higher prices for crop protection products containing BASF Relevant AIs than would prevail in a competitive market.

**Corteva's Relevant AIs.**

134.    Corteva's loyalty program applies to a number of AIs. Those Corteva AIs that are primary focus of this Complaint are oxamyl, rimsulfuron, and acetochlor (collectively referred to as the "Corteva Relevant AI(s)").

135.    *Oxamyl*. Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, in addition to onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco. Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection and the exclusive-use period under FIFRA have expired.

136.    During the relevant period, Plaintiff purchased the following Corteva products

containing oxamyl from Co-conspirator Distributors Nutrien and Helena: Vydate L Insecticide/Nematicide, and Vydate C-LV Insecticide/Nematicide.

137.     **Rimsulfuron.** Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection for rimsulfuron and the exclusive-use period under FIFRA expired no later than 2007.

138.     During the relevant period, Plaintiff purchased the following Corteva products containing rimsulfuron from Co-conspirator Distributors Nutrien and Helena: Dupont Steadfast Herbicide and Dupont Steadfast Q.

139.     **Acetochlor**. Acetochlor is an herbicide that is used predominantly on corn, but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Sales of crop protection products containing acetochlor in the United States exceeded $400 million in 2020.

140.     The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP continues to hold the United States registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties. Relevant patent protection for acetochlor has expired.

141.     Under its loyalty program, Corteva has made exclusion payments to Co-conspirator Distributors and Retailers for their not marketing significant volumes of competing, lower-priced generic Corteva Relevant AI products. As noted in the Corteva documents discussed above, Corteva Relevant AI(s) sales by a Retailer that reached exceptional threshold ranges, in some cases as high as 105%, were subject to significant incentive rebates worth

millions to participating co-conspirators.

142.     During the relevant time period, Corteva's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of Corteva's Relevant AI products. As a result, Corteva, Co-conspirator Distributors, and Retailers have benefitted from supra-competitive prices of Corteva's Relevant AI products even though generic manufacturers introduced competing AI products in the United States after the expiration of Corteva's Relevant AI(s) patent exclusivity. Generic products of these same AIs were priced significantly below Corteva's existing crop protection products.

143.     Under Corteva's loyalty programs, Co-conspirator Distributors and Retailers strictly managed their generic AI(s) open space, focused marketing on Corteva Relevant AI products rather than generic competitors to those same AI products, and in some cases, stopped selling generic products despite customers' continued demand for lower-priced Corteva Relevant AI products. The loyalty program ensures Co-Conspirator Distributors and Retailers sell minimal amounts of, if any, generic Corteva Relevant AI crop protection products in exchange for loyalty rebates predicated on their not selling the same AI crop protection products made by generic producers.

144.     Corteva's prices remain significantly above competitive levels. Corteva's and Co-conspirator Distributor's loyalty programs have resulted in higher prices for crop protection products containing each of Corteva's Relevant AIs than would prevail in a competitive market.

## VI.     MARKET POWER AND DEFINITION

145.     The relevant geographic market is the United States. United States farmers may not lawfully use crop protection products manufactured and labeled for use outside the United States.

146.    Separate relevant product markets exist for Syngenta's Relevant AIs (azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin) ("the Syngenta AIs Market"), BASF's Relevant AIs (boscalid, glufosinate, pendimethalin, F500, and imazamox) (the "BASF AIs Market), and for Corteva's Relevant AIs (rimsulfuron, oxamyl and acetochlor) (the "Corteva AIs Market") (collectively the Syngenta AIs Market, BASF AIs Market and the Corteva AIs Market are referred to as the Relevant AI Market(s)").

147.    Each Manufacturer Defendant's Relevant AI Market consists of: (1) the technical-grade or manufacturing-use of the each of the Manufacturer Defendant's Relevant AIs to be formulated into an EPA-registered finished crop protection product for sale in the United States, and (2) each Manufacturer Defendant's Relevant AIs as a component of an EPA-registered finished crop protection product for sale in the United States.

148.    Each Manufacturer Defendant's Relevant AI Market is no broader than EPA-registered crop protection products for sale in the United States that contain that Manufacturer Defendant's Relevant AIs. Each Manufacturer Defendant's Relevant AI Market includes branded and generic versions of each of its Relevant AIs.

149.    As to each Relevant AI, allegations herein relating to the Relevant AI Market(s) apply to both sets of product markets described above.

150.    At all relevant times, Syngenta had monopoly power in the markets for azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin, with respect to crop protection products containing those specific Relevant AIs, because Syngenta had the power to price Relevant AIs and crop protection products containing those Relevant AIs at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and

lambda cyhalothrin  and crop protection products containing those Relevant AIs.

151.    At all relevant times, BASF had monopoly power for boscalid, F500, glufosinate ammonium, imazamox, and pendimethalin, and with respect to crop protection products containing those specific Relevant AIs, because BASF had the power to price Relevant AIs and crop protection products containing those Relevant AIs at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as respect to the BASF Relevant AIs, and with respect to crop protection products containing those Relevant AIs.

152.    At all relevant times, Corteva had monopoly power for rimsulfuron, oxamyl, acetochlor, and with respect to crop protection products containing those specific Relevant AIs, because Corteva had the power to price Relevant AI and crop protection products containing those Relevant AI at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as respect to rimsulfuron, oxamyl, acetochlor, and with respect to crop protection products containing those Relevant AIs.

153.    During the relevant period, the Manufacturer Defendants have dominated their respective Relevant AI markets with sales of their own branded Relevant AIs and crop-protection products containing those Relevant AIs and by excluding generic competition through operation of each Defendant's loyalty program.

154.    To the extent that Plaintiff and Class Members may be required to prove market power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant product market is composed of each Defendant Manufacturer's Relevant AIs and crop protection products containing those Relevant AIs, both brand and generic, in all forms sold in the United States.

155. For each Defendant Manufacturer's Relevant AI(s), other AIs are not close enough functional or economic substitutes to prevent the Manufacturer Defendants from maintaining prices of crop protection products containing their specific Relevant AIs above competitive levels.

156. For each Defendant Manufacturer's Relevant AI(s), absent the restraints of trade imposed by the Manufacturer Defendants' loyalty programs, unconstrained competition from generic crop protection product manufacturers would have had a significant and non-transitory downward effect on prices in that specific Relevant AI(s) Market.

157. Direct evidence of each Manufacturer Defendant's monopoly and market power includes each Defendant's ability to price its Relevant AIs and crop protection products containing those Relevant AIs above competitive levels, and to exclude competition from generic manufacturers through operation of its loyalty program.

158. The Manufacturer Defendants have maintained and exercised the power to exclude and restrict competition to their respective Relevant AIs and crop protection products containing those Relevant AIs, which no longer had any patent protection.

159. Each Manufacturer Defendant's monopoly power is also shown through circumstantial evidence, including dominant or substantial market shares in its relevant market with substantial barriers to entry.

160. Potential generic manufacturers face significant capital, technical, regulatory, and legal barriers. The Manufacturer Defendants' use of loyalty programs also imposed a substantial barrier to entry by, among other things, limiting generic manufacturers' access to the traditional distribution channel.

161. Syngenta maintained dominant shares of the United States Relevant Market for its

Relevant AIs azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin from at least 2017 through the present.

162.    BASF maintained dominant shares of the United States Relevant Market for its Relevant AIs boscalid, F500, glufosinate ammonium, imazamoz, and pendimethalin from at least 2004 through the present.

163.    Corteva maintained dominant shares of the United States Relevant Market for its Relevant AIs rimsulfuron, acetochlor, oxamyl. Each year from at least 2017 through the present, Corteva maintained a substantial share of sales in each of these markets.

## VII.    ANTITRUST IMPACT AND DAMAGES TO THE CLASSES

164.    The Manufacturer Defendants' anticompetitive conduct had the following effects in each Relevant AI market:

  a)  Competition in each Relevant AI market was reduced or eliminated;

  b)  Prices have been maintained at supra-competitive levels; and

  c)  United States purchasers have been deprived of the benefit of price competition, product choice, and innovation in each Relevant AI market.

165.    As described herein, during the Class Period, Plaintiff directly purchased Relevant AIs from Co-conspirator Distributors and Retailers.

166.    As a result of the Defendants' anticompetitive conduct, Plaintiff and Members of the Classes paid more for Relevant AIs than they otherwise would have and thus suffered substantial damages to their business or property in the form of overcharges.  This is a cognizable antitrust injury and constitutes harm flowing from the affect Defendants' illegal agreements and resulting monopolization on competition under the federal antitrust laws.

167.     The Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Manufacturer Defendants' monopoly of the Relevant AIs market(s) and limiting competition after the entry of generic Relevant AI. The Defendants' actions allowed the Manufacturer Defendants to maintain a monopoly and exclude competition in the Relevant AIs market(s) and to artificially maintain market share and prices.

168.     Through operation of the Manufacturer Defendants' loyalty program agreements, as alleged herein, generic manufacturers were discouraged from developing and marketing generic versions of the Relevant AIs, have exited the Relevant AI Market(s), and have faced an unfair competitive landscape even when they have been able to enter. But for the illegal conduct of Defendants, additional generics of Relevant AIs would have entered and captured market share.

**A.     The Manufacturer Defendants', Co-conspirator Distributors', and Retailers' Conduct Increased and Continues to Increase Prices to Farmers in the Relevant AI Market(s).**

169.     The most efficient and effective channel of distribution for each AI in the Relevant Market is the traditional distribution channel. Over ninety percent of all crop protection product sales are made through the traditional channel. A high proportion of the traditional channel participates in the Manufacturer Defendants' loyalty programs (over 80%).

170.     The Manufacturer Defendants' loyalty programs with Co-Conspirator Distributors and Retailers have high market share thresholds. Thus, these loyalty program have effectively foreclosed generic competitors from approximately 80% or more of each Relevant AI Market from access to the traditional channel.  This practice continues and should be enjoined.

171.     The Manufacturer Defendants' loyalty programs incentivize Co-conspirator Distributors and Retailers to meet loyalty thresholds by forgoing or severely limiting purchases

from generic manufacturers. Substantially all major distributors and leading retailers participate in the respective loyalty programs. Co-Conspirator Distributors and Retailers profit more when prices to farmers are higher. Their collective participation in the loyalty programs has had and continues to have the effect of maintaining higher prices to Plaintiff and Class Members. Through Syngenta's and Corteva's respective loyalty programs, Co-Conspirator Distributors and Retailers have severely limited their purchase, promotion, and sale of generic crop protection products containing each applicable Relevant AI.

172.    To meet applicable loyalty thresholds Co-conspirator Distributors and Retailers have omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered farmers toward branded products.

173.    Through Manufacturer Defendants' respective loyalty programs, Co-Conspirator Distributors and Retailers have declined to buy or sell more than minimal amounts of crop protection products containing each applicable Relevant AI from generic manufacturers even though (1) generic products are of sufficient quality and availability; (2) generic manufacturers work to create demand for their products at the farmer and retailer levels; and (3) absent the Manufacturer Defendants' loyalty programs, demand for generic products containing each applicable Relevant AI would exceed the open space allowed under the Manufacturer Defendants' respective loyalty programs.

174.    This dynamic is so well established in the industry that it is futile for generic manufacturers to approach any large Co-conspirator Distributor or Retailer. In contrast, when selling products containing AI that are not subject to loyalty programs, generic manufacturers are able to make all or nearly all their sales through traditional-channel distributors.

175.     Generic manufacturers of crop protection products containing the applicable Relevant AI have thus been substantially foreclosed from the Relevant Markets for five years or more, to the detriment of not only the generic manufacturers but also U.S. farmers.

176.     The exclusion of generic competitors from the traditional channel harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient and effective lower-cost distribution.

177.     With respect to each Relevant AI, in the absence of the Manufacturer Defendants' and the Co-conspirator Distributors' and Retailers' mutual participation in the loyalty programs, generic manufacturers would have made significantly more sales through the traditional distribution chain. This generic competition would have increased price competition, innovation, and choice in the Relevant AI Market(s), which in turn would benefit U.S. farmers.

178.     In the absence of the Manufacturer Defendants' respective loyalty programs, sales of generic crop protection products containing active ingredients subject to the programs, including each Relevant AI, would be significantly higher and would exceed the open space allowed by the programs. Plaintiff and US farmers would benefit from having an increased amount of lower-price generic products available in Relevant AI Market(s).

179.     In at least the azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin Relevant AI Markets, Syngenta further foreclosed competition through its retail loyalty program. As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient and effective distribution of their products, given the participation of leading retailers in the program. The same is true of the Relevant AIs for Corteva and BASF and the products containing them.

180.     The Manufacturer Defendants', Co-conspirator Distributors', and Retailers'

loyalty program agreements resulted in higher prices to farmers by limiting the amount of available generic Relevant AI.

181.    The Manufacturer Defendants' respective downward price responses, and responses of prices more generally in the applicable Relevant AI Market(s), have been less significant, and slower, than they would have been absent operation of the applicable loyalty program.

182.    Defendants' anticompetitive conduct was not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

**B.    The Manufacturer Defendants', Co-conspirator Distributors' and Retailers' Unlawful Conduct Prevented and Continues to Prevent Generic Expansion and Caused and Continues to Cause Generic Exit from Markets.**

183.    The Manufacturer Defendants and Co-conspirator Distributors' and Retailers' loyalty program agreements have prevented, delayed, and diminished both entry and expansion of generic manufacturers of crop protection products containing the Relevant AI. The same wrongful conduct caused generic exit as to products containing the Relevant AI.

184.    Due to the competitive landscape and difficulty of entering traditional distribution chains for the Relevant AI, multiple generic manufacturers have concluded that entry is not economically feasible due to the artificial constraints created by the Manufacturer Defendants', Co-conspirator Distributors', and Retailers' loyalty program agreements. The loyalty programs foreclosure of sales opportunities for Relevant AI led one generic manufacturer not to re-register its product in a Relevant AI market.

185.    In the absence of the Manufacturer Defendants', Co-conspirator Distributors' and Retailers' respective loyalty program agreements, generic manufacturers would compete more

effectively and compete for more sales in the Relevant AI Market(s).

186. The Manufacturer Defendants', Co-conspirator Distributors' and Retailers' loyalty programs inhibited generic manufacturers' ability to access the Relevant AI market(s) to create downward pricing pressure.

187. The Manufacturer Defendants, Co-conspirator Distributors and Retailers together foreclosed actual or potential competitors from access to efficient and effective distribution services. With respect to the Relevant AI Market(s), this exclusion of generic competitors from the traditional distribution channel harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, lower-cost distribution.

### C. The Manufacturer Defendants' Co-conspirator Distributors' and Retailers' Unlawful Conduct Reduced and Continues to Reduce Available Innovative Products.

188. The Manufacturer Defendants' loyalty programs with Co-conspirator Distributors and Retailers reduced the ability and incentive of generic manufacturers to bring new differentiated crop protection products containing Relevant AI to market, harming innovation and restricting farmer choice.

189. Because of the barriers to entry created by the Manufacturer Defendants' respective loyalty programs with the Co-conspirator Distributors and Retailers', generic manufacturers too often abandoned attempts to develop innovative products containing Relevant AIs. Generic manufacturers also sought to avoid using active ingredients that were subject to Defendants' loyalty programs.

190. In the absence of the Manufacturer Defendants', Co-conspirator Distributors', and Retailers' respective loyalty program agreements, there would be more innovative products from generic manufacturers in the Relevant AI Market(s), leading to more farmer choice.

###### D. The Manufacturer Defendants', Co-conspirator Distributors', and Retailers' Unlawful Conduct Resulted and Continues to Result in Supra-Competitive Prices.

191.     The Manufacturer Defendants' loyalty programs with Co-conspirator Distributors and Retailers have resulted in higher prices to farmers for crop protection products containing applicable Relevant AI than would prevail in competitive markets. Each Defendant's anticompetitive conduct thwarted the downward price pressure from generic manufacturers' entry and expansion, denying these generics access to efficient and effective distribution and resulting in artificially high prices.

192.     Because the loyalty programs artificially limit the availability of lower-priced generic alternatives, farmers are left to pay more for brand crop protection products containing the AI. Without the availability of cheaper, generic crop protection products in the traditional distribution channel, Plaintiff and Members of the Class often must buy the more expensive, branded product—because the brand product is promoted and favored by the traditional distribution channel.

193.     In a competitive world where generic manufacturers can access the market for an AI, they put downward pressure on the prices of branded products containing that relevant AI. The more access generic manufacturers obtain, the more price pressure they exert. This downward price pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the AI, including higher-end mixture products.

194.     Despite access to non-traditional distribution channels in which generic manufacturers can enter and sell at low prices, the Manufacturer Defendants' loyalty programs with Co-conspirator Distributors and Retailers limit the overall amount of available generic product in the Relevant AI market(s) because of the traditional channels' predominance in supply and demand chain. The limited availability of generics in the Relevant AI market(s)

allows distributors or retailers to then price generic higher than would have been possible otherwise, thus preventing the full benefits of generic price competition from flowing to farmers.

195.     Even where generic manufacturers were able to enter a Relevant AI Market, the Manufacturer Defendants' loyalty programs with Co-conspirator Defendants and Retailers successfully limited the effects of this competition. The Manufacturer Defendants' respective price responses, and responses of prices more generally in the Relevant AI Market(s), have been less significant, and slower, than they would have been absent operation of the Manufacturer Defendants' loyalty programs with the Co-conspirator Distributors and Retailers.

## VIII.    PLAINTIFF AND CLASS ALLEGATIONS

196.     Plaintiff brings this action on behalf of themselves and as a class action under the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of members of the following Plaintiff Classes:

> All persons or entities in the United States that purchased azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, or lambda cyhalothrin, or any crop protection product containing azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, or lambda cyhalothrin directly from Syngenta, or any distributor or retailer participating in Syngenta's Loyalty Program for such active ingredients, beginning January 1, 2004, until the effects of the unlawful conduct cease (the "Syngenta Class Period");

> All persons or entities in the United States that purchased rimsulfuron or oxamyl, or any crop production products containing rimsulfuron or oxamyl, directly from Corteva or any distributor or retailer participating in Corteva's Loyalty Program for such active ingredients, beginning January 1, 2004, until the effects of the unlawful conduct cease (the "Corteva Class Period"); and

> All persons or entities in the United States that purchased Boscalid, F500, Glufosinate ammonium, Imazamox, or Pendimethalin, or any crop production products containing them, directly from BASF or any distributor or retailer participating in BASF's Loyalty Program for such active ingredients, beginning January 1, 2004, until the effects of the unlawful conduct cease (the "BASF Class Period").

197.     All of these Classes seek treble damages and injunctive relief under 15 U.S.C. §§

15 and 26.

198.     Excluded from the Classes are: (a) the Manufacturer Defendants and their subsidiaries, affiliate entities, employees, and co-conspirators (*i.e*, distributors or retailers participating in the Manufacturer Defendants' loyalty programs involving the at-issue products), (b) entities that purchased crop protection products for resale to others, and (c) all federal or state government entities or agencies.

199.     Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in Defendants' possession.

200.     Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes were damaged by the same wrongful conduct of Manufacturer Defendants and Co-conspirator Distributors.

201.     Plaintiff will fairly and adequately protect and represent the interests of members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of members of the Classes.

202.     Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation.

203.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

204.     Questions of law and fact common to members of the Classes predominate over

questions that may affect only individual Class members, thereby making a class action with respect to members of each Class as a whole appropriate. Questions of law and fact common to Plaintiff and members of the Classes include, but are not limited to:

    a.  Whether Syngenta conspired with Co-conspirator Distributors, and Retailers to unreasonably restrain trade in violation of federal antitrust laws;

    b.  Whether Corteva conspired with Co-conspirator Distributors, and Retailers to unreasonably restrain trade in violation of federal antitrust laws;

    c.  Whether BASF conspired with Co-conspirator Distributors, and Retailers to unreasonably restrain trade in violation of federal antitrust laws;

    d.  Whether Syngenta, Co-conspirator Distributors, and Retailers unlawfully monopolized or conspired to monopolize the Relevant AI;

    e.  Whether Corteva, Co-conspirator Distributors, and Retailers unlawfully monopolized or conspired to monopolize the Relevant AI;

    f.  Whether BASF, Co-conspirator Distributors, and Retailers unlawfully monopolized or conspired to monopolize the Relevant AI;

    g.  The scope and duration of the alleged conspiracies;

    h.  Whether Syngenta, Co-conspirator Distributors, and Retailers violated Section 3 of the Clayton Act;

    i.  Whether Corteva, , Co-conspirator Distributors, and Retailers violated Section 3 of the Clayton Act;

    j.  Whether BASF, Co-conspirator Distributors, and Retailers violated Section 3 of the Clayton Act;

    k.  Injury suffered by Plaintiff and members of the Classes;

    l.  Injunctive relief available to the Plaintiff and members of the Classes;

    m.  Damages suffered by Plaintiff and members of the Classes.

205. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

206.     Plaintiff reserves the right to amend the definition of members of the respective

Classes, including, without limitation, the Class Period.

##     IX.     EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

207.     By equitable estoppel, the Manufacturer Defendants', Co-Conspirator

Distributors' and Retailers' concealment of their unlawful combination and conspiracy has tolled

any applicable statute of limitations for Plaintiff and the Classes with respect to any claims and

rights of action that Plaintiff and the Classes have alleged in this Complaint.

208.     Plaintiff and the Classes were not placed on actual or constructive notice of the

conspiracies alleged herein until, at the earliest, the FTC's and AGs' September 29, 2022

complaint made public its investigation into the Manufacturer Defendants' misconduct and its

allegations that Manufacturer Defendants' loyalty program agreements with the Co-conspirator

Distributors and Retailers restrained competition and caused higher prices, among other harms.

209.     Throughout the Class Period, the Manufacturer Defendants, Co-conspirator

Distributors, and Retailers effectively, affirmatively, and fraudulently concealed their unlawful

combination and conspiracy from Plaintiff and the Classes.

210.     The Manufacturer Defendants, Co-conspirator Distributors, and Retailers

maintain and enforce strict confidentiality provisions in their agreements with one another and

the conditions and descriptions of their respective loyalty programs. Distributors' contracts also

contain strict confidentiality provisions, prohibiting the disclosures of prices Retailers pay to

wholesalers for the Relevant AI products.

211.     The Manufacturer Defendants all publicly stated that they were in compliance

with federal laws that governed their conduct, including federal antitrust laws. Plaintiff and

Members of the Classes could and did rely on such statements and thus were misled into

believing that no anticompetitive activity was occurring.

212.    For example, Syngenta says in its current Code of Conduct ("CoC")[22] at page 6 that'[a]s an industry leader, we take our responsibilities very seriously. We are transparent and responsible and comply with all applicable laws, and ensure that employees are aware of those laws relevant to those roles." At page 8 of the same document, it states that "[w]e ensure that all business practices comply with the competition law wherever business is conducted. Competition laws apply to business conduct in general and to all business arrangements, irrespective of whether they are written, oral, or in any other form."

213.    Corteva's CoC[23] states at page 12 that "[w]e conduct business ethically. Every time we represent Corteva Agriscience, it is our chance to make a positive impression. We speak with pride, honesty, and transparency about our work to promote trust, confidence, and sustainable business." At page 14 of the same document, Corteva states that it does not "interfere with our competitors' business relationships", or "[u]se our market strength or market information to unfairly harm or unlawfully prevent competition."

214.    BASF's current CoC[24] touts at page 14 "our integrity as a company—that means living up to the spirit and the letters of the laws that govern our industry…." It adds at page 26 that "[w]e are committed to conducting our business solely on the basis of free and fair competition, and we strictly obey all applicable laws and regulations. We believe that fair, well-

---

[22] Available at https://www.syngentagroup.com/sites/syngenta-group/files/governance/code-of-conduct/syn-240-sg-coc-english-aw5.pdf (last accessed Nov. 16, 2022).

[23] Available at https://www.corteva.com/content/dam/dpagco/corteva/global/corporate/files/code-of-conduct/Corteva_Code_Interactive_enEN_English.pdf (last accessed Nov. 16, 2022).

[24] Available at https://www.basf.com/global/documents/en/news-and-media/publications/reports/2020/BASF_Code_of_Conduct_2020_EN.pdf (last accessed Nov. 16, 2022).

regulated competition strengthens our market and benefits our customers. As a market leader in various fields, BASF has special obligations under antitrust law for conducting our business in a way that promises fair competition. We welcome this extra responsibility, and aim to lead by example, to achieve the best for our customers. We are aware that any violation of antitrust laws can result in heavy fines, and even imprisonment, for the company, management and individuals concerned. It is up to all of us to be alert for any situation that could potentially be seen as harmful to free and fair competition."

215.  These promises in Defendants' respective CoCs are belied by their respective conduct set forth in this complaint. Their ultimate customers—like the Plaintiff here—relied on their self-professed integrity and law-abiding goals and were misled as a result.

216.  Accordingly, prior to the filing of the FTC Action, Plaintiff and the Members of the Classes have had virtually no visibility into the Manufacturer Defendants' loyalty programs, other than those unredacted portions of the FTC's recent complaint, let alone visibility of the conspiracy to use the loyalty programs to restrain trade and maintain supra-competitive pesticide prices.

## X.  CAUSES OF ACTION

### COUNT I

### UNLAWFUL CONDITIONING OF PAYMENTS
### IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14)

217.  The Manufacturer Defendants provided payments in the form of rebates in the sale of at-issue crop protection products to Co-conspirator Distributors and Retailers in exchange for Co-conspirator Distributors' and Retailers' agreements not to use or deal in the goods of generic competitors in accordance with the Manufacturer Defendants' loyalty programs. This conduct substantially lessened competition and created monopolies in the at-issue products in the Relevant

Markets, in violation of Section 3 of the Clayton Act (15 U.S.C. § 14).

218.     As a result, generic competition in the at-issue product Relevant Markets was

substantially restrained and the Manufacturer Defendants unlawfully maintained monopolies in

the at-issue products, which caused the prices of the at-issue products purchased by Plaintiff and

Class Members to be higher than they would have been in the absence of the Manufacturer

Defendants' agreements with Co-conspirator Distributors and Retailers.

219.     Plaintiff and the Class Members were injured and damaged because they

purchased at-issue products at supra-competitive prices caused by the Manufacturer Defendants'

violations of Section 3 of the Clayton Act.

220.     Plaintiff and Class Members have no adequate remedy at law to prevent

Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to

prevent them from continuing with such conduct.

## COUNT II

### UNLAWFUL  MONOPOLIZATION
### IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)

221.     At all times relevant, Syngenta has had monopoly power in the Relevant Markets

for azoxystrobin, metolachlor, s-metolachlor,  mesotrione, fomesafen, paraquat, and lambda

cyhalothrin. At all times relevant, Corteva has had monopoly power in the Relevant Markets for

rimsulfuron, acetochlor,  and oxamyl.  At all times relevant, BASF has had monopoly power in

the Relevant Markets for boscalid, F500, glufosinate ammonium, imazamox, and pendimethalin

222.     The Manufacturer Defendants maintained monopoly power through a course of

anticompetitive and exclusionary conduct by entering and maintaining agreements with

distributors and retailers that contain competition-limiting loyalty requirements and, among other

things, enforcing and threatening enforcement of these requirements or the imposition of other

penalties for insufficient loyalty in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

223.     Plaintiff and Class Members were injured by the Manufacturer Defendants' maintaining their monopolization of the Relevant Markets for the at-issue products, which allowed Syngenta and Corteva to price the at-issue products at artificially high levels that bar or limit competitive entry. Plaintiff and the Members of the Classes paid higher prices for the at-issue products than they would have in the absence of the Manufacturer Defendant's violations of Section 2 of the Sherman Act.

224.     Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT III

## CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2)

225.     The Manufacturer Defendants individually conspired with the Co-conspirator Distributors and Retailers to unlawfully maintain the Manufacturer Defendants' monopolies in the at-issue products through anticompetitive exclusionary agreements. The Co-conspirator Distributors and Retailers intentionally facilitated the Manufacturer Defendants' efforts to illegally maintain their monopoly power in the Relevant Markets for the at-issue products by participating in the Manufacturer Defendants' loyalty programs, which were designed to and did artificially restrict generic competition, as described above.

226.     The Manufacturer Defendants', the Co-conspirator Distributors', and the Retailers' intent and goal was to maintain the Manufacturer Defendants' monopolies in the at-issue products so the Manufacturer Defendants and the Co-conspirator Distributors and Retailers could eliminate or limit the threat from generic competition and continue to charge supra-competitive prices for the at-issue products.

227. Plaintiff and Class Members were injured by Manufacturer Defendants' agreements with Co-conspirator Distributors and Retailers that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of the at-issue products at artificially high levels. Plaintiff and the Class Members paid higher prices for the at-issue products than they would have in the absence of Defendants' violations of Section 2 of the Sherman Act.

228. Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT IV

### UNREASONABLE RESTRAINTS OF TRADE
### IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

229. The Manufacturer Defendants entered into unlawful contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Ac, 15 U.S.C. § 1 with Co-conspirator Distributors and Retailers.

230. These agreements had the purpose and effect of restricting sales of generic versions of the at-issue products in order to preserve the Manufacturer Defendants' monopolies in the at-issue products and to artificially raise, fix, maintain, or stabilize the prices of the at-issue products. Distributor co-conspirators and retailers agreed with the Manufacturer Defendants to essentially boycott generic versions of the at-issue products.

231. These practices were unreasonable restraints of trade in violation of Section 1 of the Sherman Act. Even if these violations are contended not to constitute per se offenses, they are unlawful under either a "quick look" or rule of reason analysis.

232. Plaintiff and Class Members were injured by the Manufacturer Defendants' agreements with Co-conspirator Distributors and Retailers that unreasonably restrained trade and

raised, fixed, maintained, or stabilized prices of the at-issue products at artificially high levels. Plaintiff and the Class Members paid higher prices for the at-issue products than they would have in the absence of the Manufacturer Defendants', and Co-conspirator Distributors' and Retailers' violations of Section 1 of the Sherman Act.

233.     Plaintiff and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes, pray for judgment against all Defendants, jointly and severally, as follows:

1.     That the Court adjudge and decree that Defendants each have violated Sections 1 and 2 of the Sherman Act;

2.     That the Court adjudge and decree that Defendants each have violated Section 3 of the Clayton Act;

3.     That Plaintiff and all others similarly situated be granted injunctive relief with respect to Defendants' ongoing anticompetitive conduct;

4.     That Plaintiff and all others similarly situated be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with the law;

5.     That Plaintiff be awarded reasonable attorneys' fees and costs; and

6.     That Plaintiff be granted such other and further relief as the Court may deem just and proper.

## XII.    DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), on any and all claims or issues so triable.

DATED:  November 17, 2022                    Respectfully submitted,


/s/ *Scott D. Gilchrist*
Irwin B. Levin (#8786-49)
Richard E. Shevitz (#12007-49)
Scott D. Gilchrist (#16720-53)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Fax: (317) 636 2593
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com

**Local Counsel**

Michael L. Roberts (*pro hac vice* forthcoming)
mikeroberts@robertslawfirm.us
Dr. Kelly A. Rinehart (*pro hac vice* forthcoming)
kellyrinehart@robertslawfirm.us
ROBERTS LAW FIRM, PA
1920 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (501) 952-8558

**Counsel for Plaintiff**

# 2004 SOUTHERN FIELD CROPS
## RETAILER PROGRAM

## Portfolio Sales Support
*Rewards Retailers for their stewardship of Syngenta brands.*

| BRANDS | ACTIVITY | INCENTIVE |
|---|---|---|
| All participating Syngenta Crop Protection brands and pack sizes. Corn and cotton seed commercially treated with the Syngenta Seed Treatment product - Cruiser®. | • Purchase and sell Syngenta brands to growers | 4% |

## Bulk Support
*Rewards Retailers for stewardship and investment in facilities for all Syngenta bulk brands.*

| BULK PRODUCTS | INCENTIVE | KEY DATES | ACTIVITY |
|---|---|---|---|
| Bicep II MAGNUM® brands, Dual MAGNUM® brands, and LUMAX™ | 10% | Dec. 31st, 2003 | Stewardship of Syngenta bulk brands:<br>• Bulk site inspection & compliance<br>• Retailer agrees to accept a minimum shipment by the Key Dates<br>• Evergreen commitment for each tank and brand at each location. |
| AAtrex®, Boundary®, Expert™, Princep®, Sequence™ and Touchdown® brands except CF | 7% | Dec. 31st, 2003 | |
| Bravo®, Caparol® and Gramoxone Max™ | 7% | Mar. 14th, 2004 | |
| Touchdown® CF | 5% | Mar. 14th, 2004 | |

## Key Active Ingredient Support
*Rewards Retailers for their loyalty to Syngenta brands where a generic alternative exists.*

| ACTIVE INGREDIENTS | BRANDS | SYNGENTA THRESHOLD SHARE | INCENTIVE |
|---|---|---|---|
| Abamectin | Agri-mek®, Zephyr®, and Clinch® | 98% | 5% |
| S-metolachlor | Boundary®, Bicep II MAGNUM® brands, Dual MAGNUM® brands, Expert™, LUMAX™ and Sequence™ | 98% | 5% |
| Paraquat | Gramoxone Max™ | 98% | 5% |
| Lambda Cyhalothrin | Warrior® and Karate® | 98% | 5% |
| Flumetralin | Prime+® | 95% | 5% |
| Chlorothalonil | Bravo® brands and Tilt®/Bravo® | 95% | 5% |
| Propiconazole | Orbit™ and Tilt® | 90% | 5% |
| Mefenoxam | Ridomil Gold® brands | 90% | 5% |
| Prometryn | Caparol® | 85% | 5% |

## Market Planning Support
*Incentive for seasonal market planning and support of specific Syngenta brands and reaching a mutually agreed goal for total sales. See the 'Program Rules and Conditions' for details\*.*

| BRAND SUPPORT | ACTIVITY | INCENTIVE |
|---|---|---|
| **Eligible Herbicide Brands:**<br>AAtrex®, Callisto™, Camix™, Envoke™, Flexstar®, Fusion®, Fusilade®, Reflex®, Suprend™ and Touchdown® brands except CF.<br><br>**Eligible Fungicide Brands:**<br>Abound®, Amistar™, Omega®, Platinum®/Ridomil Gold®, Quadris®, Quadris®/Bravo®, Quilt™, Tilt® and Uniform™(Quadris®/Ridomil Gold®)<br><br>**Eligible Insecticide Brands:**<br>Centric®, Curacron®, Denim®, Force® 3G, Karate®, Platinum®, Proclaim® and Warrior®. Cruiser® on cotton seed that is commercially treated. | Retailer & Syngenta Sales Representative design a market plan to achieve mutually beneficial objectives. Components may include but not limited to:<br>• Retailer Objectives<br>• Purchase & Consumption Forecasting<br>• Active Ingredient Support<br>• Product Servicing | 3-5%\* |

2004

SFC

## Summary of Maximum Potential Incentives under 2004 Syngenta Southern Field Crops Retailer Offer.

| BULK BRANDS | MAXIMUM INCENTIVE POSSIBLE |
|---|---|
| Bicep II MAGNUM® brands, Dual MAGNUM® brands and LUMAX™ | 19% |
| AAtrex®, Bravo® brands, Boundary®, Caparol®, Expert™, Gramoxone Max™, Sequence™ and Touchdown® brands | 16% |
| Princep® | 11% |
| Touchdown CF™ | 9% |

| PACKAGE BRANDS | MAXIMUM INCENTIVE POSSIBLE |
|---|---|
| Karate®, Tilt® and Warrior® | 14% |
| AAtrex®, Abound®, Agri-mek®, Amistar™, Bicep II MAGNUM® brands, Boundary®, Bravo® brands, Camix™, Caparol®, Callisto™, Centric®, Clinch®, Curacron®, Cruiser® on commercially treated cotton seed, Denim™, Dual MAGNUM® brands, Envoke™, Expert™, Flexstar®, Force® 3G, Fusilade®, Fusion®, Gramoxone Max™, LUMAX, Omega®, Orbit®, Platinum™, Platinum®/Ridomil Gold®, Prime+®, Proclaim®, Quadris™, Quadris®/Bravo®, Quilt™, Reflex®, Ridomil Gold® brands, Ridomil®/Bravo®, Sequence™, Suprend™, Tilt/Bravo®, Touchdown® brands except CF, Uniform™ (Quadris®/Ridomil Gold®), Zephyr® | 9% |
| All other participating package brands | 4% |

## Participating Products
The following Syngenta branded products qualify for participation in the 2004 Program:

| | | | | |
|---|---|---|---|---|
| AAtrex® | Camix™ | Flexstar® | Platinum™ | Solicam® |
| Abound® | Caparol® | Force® 3G | Prime+® | Spirit® |
| Actara® | Centric® | Fuego™ | Princep® | Suprend™*** |
| Actigard™ | Clinch® | Fulfill® | Proclaim® | Switch® |
| Agri-Mek® | Curacron® | Fusilade® DX | Quadris® | Tilt® |
| Amber® | Cruiser® treated corn seed* | Fusion® | Quadris Opti™**** | Touchdown® brands |
| Amistar™ | Cruiser® treated cotton seed* | Gramoxone Max™ | Quilt™*** | Trigard® |
| Apron MAXX™ brands | Denim™ | Karate® | Rave® | Uniform™*** (Quadris/ |
| Beacon® | Discover® | LUMAX™ | Reflex® | Ridomil Gold) |
| Bicep II MAGNUM® brands | Dual MAGNUM® brands | Mertect® | Reglone® | Vangard® |
| Boundary® | Envoke™ | NorthStar® | Ridomil®/Bravo® | Warrior® |
| Bravo® brands | Evik® | Omega®** | Ridomil Gold® brands | Zephyr® |
| Callisto™ | Exceed® | Orbit™ | Scholar® | Zorial® |
| | Expert™ | Peak® | Sequence™**** | |

*Commercially treated seed only. No on-site treated seed.
**Omega is a registered trademark of Ishihara Sangyo Kaisha, Ltd.
***May not be used or sold until registration is granted.
IMPORTANT: Products listed may not be registered in all states. Please verify that products are labeled in your area prior to purchase.

## Program Rules and Conditions
**Program Period: October 1, 2003 - September 30, 2004**
**Minimum Qualifying retail purchases: $75,000**

- Program qualification will be based on Retailer purchases of Syngenta eligible bulk (no inventory adjustments) and eligible package brands reported via EDI. Payment calculations will be based on Retailer net sales to growers of Syngenta eligible bulk brands (adjusted for inventory) and eligible package brands reported via EDI during the Program year.

- For a multi-outlet Retailer to be treated as one business entity, and therefore one claim, each retail outlet must be at least 51% owned by the parent company. If rolled up into one claim, all calculations will be done on the total business of all retail locations, and one check written to the Retailer making the claim for the total amount of incentive earned. Syngenta has final authority to determine which retail outlet may be included in a headshed.

- An individual retail outlet is defined as a 'ship to' location. An individual retail outlet is a 'ship to' location that has an IC Code number, a state retail license to do business and is a physical storefront that can store and sell agricultural herbicides, fungicides and insecticides. Retailer must comply with all local, state, and federal laws and regulations regarding the sale, use, storage, transportation, application, disposal and safe and proper handling of Syngenta products. Retailer must conduct a yearly inspection of all of their facilities to ensure compliance. Retailer must be committed to proper stewardship of Syngenta products.

- **For the purposes of this program, a Retailer shall be defined as a retail business which purchases Syngenta products from Syngenta or an authorized Syngenta Distributor who has been appointed by Syngenta to sell and service eligible Syngenta products within the Retailer's geographic area, and resells such products to growers. Copies of Distributor invoices and/or credit returns may be required to verify qualification.**

– contd.

- Qualifications under this program are determined based on net EDI sales transactions as reported by an authorized Syngenta distributor and then sold to growers. Net EDI sales are defined as purchases in weight or volume minus any returns from a contracted Syngenta Distributor. Purchases from ineligible entities or unauthorized distributors will be disqualified and not included in qualification or payment. Any volumes determined by Syngenta to be 'brokered' will be disqualified.

- Sales from Retailer-to-Retailer do not qualify for qualification levels or program incentives.

- Distributors and Distributor-owned Retailers cannot claim sales to or from independent Retailers for qualification and or incentive payment under this program. Any sales made by a Distributor must be reported to Syngenta with accurate Retailer and 'end user' designation. Reporting sales to Retailers as 'end users' is fraud and will result in data being declared ineligible for consideration in this program. Reporting of excessive quantities that equate to more products than an 'end user' can use on his acreage will result in data being declared ineligible for consideration in this program. Sales to 'brokers' (including Internet brokers), and others that are not considered Retailers by definition in this program will be disqualified. Syngenta reserves the right to be the final authority in determining the validity of data and the inclusion of said data in this program.

- If a Retailer business entity changes due to the sale or purchase of another retail location(s), the purchase information will either be added to or subtracted from a Retailer's base purchases from the previous program year for proper measurement of growth in sales over the previous program year.

- Syngenta and its designated agents reserve the right to audit and verify Retailer's qualifications and claims for incentive payments.

- Program payment will be made to qualified Retailers in December of 2004.

- Syngenta reserves the right to change or discontinue this program at any time without prior notice.

**Portfolio Sales Support**
- Incentive paid on all qualified net purchases of participating bulk and package brands and sold to growers.

**Bulk Support**
- Incentive paid on all qualified net purchases of participating bulk brands and sold to growers.

- Commitment form must be signed and submitted to Syngenta by December 31, 2003, or March 14, 2004, depending on the brand.

- Retailer must be ready to take shipment by the 'Key Dates' for the participating brands. Any shipment refused by the Retailer before the Key Dates for reasons other than weather, Syngenta reasons, or others that Syngenta approves will mean forfeiture of the Bulk Support payment on that shipment.

- Retailer must pass the bulk site inspection to qualify for any payments.

**Key Active Ingredient Support**
- Retailer must meet or exceed the stated "Syngenta Threshold Share" for each A.I. to qualify for that individual A.I.'s incentive. Threshold qualification will be determined by comparing the Retailer's product net eligible EDI, in pounds of A.I., of these Syngenta brands containing the A.I.'s listed as a percentage of all products containing that same A.I. and isomeric variants of that A.I., to the Retailer's purchases of specified competitive products containing the active ingredients, in pounds of A.I., defined in the A.I.'s listed.

- For all of the A.I. thresholds that are achieved, the corresponding incentive will be multiplied by the total dollar volume of that Syngenta brand A.I. net eligible EDI to determine the incentive for that one A.I. All of the A.I.'s for which thresholds have been met will be calculated individually and then added together for a total earnings.

- Chlorothalonil active ingredient contained in Quadris Opti, Quadris/Bravo and Ridomil Gold/Bravo will be included in CTL share calculations. Mefenoxam active ingredient contained in Platinum/Ridomil Gold and Uniform will be included in mefenoxam share calculations. Propiconazole active ingredient contained in Quilt will be included in propiconazole share calculations. S-metolachlor active ingredient contained in Cinch®, Cinch ATZ® and Medal™ will be included in S-metolachlor share calculations. Although the A.I. in these brands will be used for share calculations, no Active Ingredient Support incentive will be made on above brands.

**Market Planning Support**
- Retailer must complete a Business Plan with the Syngenta Sales Representative by January 31, 2004.

- Retailer must meet or exceed the total dollar volume purchases as agreed in the Business Plan to qualify for the maximum payment in this portion of the program. Performance below 100% of Business Plan will be prorated. Less than 80% performance against the Business Plan disqualifies the Retailer from participation in this section.

- The Business Plan will be reviewed in June for refinement and finalization if market conditions for Syngenta products have changed from January. Adjustments to plans will be made for significant environmental issues related to total market size only, not competitive issues.

## Program Geography

The states of **Alabama, Arkansas, Georgia, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, Texas,** ; the **Florida** counties of Baker, Bay, Calhoun, Columbia, Duval, Escambia, Franklin, Gadsden, Gulf, Hamilton, Holmes, Jackson, Jefferson, Leon, Liberty, Madison, Nassau, Okaloosa, Santa Rosa, Suwannee, Wakulla, Walton, and Washington; the **Missouri** counties of Bollinger, Butler, Cape Girardeau, Dunklin, Madison, Mississippi, New Madrid, Pemiscot, Ripley, Scott, Stoddard, and Wayne; and the **Virginia** counties of Brunswick, Charlotte, Chesapeake City, Colonial Heights City, Danville City, Dinwiddie, Franklin City, Greensville, Halifax, Isle of Wight, Lunenburg, Mecklenburg, Norfolk City, Nottoway, Petersburg City, Portsmouth City, Prince Edward, Prince George, Pittsylvania, Southampton, Suffolk City, Surry, Sussex, and Virginia Beach City.

Syngenta Crop Protection, Inc., Greensboro, NC 27419-8300.
**Important: Always read and follow label instructions before buying or using these products.**
In order to be eligible to receive any payments from Syngenta under this program, Retailer must be current in its payment of all amounts owed for products purchased from Syngenta. Retailer will forfeit its right to receive any payments hereunder if it has failed to purchase and pay for products in full accordance with the terms and conditions of Syngenta's agreements and programs as of the time that any such payments are due hereunder. Syngenta reserves the right to withhold and offset any payments earned by Retailer or otherwise owed by Syngenta hereunder against any amounts owed by Retailer to Syngenta.
AAtrex® and Bicep II MAGNUM™ Brands are Restricted Use Pesticides (Ground and Surface Water Concerns).
Agri-Mek®, Camix™, Cyclone®, Curacron®, Denim™, Force®, Gramoxone®, Karate®, LUMAX™, Warrior®, and Zephyr® are Restricted Use Pesticides.
Syngenta Crop Protection, Inc. warrants that its products conform to the chemical description set forth on the products' labels. NO OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, SHALL APPLY TO SYNGENTA'S PRODUCTS. Syngenta Crop Protection, Inc. neither assumes nor authorizes any representative or other person to assume for it any obligation or liability other than such as is expressly set forth herein. UNDER NO CIRCUMSTANCES SHALL SYNGENTA CROP PROTECTION, INC. BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM THE USE OR HANDLING OF ITS PRODUCTS. No statements or recommendations contained herein are to be construed as inducements to infringe any relevant patent now or hereafter in existence.
AAtrex®, Abound®, Actara®, Agri-Mek®, Amber®, Amistar™, Apron MAXX®, Beacon®, Bicep II MAGNUM®, Boundary®, Bravo®, Callisto™, Camix™, Caparol®, Centric®, Cinch®, Cruiser®, Curacron®, Denim™, Discover®, Dual Opti™, Quilt™, Revus®, Reflex®, Regione®, Ridomil®/Bravo®, Ridomil Gold®, Scholar®, Sequence™, Soicam®, Spirit®, Supreno™, Switch™, Tilt®, Trigard®, Uniform™, Vangard®, Warrior®, Zephyr®, Zorial®, and the Syngenta logo are trademarks of a Syngenta Group Company.
Cinch®, Cinch® ATZ, and Cinch® ATZ Lite are registered trademarks of E.I. du Pont de Nemours and Company. Cinch® ATZ and Cinch® ATZ Lite are restricted use pesticides.
BF 0216



## Section 2. Key Active Ingredient Support
Reward Retailers for their support of Syngenta products where a generic alternative exists.

| ACTIVE INGREDIENTS | PRODUCTS | RETAILER SUPPORT THRESHOLD | INCENTIVE |
|---|---|---|---|
| Mesotrione | Acuron, Callisto 4SC, Callisto GT, Callisto Xtra, Halex GT, Lexar EZ, Lumax EZ, Zemax | 99% | 5% |
| Clodinafop | Discover NG | 98% | |
| Azoxystrobin | Abound, Quadris, Quadris Opti, Quadris Top, Quadris Top SB, Quadris Top SBX, Quilt, Quilt Xcel, Uniform | 94% | 10% |
| Diquat | Reglone | 90% | 5% |
| Flumetralin | Prime+ | | |
| Fomesafen | Flexstar, Flexstar GT, Flexstar GT 3.5, Prefix, Reflex | | |
| Mefenoxam | Quadris Ridomil Gold, Ridomil Gold brands, Ridomil Gold Bravo | | |
| S-metolachlor (S-MOC) | Bicep II Magnum brands, Bicep Lite II Magnum, BroadAxe XC, Boundary, Dual Magnum, Dual II Magnum brands, Expert, Sequence | | |
| Abamectin | Agri-Flex, Agri-Mek SC | 85% | |
| Lambda Cyhalothrin | Karate with Zeon Technology, Warrior II with Zeon Technology | | |
| Paraquat | Gramoxone SL, Gramoxone SL 2.0 | | |

Purchases of Products listed will qualify for payment of corresponding incentive only.

Retailer must provide certification of total net sales to growers of Syngenta and generic products to qualify for the incentives.

Retailers must achieve the stated Retailer Support Threshold for each active ingredient ("A.I.") to qualify for that A.I.'s incentive. Qualification pursuant to Retailer Support Threshold is the calculated ratio of "(a)" to "(b)", as defined in Program Terms and Conditions. A Key AI Calculator will be provided to perform the calculation of the Retailer Support Threshold. Syngenta reserves to right to change the Key AI Calculator, at its own discretion, to reflect changes to products in the market place. Syngenta reserves the right to verify all claims for Key AI Support incentives using the provided Key AI Calculator.

Syngenta reserves the right to verify information in support of claims under this Key AI Support using an independent audit team. See Program Terms and Conditions for more details.



*Committed to Agriculture*
*...Committed to You.*

# 2004 BASF Retailer Package Program

*Effective: October 1, 2003*

## Objective:

To strengthen long-term, strategic, business relationships between BASF and Retailer accounts by rewarding local demand creation efforts and stewardship of BASF package brands. BASF endeavors to assist Retailers in growing their business with grower customers through product technology, convenient packaging and product support.

## Program Period:

October 1, 2003 through September 30, 2004

## Effective Area:

All states in the U.S. marketing area

## Eligibility:

❑ All Retailers meeting the minimum BASF net sales dollars required for its defined geography reported through EDI by October 8, 2004.

❑ Only purchases from BASF Authorized Distributors will be eligible.

## Payment Incentive:

**Base Payment Incentive:**

| | Schedule A | Schedule B |
|---|---|---|
| **Participating Incentivized BASF Package Brands** | If 2004 Total Qualified BASF Net EDI Sales (Bulk + Package) is *90% or Greater* Than Retailer's 2003 Total Qualified BASF Net EDI Sales | If 2004 Total Qualified BASF Net EDI Sales (Bulk + Package) is *Less Than 90%* of Retailer's 2003 Total Qualified BASF Net EDI Sales |
| Apogee®, Beyond™*, Cabrio® EG, Cadre® DG, Clarity®, Conclude Xact®,Counter® CR and 15G, Distinct®, Facet®, Frontier®, G-Max Lite™, Guardsman®, Guardsman Max™, Newpath®, Nexter®, Pentia®, Pix® Plus, Pix® Ultra, Ponnax®, Outlook®, Prowl® EC, Prowl® H₂O, Pursuit®, Pursuit® Plus, Raptor®, Regent®, Rezult®, Scepter®, Squadron®, Sovran®. | *12%* | *6%* |
| Acrobat® 50WP, Backdraft® SL, Celebrity Plus®, Extreme™, Marksman®, Paramount®, Pyramite™, Ronilan®, Steel®, Weedmaster®. | *8%* | *4%* |

\* Brands repacked by distributors or shuttles filled by BASF will be paid at the same percentage as the package payment for that brand
\*\* Excluding the states of WA, OR, ID, MT, CA, UT, NV

## 2004 BASF Retailer Package Program Rules and Conditions:

❑ Payment Incentives will be calculated at a Retailer's Operating Unit level.

❑ All Payment Incentives will be based on Net EDI Sales defined as Authorized Distributor transmissions of product movement transactions via EDI (purchases less returns) from October 1, 2003 to September 30, 2004.

# 2021 Retailer Base Program

Effective: October 1, 2020



## Objective

To strengthen long-term business relationships between BASF and Authorized Retailers.

## Offer Summary

| PARTICIPATING BRANDS | INCENTIVE |
|---|---|
| **Alite™ 27** herbicide, **Altrevin®** insecticide, **Apogee®** plant growth regulator (PGR), **Armezon®** herbicide, **Armezon® PRO** herbicide, **Armezon® Sugarcane** herbicide, **Basagran** herbicide, **Beyond®** herbicide, **Cabrio® EG** fungicide, **Cadre®** herbicide, **Caramba®** fungicide, **Cevya®** fungicide, **Clarity®** herbicide, **Clearpath®** herbicide, **Distinct®** herbicide, **Endura EG®** fungicide, **Engenia®** herbicide, **Facet® L** herbicide, **Fastac® CS** insecticide, **Forum®** fungicide, **Headline AMP®** fungicide, **Headline® EC** fungicide, **Headline® SC** fungicide, **Liberty®** herbicide, **Merivon®** fungicide, **Nealta®** insecticide, **Newpath®** herbicide, **Nexicor®** fungicide, **Optill® WG** herbicide, **Outlook®** herbicide, **Poast®** herbicide, **Priaxor®** fungicide, **Pristine® EG** fungicide, **Provisia®** herbicide, **Provysol®** fungicide, **Prowl® 3.3 EC** herbicide, **Prowl® H2O** herbicide, **Pursuit®** herbicide, **Raptor** herbicide, **Regent®** insecticide, **Rely®** herbicide, **Renestra™** insecticide, **Revytek™** fungicide, **Sefina®** insecticide, **Sequestrene®** micronutrient, **Sercadis®** fungicide, **Serifel®** biofungicide, **Sharpen®** herbicide, **Status®** herbicide, **Treevix®** herbicide, **Varisto®** herbicide, **Veltyma™** fungicide, **Verdict®** herbicide, **Versys®** insecticide, **Vivando®** fungicide, **Zampro®** fungicide, **Zidua® PRO** herbicide, and **Zidua® SC** herbicide | BASF Authorized Retailer earns specified incentive on 2021 season Qualified Adjusted Net Sales according to the details below. |

| PROGRAM PERIOD | EFFECTIVE AREA |
|---|---|
| October 1, 2020 through September 30, 2021 | All states in the United States |

## Offer Details

1. BASF will use the 2021 Program Redemption Price applied to volumes to calculate the incentive amount.

2. Incentive will be based on Qualified Adjusted Net Sales of Participating BASF Brands from October 1, 2020 through September 30, 2021.

3. Qualified Adjusted Net Sales is calculated by adding together Packaged Net Sales and Bulk Net Sales. Packaged Net Sales is defined as Authorized Distributor product movement transmitted via Electronic Reporting (purchases less returns). Bulk Net Sales is defined as beginning inventory plus shipments from BASF minus Sales to other BASF Authorized Retailers minus Repack minus ending inventory.

# 2021 Retailer Base Program

Effective: October 1, 2020



BASF
We create chemistry

| STANDARD BASE (1-10%): Brands receiving standard incentives | | | | | | | |
|---|---|---|---|---|---|---|---|
| **BRAND** | **INCENTIVE** | | **BRAND** | **INCENTIVE** | | **BRAND** | **INCENTIVE** |
| **Alite 27** herbicide | 2% | | **Nealta** insecticide | 2.5% | | **Sefina** insecticide | 2% |
| **Altrevin** insecticide | 2% | | **Newpath** herbicide | 2.5% | | **Sequestrene** micronutrient | 2% |
| **Apogee** PGR | 7% | | **Nexicor** fungicide | 3% | | **Serifel** biofungicide | 2.5% |
| **Armezon PRO** herbicide | 5% | | **Optill WG** herbicide | 10% | | **Sharpen** herbicide | 3% |
| **Basagran** herbicide | 2% | | **Poast** herbicide | 9% | | **Status** herbicide | 2% |
| **Beyond** herbicide | 6%* | | **Priaxor** fungicide | 5%* | | **Treevix** herbicide | 2% |
| **Cadre** herbicide | 3% | | **Pristine EG** fungicide | 10%* | | **Varisto** herbicide | 2.5%* |
| **Cevya** fungicide | 2% | | **Provisia** herbicide | 2.5% | | **Veltyma** fungicide | 2%* |
| **Clarity** herbicide | 2% | | **Provysol** fungicide | 2% | | **Verdict** herbicide | 5% |
| **Clearpath** herbicide | 2.5% | | **Prowl 3.3 EC** herbicide | 10%* | | **Versys** insecticide | 2% |
| **Distinct** herbicide | 2% | | **Prowl H2O** herbicide | 8%* | | **Vivando** fungicide | 2% |
| **Forum** fungicide | 6% | | **Raptor** herbicide | 6%* | | **Zampro** fungicide | 2% |
| **Headline AMP** fungicide | 2%* | | **Regent** insecticide | 10% | | **Zidua PRO** herbicide | 1% |
| **Headline SC** fungicide | 4%* | | **Rely** herbicide | 10% | | **Zidua SC** herbicide | 1% |
| **Liberty** herbicide | 8%* | | **Renestra** insecticide | 5% | | | |
| **Merivon** fungicide | 2% | | **Revytek** fungicide | 4%* | | | |

\* AI Loyalty Requirements according to the details below

| SUPPLEMENTARY BASE (11-25%): Brands receiving supplemental incentives due to market conditions | | | | | | | |
|---|---|---|---|---|---|---|---|
| **BRAND** | **INCENTIVE** | | **BRAND** | **INCENTIVE** | | **BRAND** | **INCENTIVE** |
| **Caramba** fungicide | 20% | | **Facet L** herbicide | 25% | | **Sercadis** fungicide | 11% |
| **Engenia** herbicide | 13% | | **Outlook** herbicide | 18% | | | |
| **Endura EG** fungicide | 12%* | | **Pursuit** herbicide | 21% | | | |

\* AI Loyalty Requirements according to the details below

| PREMIER BASE (26-39%): Brands receiving premium incentives due to market fit | | | | | | | |
|---|---|---|---|---|---|---|---|
| **BRAND** | **INCENTIVE** | | **BRAND** | **INCENTIVE** | | **BRAND** | **INCENTIVE** |
| **Armezon** herbicide | 27% | | **Cabrio** fungicide | 33%* | | **Headline EC** fungicide | 33%* |
| **Armezon Sugarcane** herbicide | 27% | | **Fastac CS** insecticide | 39% | | | |

\* AI Loyalty Requirements according to the details below

# 2021 Retailer Base Program

Effective: October 1, 2020



4. **AI Loyalty Requirement**:

| AI | BRANDS | SOW REQUIREMENT | ACTIVITY |
|---|---|---|---|
| **BOSCALID** | **Endura EG** fungicide, **Pristine EG** fungicide | **90%** | BASF Authorized Retailer is required to submit SOW% through enrollment tool by **October 15, 2021** |
| **F500** | **Cabrio** fungicide, **Headline AMP** fungicide, **Headline EC** fungicide, **Headline SC** fungicide, **Merivon** fungicide, **Nexicor** fungicide, **Priaxor** fungicide, **Pristine EG** fungicide, **Revytek** fungicide, and **Veltyma** fungicide | **90%** | |
| **GLUFOSINATE-AMMONIUM\*** | **Liberty** herbicide, **Noventa™** herbicide, and BASF sourced private label Glufosinate-ammonium | **90%** | |
| **IMAZAMOX** | **Beyond** herbicide, **Raptor** herbicide, and **Varisto** herbicide | **95%** | |
| **PENDIMETHALIN** | **Prowl 3.3 EC** herbicide**, Prowl H2O** herbicide and BASF sourced private label Pendimethalin | **90%** | |

\* Glufosinate-ammonium loyalty requirement is waived for: AZ, CA, FL, ID, NV, OR, UT and WA.

a. In order to earn the Base Incentive on AI Loyalty Brands (listed above) an active ingredient Share of Wallet (SOW) is required at the thresholds indicated as the SOW Requirement:

- 90% SOW on Boscalid containing brands
- 90% SOW on F500 containing brands
- 90% SOW on Glufosinate-ammonium containing brands
- 95% SOW on Imazamox containing brands
- 90% SOW on Pendimethalin containing brands

b. SOW is defined as Retail EDI volume of BASF sourced AI compared to total Retail EDI volume of all products containing specified active ingredients.

c. BASF Authorized Retailer is required to provide SOW% to BASF through designated enrollment tool by Oct 15, 2021. Enrollment process must be completed by BASF Authorized Retailer.

d. SOW will be enrolled for each Retail OU separately for each AI. For linked retail customers - AI loyalty will be determined at the National level.

e. By the end of 2021 season, if OU SOW targets have been met as specified, program incentive will be paid

f. If SOW target is not met, retailer does not accept terms of incentive or retailer does not complete SOW enrollment, the base incentive will not be paid

g. Enrollments must be submitted and in 'completed' state. Any enrollments in 'draft' state will not be counted, therefore, base incentive will not be paid

h. BASF Authorized Retailer MUST achieve minimum SOW threshold for each specified AI to qualify for base incentive. BASF reserves the right to change the AI calculator at its own discretion, to reflect product changes in the market.

# 2021 Retailer Base Program

Effective: October 1, 2020



■ BASF
We create chemistry

    i.   **Glufosinate-ammonium Loyalty:** Glufosinate-ammonium loyalty requirement is waived for: AZ, CA, FL, ID, NV, OR, UT and WA. OU's geography will determine the state for all enrollment hierarchy levels.

- To qualify for 4% base incentive, Retailer must purchase a minimum 90% of total Glufosinate-ammonium from BASF (Branded Liberty herbicide, Noventa herbicide, and BASF sourced GA Private Label) during the 2021 market year.

- To qualify for an additional 4% base incentive, the Noventa and BASF sourced GA Private Label must be 20% or less of all BASF sourced GA (Branded Liberty herbicide, Noventa herbicide, and BASF sourced GA Private Label) during the 2021 market year.

    j.   BASF reserves the right to verify information in support for specified AI volumes using an independent audit team.

5.   Program period is October 1, 2020 through September 30, 2021.

6.   Program is effective in all states in the United States marketing area.

7.   Incentive earnings that satisfy the above-stated requirements will be sent on or before December 22, 2021.

8.   BASF will only issue incentive checks with $5,000 or greater of current season cumulative earnings.

9.   BASF established 2021 Program Redemption Price will be applied to reported quantities for earnings calculations.

## Incentive Examples

**Example 1:** A retailer achieves the AI loyalty SOW percentages 95% for Glufosinate-ammonium (with 15% of the total BASF Sourced GA coming from Noventa and BASF sourced GA Private label), and 98% Imazamox:

| BRAND | POTENTIAL INCENTIVE | INCENTIVE PAID |
|---|---|---|
| **Liberty** herbicide | 8% | 8% |
| **Noventa** herbicide | 0% | 0% |
| **Raptor** herbicide | 6% | 6% |

**Example 2:** A retailer achieves the AI loyalty SOW percentages of 33% Imazamox and 98% Glufosinate-ammonium (with 35% of the total BASF Sourced GA coming from Noventa and BASF sourced GA Private label). They would receive 4% on their Liberty purchases; **0% on any Beyond herbicide, Raptor herbicide, or Varisto herbicide purchases**. They would also receive all other incentives for other participating brands as outlined above, **except they would receive 0% for Beyond herbicide, Raptor herbicide, and Varisto herbicide:**

| BRAND | POTENTIAL INCENTIVE | INCENTIVE PAID |
|---|---|---|
| **Liberty** herbicide | 8% | 4% |
| **Noventa** herbicide | 0% | 0% |
| **Beyond** herbicide | 6.5% | 0% |
| **Raptor** herbicide | 6% | 0% |
| **Varisto** herbicide | 2% | 0% |

# 2021 Retailer Base Program

Effective: October 1, 2020



## Program Rules and Conditions

1. Only purchases of BASF product from BASF Authorized Distributors or transfers into Authorized Retail locations via the BASF Transfer Tool, in authorized geographies and for approved products, are eligible for BASF incentives.
2. Only sales of BASF product to Authorized End-Users are eligible for BASF incentives. Authorized End-Users are defined by: the entity that purchases the crop protection products and owns or controls the land on which they are being applied, with documented use location within the US.
3. Only BASF Authorized Retailers will be eligible to earn incentives under this Program. For more information on BASF Authorized Retailers, please contact your local BASF Business Representative (http://www.agproducts.basf.us/app/repfinder).
4. Authorized Retailers must report Grower Point of Sales (POS) data for all BASF products, purchased from a BASF Authorized Distributor, and sold to growers, for the program season. BASF incentive programs require information on all BASF sales to Growers for fulfillment and incentives, submitted through Point-of-Sale (POS). Only Valid POS as determined by BASF business processes will be eligible for fulfillment.
   a. The following information is required when reporting product sales to Growers:
      i. Valid Grower First and Last Name or Farm Name
      ii. Valid Grower or Farm Address (includes mailing and/or physical address, city, state, and zip code)
      iii. Valid BASF Product Purchased
      iv. Volume Purchased
      v. Date of Purchase
      vi. Invoice Number as attached to sales transaction
   b. All POS information must be reported by October 5th immediately following the Program Period through the established data collection systems of Agrimine, Data Dimension, or EDI.
   c. Monthly reporting is preferred. If Electronic Reporting is the established method utilized, sales must be submitted in accordance with the established timelines (8th of the month for the previous month's sales, with the exception of October 5th).
5. Authorized Retailers must submit volumes carried in Inventory to a BASF Representative by October 19th immediately following the Program Period. Ending Inventories are required to be submitted under BASF Incentives. Package inventory volumes are to be submitted at the Operating Unit level for each BASF brand. Repack volumes should be included in package inventory. Bulk inventory volumes are to be submitted at the Outlet level for each BASF brand. Failure to have inventories reported to BASF will result in a decrease in Net Sales.
6. Valid Grower Point of Sale (POS) volumes that are not substantiated by an Authorized Retailers Net Sales will not be eligible under BASF program incentives. Net Sales is defined as Beginning Inventory plus Package or Bulk Orders from an Authorized Distributor plus or minus product Transfers facilitated though the BASF Transfer Tool minus Ending Inventories. Net Sales is determined at the Operating Unit / Brand level. Failure to have Ending Inventories submitted will result in Net Sales equal to zero (0).
7. Sales to other Retailers and/or to Distributors, or through on-line product exchanges or auctions, or to end-users that the BASF Authorized Retailer knows, or has reason to know, intends to resell product, will <u>not</u> qualify for BASF incentives
8. For the purpose of this and other BASF programs, payment calculations will be based on BASF's Program Redemption Price for the specific program season
9. Right to Audit.
   a. BASF reserves the right to audit all program claims, and supporting data and records, and reserves the right of final decision on payments due.
   b. The BASF Authorized Retailer's pertinent records, which are sufficiently detailed (as determined by BASF in its discretion) to enable verification of Program compliance, shall be made available, upon request, to BASF or its independent accountant in order to evaluate and verify compliance with the terms of this Program. BASF may also, upon reasonable advance written notice, inspect facilities where its Products are sold and/or stored. If BASF or its independent accountant (in its sole judgment) determines that a claim for any benefit, payment or reward offered under any BASF program submitted by or on behalf of the BASF Authorized Retailer contains false, misleading, inconsistent or inaccurate information, then BASF reserves the right to withhold all benefits, payments, and rewards under this and any impacted BASF program(s), until any identified discrepancies are resolved. Where a discrepancy has been identified, failure to resolve the discrepancy to BASF's satisfaction or refusal to permit BASF or its independent accountant to perform an audit under this Program shall result in forfeiture of any payment that might otherwise be earned but for the discrepancy. Any BASF Authorized Retailer found to have submitted false or fraudulent information shall also be responsible for the costs associated with any audit conducted by BASF.
   c. Any false or fraudulent information given to BASF or transactions (including inventory movements) that are made with the object to manipulate program earnings will result in forfeiture of any and all BASF Authorized Retailer program payments related to or based upon such information or transactions.
10. If BASF reasonably believes an overpayment may occur as a result of this Program alone, or in connection with any other program, then BASF has the option of reducing payment under this Program, as well as any subsequent payments under other programs.
11. BASF reserves the right to apply and/or offset any monies prepaid by or owed to Authorized Retailer against any monies owed to BASF by the BASF Authorized Retailer and/or its affiliates, regardless of whether or not the amounts involved arose out of the same transaction, or unrelated transactions. For purposes of this paragraph, an "affiliate" is defined as any entity that directly or indirectly controls, is controlled by, or is under common control with BASF Authorized Retailer. Control exists where an entity owns or controls 50% or more of the voting stock of, or interest in, another entity.
12. BASF reserves the right to assign BASF obligations (including the obligation to make payment), in whole or part, under this Program to a third party without notice to, or the consent of, the BASF Authorized Retailer. BASF Authorized Retailer may not assign any payment that may become due hereunder to any third party without BASF's prior written consent, which may be withheld at BASF's sole discretion.
13. The BASF Authorized Retailer represents and warrants that it shall comply with all applicable state, local, and federal laws and regulations for the collection and sharing of data related to an individual or household which is provided to or acquired by the BASF Authorized Retailer under the terms of this Program.
14. BASF reserves the right to cancel or modify this Program at any time without any notice.
15. These Program Rules & Conditions are subject to revision based on additional or revised state and/or federal requirements.

## Stocking

Once the minimum requirement is met by the stocking date and sold by the end of the Market Year, payment is made on all net purchases during the program year.

| Product | Stocking Pay Rate | Min. Volume Customer Must Stock & Sell in 2005-2006 | Date |
|---|---|---|---|
| Sonalan® 10G herbicide | 4.5% | 8,000 lbs. | 11/15/05 |
| Sonalan HFP Bulk | 4.0% | 1,000 gallons | 11/15/05 |
| Dow AgroSciences Branded Acetochlor Bulk | 4.0% | 1,000 gallons | 12/5/05 |
| Dow AgroSciences Branded Acetochlor Custom Repack | 4.0% | Minimum repack order | 12/5/05 |
| Lorsban® 15G insecticide | 10.0% | 75% of 2004-2005 EDI | 12/5/05 |
| Treflan® TR-10® herbicide | 4.5% | 70% of 2004-2005 EDI | 12/5/05 |
| Glyphomax® XRT herbicide & Durango® herbicide Bulk | 4.0% | 1,000 gallons | 2/15/06 |
| FirstRate® herbicide | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Glyphomax XRT & Durango Custom Repack | 4.0% | Minimum repack order | 3/15/06 |
| Glyphomax XRT & Durango package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Hornet® WDG herbicide | 3.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Pendimax® 3.3EC herbicide Bulk | 6.0% | 1,000 gallons | 3/15/06 |
| Pendimax 3.3EC Custom Repack | 6.0% | Minimum repack order | 3/15/06 |
| Pendimax Package | 6.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Python® WDG herbicide 4x2.5 lbs. | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Sonalan HFP Package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |

## Stewardship

Not all products noted below participate in all geographies. The following products purchased from an approved Dow AgroSciences distributor will participate in this program.

| Product | Pay Rate | Product | Pay Rate | Product | Pay Rate |
|---|---|---|---|---|---|
| Clincher® CA herbicide 2x2.5 gal. | 7.0% | GoalTender® herbicide 4x1 gal. | 6.0% | PropiMax® EC fungicide 4x1 gal. | 5.0% |
| Clincher SF 2x2.5 gal. | 8.0% | Grandstand® CA herbicide 2x2.5 gal. | 7.5% | Python® WDG herbicide 4x2.5 lbs. | 8.0% |
| Confirm® 2F insecticide 2x2.5 gal. | 2.5% | Grandstand R 2x2.5 gal. | 12.5% | Quintec® fungicide | 5.0% |
| Curtail® herbicide | 5.0% | Granite® GR herbicide | 7.0% | Rally® 40W Green fungicide | 2.5% |
| Curtail M | 5.0% | Granite SC | 7.0% | Rally 40W Blue | 2.5% |
| Dithane® fungicide Brands | 2.5% | Grasp® SC herbicide | 8.0% | Sonalan® 10G herbicide | 9.0% |
| Dow AgroSciences Branded Acetochlor Bulk | 16.0% | Hornet® WDG herbicide | 8.0% | Sonalan HFP | 11.0% |
| Dow AgroSciences Branded Acetochlor Package | 16.0% | Indar® 75WSP fungicide 12x8x2 oz. | 2.5% | SpinTor® 2SC Naturalyte® insect control 1x1 gal. | 10.0% |
| Durango® herbicide Bulk | 16.0% | Intrepid® 2F insecticide 4x1 gal. | 6.0% | Stam® 4E herbicide Bulk | 9.5% |
| Durango drum 30 gal. | 16.0% | Kelthane® miticide Brands | 7.5% | Stam 80EDF | 8.0% |
| Enable® 2F fungicide BTLHPE 16x40 fl. oz. USA | 2.5% | Kerb® 50-W herbicide 12x3 lbs. | 3.5% | Stam M4 Drum 35 gal. | 9.5% |
| FirstRate® herbicide | 8.0% | Laredo® EC fungicide 2x2.5 gal. | 10.0% | Starane® herbicide | 8.0% |
| Gallery® T&V 75DF herbicide 6x4x1 lb. | 2.5% | Laredo EW 4x1 gal. | 2.5% | Stinger® herbicide | 5.0% |
| Gavel® 75DF fungicide | 2.5% | Lock-On® insecticide 2x2.5 gal. | 6.0% | Strongarm® WSP herbicide | 10.5% |
| Glyphomax® XRT herbicide Bulk | 16.0% | Lorsban® 15G insecticide | 5.0% | Success® Naturalyte insect control | 9.0% |
| Glyphomax XRT 2x2.5 gal. | 8.0% | Lorsban-4E | 15.0% | Tracer® Naturalyte insect control | 10.0% |
| Goal® 2XL herbicide | 6.0% | Mandate® 2E herbicide 2x2.5 gal. | 5.5% | Treflan® TR-10® herbicide | 7.5% |
| | | M-Pede® insecticide | 2.5% | Visor® 2E herbicide 2x2.5 gal. | 5.5% |
| | | Nova® 40W fungicide 12x5x4 oz. | 2.5% | WideMatch® herbicide | 15.0% |
| | | Pendimax® 3.3 EC herbicide | 8.0% | | |

PhytoGen™ pay rates are detailed on the PhytoGen product sales plan insert to the 2005-2006 National Retail Program announcement.

## Program Rules

Retailers must abide by the following program rules in order to be eligible for payment under the 2005-2006 Dow AgroSciences National Retail Program.

1. The 2005-2006 Dow AgroSciences National Retail Program is applicable between September 1, 2005, through August 31, 2006.

2. Retailers must have an EDI minimum of Dow AgroSciences branded product valued at $75,000.00 during the program year to earn payment on this program.

3. The minimum dollar amount and volumes will be based on eligible product volume as reported via EDI from Distributors approved by Dow AgroSciences. Reported volumes include net reported purchases from approved Distributors less any sales to non-growers for the 2005-2006 program year.

4. Dow AgroSciences may make program progress payments during the 2005-2006 Market Year:
   (a) Progress payments are based on 80% of the stewardship earnings of participating products calculated from EDI-reported data available to Dow AgroSciences.
   (b) Final payment issued by December 31, 2006.
   (c) Following the program end date and final payment for the 2005-2006 program, any change in an EDI product value resulting in a negative program earning will be deducted from future Dow AgroSciences Retail Program earnings.

5. Dow AgroSciences will not issue a check or electronic payment below $500.00 for this program.

6. Dow AgroSciences reserves the right to audit compliance with all conditions and provisions of this program which includes, but is not limited to, an audit of dealers' books/records and an inspection of facilities. Any retailer found to have submitted false or fraudulent information will be responsible for the cost of the program audit and forfeiture of all program payments.

7. Dow AgroSciences reserves the right to deduct reported sales of product outside the retailer's normal service area where sufficient product support (e.g. personnel, warehousing and other facilities) is not available to purchaser from retailer.

8. Dow AgroSciences reserves the right to withhold program payments with respect to transactions which it believes are not made in good faith, are not made in the ordinary course of business, or are made with the purpose of manipulating program earnings.

   *For example: Dow AgroSciences will not recognize volume sold to growers in excess of their needs for their own use or sales to entities in the business of reselling agricultural chemicals.*

9. In the event a Retailer is owned or controlled by a Distributor customer of Dow AgroSciences and/or its affiliates, program payments will be made only when the Distributor customer has met their purchase payment obligations to Dow AgroSciences and/or its affiliates.

10. Where permitted by law, Dow AgroSciences may deduct from program payments any amount due to Dow AgroSciences and/or its affiliates by a Distributor customer who owns or controls a Retailer, from the following including, but not limited to, past due accounts, late payment fees and penalties.

11. Dow AgroSciences reserves the right to invoice customers for any program overpayments that may include, but are not limited to, incorrect submission of EDI sales information. Customer agrees to promptly repay such invoice within thirty (30) days of its receipt.

12. Payments will be made based on calculations performed by Dow AgroSciences, in its sole discretion.

13. All information provided by Dow AgroSciences regarding individual retail program earnings, is a good faith estimate of total earnings potential. Actual total program earnings and payments will be calculated by Dow AgroSciences, at its sole discretion.

14. Participation in this program is subject to any terms, conditions and procedures that Dow AgroSciences may, at its discretion, adopt from time to time. Dow AgroSciences reserves the right to modify or terminate this program at any time without notice.



™Trademark of Dow AgroSciences LLC

™ PhytoGen is a trademark of PhytoGen Seed Company, LLC. ¹Saber, Salvo and Sword are registered trademarks of Platte Chemical Co. FulTime, Grazon, Kerb, Keystone, Lock-On, Lorsban-4E, Surmount, Surpass, Telone, TopNotch, Tordon 101M, Tordon 22K and Tordon K are federally Restricted Use Pesticides. FulTime, Keystone, Surpass and TopNotch are not registered for sale, distribution or use in the state of New York. Hornet WDG is not available for sale, distribution or use in Nassau and Suffolk counties in the state of New York. Spike 80DF is registered for range and pasture only in AL, KS, LA, MO, MS, NM, OK and TX. Dithane contains mancozeb and ETU, chemicals known to the state of California to cause cancer. ETU is also known to the state of California to cause birth defects or other reproductive harm. Do not fall-apply anhydrous ammonia south of State Route 16 in the state of Illinois. In Florida, please refer to the Dow AgroSciences product label for Telone for use restrictions by county. Always read and follow label directions.

504-G2-7-05

R11-000-021 (8/05) BR
010-56975





# 2015 DuPont Retail Sales & Service Pays

**Southern**

**DuPont goes beyond crop protection with the Retail Sales and Service Pays program to make every acre count from seed to harvest.**

## Sales and Service Pays

The Sales and Service Pays incentive is a reward for achieving total portfolio growth vs the prior year.

## Criteria

- Qualify for the Retail Advantage - Sales and Service Incentive
- Earn 1% on total portfolio sales with growth of 105% over prior year.
- Earn another 1% on the total portfolio if sales growth of the following products collectively total 105% over prior year.
  - Afforia™, Aproach® Prima, Coragen®, Envive®, Fontelis®, LeadOff®, Prevathon®, Realm® Q and Vydate® C-LV.

## Terms and Conditions

- The 2015 Program Year is defined as 10/1/2014 through 9/30/2015.
- Incentive payment provided in form of end-of-season payment December 2015.
- Incentive payments are offered only on purchases through DuPont authorized distributors.
- For DuPont retailers with branches reporting to a prime location, the sales will be grouped at the prime level for the calculation of the incentive. Prime location is defined as the functional headquarters of a local retail network to which program measurements will apply.
- DuPont reserves the right to review retail location groupings and assign these groupings for purposes of program payments during the business planning process.
- DuPont will calculate purchases based on its estimate of prices. DuPont is not responsible for, and has no control over, the actual prices charged by distributors.
- Any quantities of qualified products purchased during the offer period, that are subsequently returned to DuPont authorized distributors, are not eligible for the incentives.
- The Retail Sales & Service program is available to retailers whose business operations are based in **AL**, **AR** (except the counties of Benton, Crawford, Sebastian, and Washington) , **GA**, **FL Northern row crops only** (counties of Alachua, Baker, Bay, Bradford, Calhoun, Clay, Columbia, Dixie, Duval, Escambia, Franklin, Gadsden, Gilchrist, Gulf, Hamilton, Holmes, Jackson, Jefferson, Lafayette, Leon, Levy, Liberty, Madison, Marion, Nassau, Okaloosa, Putnam, Santa Rosa, Suwannee, Taylor, Union, Wakulla, Walton, Washington), **KY**, **LA**, **MO Bootheel** (counties of Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Ste Genevieve, St Francois, Scott, Shannon, Stoddard, and Wayne) **MS**, **NC**, **OK** (includes the county of McCurtain), **SC**, **TN**, **TX** (includes the county of Bowie), **VA** and **WV**.
- DuPont retains the right to modify or cancel the program at any time.

*Vydate® CLV is a restricted use pesticide. Always read and follow label directions. The DuPont Oval Logo, DuPont™, The miracles of science™, Afforia™, Aproach®, Corage®, Envive®, Fontelis®, LeadOff®, Prevathon®, Realm® Q, and Vydate® are trademarks or registered trademarks of DuPont or its affiliates. Copyright © 2014-2015 E.I. du Pont de Nemours and Company. All Rights Reserved. 8/14 v1*



**2020 – 2021**
# Retail Offers



# Contents

**Introduction & Geography** 1

**Retail Advantage Program Details** 2

**Retail Early Fill Program**

Early Fill Program price assurance 4

Early Fill Program summary 4

Early Fill Program details 6

Corn bulk herbicides
Soybean herbicides
Glyphosate products
Enlist™ herbicides
Soil health products

**Retail Stocking program**

Retail Stocking Program summary 8

Retail Stocking Program details 10

Cereal herbicides portfolio incentive
Cereal herbicides stocking incentive
Corn herbicides stocking
Burndown herbicides stocking
Soybean herbicides PRE stocking
Soybean herbicides POST stocking
Cotton herbicide stocking
Rice herbicides stocking
Plant health stocking

**Enlist™ Ahead Retail Rewards**

Program description 12

Enlist Ahead training
Enlist herbicide incentive
Enlist Match stocking
Total portfolio growth

**Terms & Conditions** 14

The following products have DuPont™ as part of the EPA registered name. See product labels for details.

DuPont™ Accent® herbicide, DuPont™ Afforia® herbicide, DuPont™ Basis® Blend herbicide, DuPont™ Curzate® 60DF fungicide, DuPont™ Enlite® herbicide, DuPont™ Envive® herbicide, DuPont™ EverpreX® herbicide, DuPont™ Lannate® SP insecticide, DuPont™ Lannate® V insecticide, DuPont™ LeadOff® herbicide, DuPont™ Matrix® SG herbicide, DuPont™ Resolve® Q herbicide, DuPont™ Steadfast® herbicide, DuPont™ Staple® herbicide, DuPont™ Synchrony® herbicide,DuPont™ Tanos® fungicide, DuPont™ Trivence™ herbicide, DuPont™ Vertisan® fungicide

These programs supersede any previous Corteva retail offers prior to Oct. 1, 2020.



**Corteva Agriscience is pleased to offer the opportunity for crop protection retailers to enhance their earning potential and secure product supply on their key Corteva portfolio products.**

### Partnership

The Corteva portfolio of products are supported by the distinguished service of our sales organization, who are ready to engage customers in business planning for a successful 2020-2021 season.

# Retail Advantage Program

The Retail Advantage Program has been designed to provide retail channel partners with competitive rewards for supporting Corteva products.

## Program Qualification

The Corteva Agriscience™ Retail Advantage Program payment is based on product volume reported by approved distributors via EDI to Corteva. Only products intended for resale to growers are eligible for payment under the terms of this program. Retail customers must have purchased a minimum of $50,000 of participating and qualifying products between Oct. 1, 2020 and Sep. 30, 2021 to be eligible for program earnings.

## Program Payment

Retailers will have an opportunity to earn a reward payment on participating products provided the following criteria are met:

- Participating in training workshops as needed
- Work with the Corteva Territory Manager to develop new market or product opportunities
- Promptly reporting product or performance concerns
- Work with the Corteva Territory Manager to resolve any product or performance issues that may arise
- Follow the product label and providing sound agronomic recommendations
- Comply with all local, state and federal regulations in the storage and distribution of Corteva products
- Submit valid Grower data for the Corteva crop protection portfolio

## Qualifying Products for EDI Product Values

Additional Corteva Agriscience™ Crop Protection and Range & Pasture EDI product values count toward meeting the $50,000 purchase requirement, but do not participate in any retail payments. For more information, see terms and conditions section in the back of this book.

### Where to submit data

**www.yourdatadimensions.com**
Customer Support: 1-800-901-0012

**Data Dimensions User Guide**
www.yourdatadimensions.com/
UserGuide/UserGuide.pdf

**How to submit Grower Purchase data**
- Upload an existing Excel file containing required information and utilize the Data Dimensions mapping tool
- Key in purchase information fields that are prompted on website
- Utilize vendor support SSI/AgVance and Agrimine. Contact information found in user guide
- EDI/XML data currently fed into Data Dimensions for reporting purposes

**Key dates**
- Program dates:
  Oct. 1, 2020 – Sep. 30, 2021
- Grower point of sale data report deadline: Oct. 15, 2021

Not applicable to products sold outside the United States

---

## Product groups

### Plant health & disease control

| Disease control | | Pay Rate |
|---|---|---|
| FUNGICIDE | | |
| Enable* 2F | Indar* 2F | 2.5% |
| Vertisan* | | 4% |
| Rally* 40WSP | Dithane F-45* Rainshield® | 5% |
| Curzate* 60DF | Tanos® | 8% |
| Fontelis* | PropiMax* EC | 10% |

| Plant health | | Pay Rate |
|---|---|---|
| FUNGICIDE | | |
| Aproach® | Aproach® Prima | 10% |

### Soil health

| Soil health | | Pay Rate |
|---|---|---|
| NITROGEN STABILIZER | | |
| Instinct* HL | Instinct NXTGEN™ | 5% |
| Instinct* II | N-Serve* | |

# Product groups

## Weed control products

| Burndown | | | Pay Rate |
|---|---|---|---|
| **HERBICIDE** | | | |
| **Basis®** Blend | | | 7% |
| **Canopy®** DF | **Elevore®** | **LeadOff®** | 10% |

| Cereals | | | Pay Rate |
|---|---|---|---|
| **HERBICIDE** | | | |
| **Curtail®** | **Curtail®** M | **Starane®** Ultra | 2.5% |
| **GoldSky®** | **Simplicity®** CA | | |
| **OpenSky®** | **WideARmatch™** | | 7.5% |
| **PerfectMatch®** | **WideMatch®** | | |
| **Pixxaro™** EC | **Tarzec™** | **TeamMate®** | |
| **PowerFlex®** HL | **Starane®** Flex | | 10% |
| **Quelex®** | **Starane®** NXT | | |
| **Stinger®** | | | 12.5% |

| Corn PRE | | | Pay Rate |
|---|---|---|---|
| **HERBICIDE** | | | |
| **Cinch®** ATZ Lite | **Cinch®** ATZ | | 8% |
| **Keystone®** LA NXT | **Fultime®** NXT | **SureStart®** II | |
| **Keystone®** NXT | **Resicore®** | **Surpass®** NXT | 10% |

| Corn POST | | | Pay Rate |
|---|---|---|---|
| **HERBICIDE** | | | |
| **Accent®** Q | **Realm®** Q | | 8% |
| **Resolve®** Q | **Revulin®** Q | **Steadfast®** Q | 11% |

| Peanut & cotton | | Pay Rate |
|---|---|---|
| **HERBICIDE** | | |
| **Staple®** LX | **Strongarm®** | 10% |

| Rice | | | Pay Rate |
|---|---|---|---|
| **HERBICIDE** | | | |
| **Clincher®** CA | **Granite®** GR | **Loyant®** | |
| **Clincher®** SF | **Granite®** SC | **Novixid™** | |
| **Grandstand®** CA | **Grasp®** SC | **RebelEX®** | 7.5% |
| **Grandstand®** R | **Grasp®** Xtra | **RebelEX®** CA | |

| Soybean PRE | | Pay Rate |
|---|---|---|
| **HERBICIDE** | | |
| **Afforia®** | | 7.5% |
| **Enlite®** | **Surveil®** | |
| **Sonic®** | **Trivence®** | 10% |

| Soybean POST | | Pay Rate |
|---|---|---|
| **HERBICIDE** | | |
| **Synchrony®** XP | | 10% |

| Specialty crop | | Pay Rate |
|---|---|---|
| **HERBICIDE** | | |
| **Pindar®** GT | **Trellis®** SC | 4% |
| **Matrix®** SG | | 10% |

| Range & Pasture | | | Pay Rate |
|---|---|---|---|
| **HERBICIDE** | | | |
| **Grazon®** P+D | | | 2.5% |
| **Surmount®** | | | 3% |
| **Remedy®** Ultra | **Tordon®** 22K | **Tordon®** RTU | 5% |
| **Spike®** 20P | | | 7.5% |
| **GrazonNext®** HL | **Chaparral™** | **Sendero®** | |
| **PastureGard®** HL | **MezaVue®** | | 8% |
| **DuraCor®** | | | 10% |

## Insect control

| Broadspectrum insect control | | Pay Rate |
|---|---|---|
| **INSECTICIDE** | | |
| **Lannate®** LV | **Lannate®** SP | 4% |
| **Cobalt®** Advanced | **Lorsban®** Advanced | 15% |

| Nematode control | | Pay Rate |
|---|---|---|
| **INSECTICIDE/NEMATICIDE** | | |
| **Vydate®** C-LV | **Vydate®** L | 4% |

| Organic insect control | Pay Rate |
|---|---|
| **NATURALYTE® INSECT CONTROL** | |
| **Entrust®** SC | 5% |
| **INSECTICIDAL BAIT** | |
| **GF-120®** NF Naturalyte® fruit fly bait | 5% |

| Insect control | | Pay Rate |
|---|---|---|
| **NATURALYTE® INSECT CONTROL** | | |
| **Blackhawk®** | | 5% |
| **Success®** | | 10% |
| **INSECTICIDE** | | |
| **Sequoia®** | **Sequoia®** CA | 2% |
| **Delegate®** WG | | 5% |
| **Intrepid Edge®** | **Transform®** CA | |
| **Intrepid 2F®** | **Transform®** WG | 10% |
| **Radiant®** SC | | |

# 2020 – 2021 Retail Early Fill program

## Corteva Agriscience early fill price assurance

This is a notice of assurance to all retail channel partners who purchase and take delivery of Corteva participating bulk herbicides, soil health and insecticide brands during the 2020 - 2021 Corteva Retail Early Fill program. If Corteva lowers the price of a brand participating in the 2020 - 2021 Corteva Retail Early Fill Program by either a market letter price decrease or increased program payment, Corteva will provide your organization a rebate for the difference. This notice reinforces the continued commitment Corteva has to our retail channel partners and our desire to be recognized as an industry leading partner.

## Retail Early Fill program summary

See product section for official rules and details



Cinch ATZ, Cinch ATZ Lite, FulTime NXT, Keystone LA NXT and Keystone NXT are Restricted Use Pesticides.



| Market Year 2020 – 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|
| October | November | December | January | February | March | April | May |

# Retail Early Fill program

| Corn bulk herbicides | Pack size | Window Order | Window EDI | Est. Payment | Offer rate | Details |
|---|---|---|---|---|---|---|
| **Resicore®** herbicide | Bulk, Repack | Jun. 5, 2020 | Jun. 15, 2020 | Dec. 2020 | **3%*** | *3% incentive on June volume is only earned if you achieve Portfolio Rate lock on participating corn herbicide products below. |
| **Keystone®** NXT herbicide | Bulk, Repack | | | | | **Portfolio Rate lock** |
| **Keystone®** LA NXT herbicide | Bulk, Repack | Aug. 14, 2020 | Sep. 15, 2020 | Dec. 2020 Rate lock Paid: August, 2021 | **4%** + Rate lock | EDI 100% of prior year early-fill dollars (Jun. - Sep. 2019), minus Resicore, by Sep. 15, 2020 to Rate lock on all participating products through May 15, 2021 |
| **SureStart®** II herbicide | Bulk, Repack | | | | | |
| **Surpass®** NXT herbicide | Bulk, Repack | | | | | |
| **Cinch®** ATZ herbicide | Bulk, Repack | | | | | • Must EDI a minimum of 1,000 gallons |
| **Cinch®** ATZ lite herbicide | Bulk, Repack | Aug. 14, 2020 | Sep. 15, 2020 | Dec. 2020 Rate lock Paid: Aug. 2021 | **2%** + Rate lock | • Resicore does NOT qualify for Rate lock |
| **FulTime®** NXT herbicide | Bulk, Repack | | | | | |

2-4% anticipated price increase Oct. 1, 2020 for Resicore herbicide.

| Soybean herbicides | Pack size | Window Order | Window EDI | Est. Payment | Offer rate | Details |
|---|---|---|---|---|---|---|
| **EverpreX®** herbicide | Bulk | Aug. 14, 2020 | Sep. 15, 2020 | Dec. 2020 | **8%** | |

| Glyphosate products | Pack size | Window Order | Window EDI | Est. Payment | Offer rate | Details Jan. 1 - May 15, 2021 |
|---|---|---|---|---|---|---|
| **Abundit®** Edge herbicide | Bulk | Aug. 1 – Oct. 30, 2020 | Dec. 15, 2020 | May 2021 | **3%** + Rate lock | **Rate lock** EDI 100% of prior year gallons (Aug. - Dec. 2019), by Dec. 15, 2020 to Rate lock on all participating products through May 15, 2021 |
| | | | May 15, 2021 | Sep. 2021 | | |
| | 250 | | May 15, 2021 | Sep. 2021 | | |
| **Durango®** DMA® herbicide | Bulk | | Dec. 15, 2020 | May 2021 | | |
| | | | May 15, 2021 | Sep. 2021 | | |
| | 250 | | May 15, 2021 | Sep. 2021 | | |

Cinch ATZ, Cinch ATZ Lite, FulTime NXT, Keystone LA NXT and Keystone NXT are Restricted Use Pesticides.

| Enlist™ herbicides | Pack size | Window | | Est. Payment | Offer rate | Details |
| --- | --- | --- | --- | --- | --- | --- |
| | | Order | EDI | | | |
| **Enlist One**® herbicide | Bulk, Repack | Aug. 1 2020 – Oct. 30, 2020 | Aug. 1 2020 – Dec. 15, 2020 | May 2021 | **3%** | |
| | 250, 2x2.5 | | | Sep. 2021 | | |
| **Enlist Duo**® herbicide | Bulk, Repack | | | May 2021 | | |
| | 250, 2x2.5 | | | Sep. 2021 | | |

| Soil health products | Pack size | Window | | Est. Payment | Offer rate | Details |
| --- | --- | --- | --- | --- | --- | --- |
| | | Order | EDI | | | |
| **N-Serve**® nitrogen stabilizer | Bulk, Repack | May 27, 2020 | Jun. 15, 2020 | Nov. 2020 | **3%** | |
| **Instinct** NXTGEN™ nitrogen stabilizer | Bulk, 250 | Aug. 14, 2020 | Sep. 15, 2020 | Nov. 2020 | **3%** | |



# 2020 – 2021 Retail Stocking program summary

See product section for official rules and details

| | Market Year 2019 – 2020 | | Market Year 2020 – 2021 | | |
|---|---|---|---|---|---|
| | August | September | October | November | December |

### Cereal herbicide portfolio incentive

**HERBICIDE**

**OpenSky®**  **Quelex®**  **Tarzec®**
**PerfectMatch®**  **Starane®** Flex
**PowerFlex®** HL  **Starane®** NXT

**3%** EDI Oct. 1 2020 – Sep. 30, 2021
**3%+ Rate lock:** EDI 80% of prior year sales by **Mar. 15, 2021**

### Cereal herbicide early fill incentive

**HERBICIDE**

**Starane®** Flex

**5%** EDI Oct. 1 – Dec. 15, 2020

**WideARmatch®**

**5%** EDI Oct. 1 2020 – Sep. 30, 2021
**5%+ Rate lock:** EDI 80% of prior year sales WideMatch® herbicide by **Dec. 15, 2020\***
**Earn up to 8% total with rate lock\*:** 3% rate lock when Cereal Herbicide Portfolio qualification is met

### Corn herbicides stocking

**HERBICIDE**

**Realm®** Q

**10%** EDI Oct. 1 – Dec. 15, 2020

**Accent®** Q  **Revulin®** Q
**Resolve®** Q  **Steadfast®** Q

**3%** EDI Oct. 1 – Mar. 15, 2021

**Keystone®** NXT  **Resicore®**  **Surpass®** NXT
**Keystone®** LA NXT  **SureStart®** II

**3%** EDI Oct. 1 – May 15, 2021

**Cinch®** ATZ  **Cinch®** ATZ lite

**2%** EDI Oct. 1 – May 15, 2021

### Burndown herbicides stocking

**HERBICIDE**

**Basis®** Blend  **Elevore®**
**Canopy®** DF  **LeadOff®**

**6%** EDI Oct. 1 – Dec. 15, 2020

### Soybean herbicides PRE stocking

**HERBICIDE**

**Afforia®**  **Sonic®**  **Trivence®**
**Enlite®**  **Surveil®**

**3%** EDI Oct. 1 – Dec. 15, 2020
**Earn a total of 6%:** Earn an additional 3% on all listed soybean PRE for purchasing a min of 500 gallons of EverpreX between **Jun. 1 – Dec. 15, 2020**

**Synchrony®** XP

### Cotton herbicide stocking

**HERBICIDE**

**Staple®** LX

### Rice herbicide stocking

**HERBICIDE**

**Grasp®** SC  **RebelEX®**
**Grasp®** Xtra

**4%** EDI Oct. 1 2020 – Sep. 30, 2021
**4%+ Rate lock:** EDI 70% of prior year sales by **Mar. 15, 2021**

### Plant health stocking

**FUNGICIDE**

**Aproach®**  **Aproach®** Prima

*WideMatch® herbicide also qualifies for this offer. Cinch® ATZ, Cinch® ATZ Lite, Keystone® LA NXT and Keystone® NXT are Restricted Use Pesticides.



# Retail stocking program

| Cereal herbicides portfolio incentive | Pack size | Window EDI | Est. Payment | Stocking incentive | Details |
|---|---|---|---|---|---|
| **OpenSky®** herbicide | All pack sizes | | | | |
| **PerfectMatch™** herbicide | All pack sizes | | | | |
| **PowerFlex®** HL herbicide | All pack sizes | Oct. 1, 2020 - Sep. 30, 2021 **Rate lock:** 80% prior year (Mar. 15, 2021) | Oct. 2021 | **3%** + Rate lock | **Rate lock** EDI 80% of prior year sales (dollars) by Mar. 15, 2021 and rate lock 3% on all EDI sales from Oct. 1, 2020 - Sep. 30, 2021 |
| **Quelex®** herbicide | All pack sizes | | | | |
| **Starane®** Flex herbicide | 250s, 2x2.5s | | | | |
| **Starane®** NXT herbicide | All pack sizes | | | | |
| **Tarzec®** herbicide | All pack sizes | | | | |

| Cereal herbicides stocking incentive | Pack size | Window EDI | Est. Payment | Stocking incentive | Details |
|---|---|---|---|---|---|
| **Starane®** Flex herbicide | Bulk, Repack | Oct. 1 - Dec. 15, 2020 | Oct. 2021 | **5%** | |
| **WideARmatch™** herbicide | Bulk, 250s, 2x2.5s | Oct. 1, 2020 - Sep. 30, 2021 **Rate lock:** 80% prior year WideMatch (Dec. 15, 2020) | Oct. 2021 | **5%** + Rate lock | **Rate lock** Receive shipment & EDI 80% of prior year WideMatch sales (dollars) by Dec. 15, 2020 and rate lock 5% on all EDI sales of WideARmatch® from Oct. 1, 2020 - Sep. 30, 2021 **Earn up to 8% total with rate lock®:** 3% rate lock when Cereal Herbicide Portfolio qualification is met |

®WideMatch® herbicide also qualifies for this offer

| Corn herbicides stocking | Pack size | Window EDI | Est. Payment | Stocking incentive | Details |
|---|---|---|---|---|---|
| **Realm®** Q herbicide | All pack sizes | Oct. 1 - Dec. 15, 2020 | Oct. 2021 | **10%** | |
| | | Jan. 1 - Mar. 15, 2021 | Oct. 2021 | **7%** | |
| **Accent®** Q herbicide | All pack sizes | | | | |
| **Resolve®** Q herbicide | All pack sizes | Oct. 1 - Mar. 15, 2021 | Oct. 2021 | **3%** | |
| **Revulin®** Q herbicide | All pack sizes | | | | |
| **Steadfast®** Q herbicide | All pack sizes | | | | |
| **Keystone®** NXT herbicide | 250s, 2x2.5s | | | | |
| **Keystone®** LA NXT herbicide | 250s, 2x2.5s | | | | |
| **Resicore®** herbicide | 250s, 2x2.5s | Oct. 1 - May 15, 2021 | Oct. 2021 | **3%** | |
| **SureStart®** II herbicide | 250s, 2x2.5s | | | | |
| **Surpass®** NXT herbicide | 250s, 2x2.5s | | | | |
| **Cinch®** ATZ herbicide | 250s, 2x2.5s | Oct. 1 - May 15, 2021 | Oct. 2021 | **2%** | |
| **Cinch®** ATZ lite herbicide | 250s, 2x2.5s | | | | |

Cinch® ATZ, Cinch® ATZ Lite, Keystone® LA NXT and Keystone ® NXT are Restricted Use Pesticides.

| Burndown herbicides stocking | Pack size | Window — EDI | Est. Payment | Stocking incentive | Details |
|---|---|---|---|---|---|
| **Basis** Blend herbicide | All pack sizes | Oct. 1 – Dec. 15, 2020 | Oct. 2021 | **6%** | |
| **Canopy** DF herbicide | All pack sizes | | | | |
| **Elevore** herbicide | All pack sizes | | | | |
| **LeadOff** herbicide | All pack sizes | | | | |

| Soybean herbicides stocking | Pack size | Window — EDI | Est. Payment | Stocking incentive | Details |
|---|---|---|---|---|---|
| **Afforia** herbicide | All pack sizes | Oct. 1 – Dec. 15, 2020 | Oct. 2021 | **3%** | **Earn a total of 6%** Earn an additional 3% on all listed soybean PRE for purchasing a min of 500 gallons of EverpreX between Jun. 1 – Dec. 15, 2020 |
| **Enlite** herbicide | All pack sizes | | | | |
| **Surveil** herbicide | All pack sizes | | | | |
| **Trivence** herbicide | All pack sizes | Jan. 1 – Mar. 15, 2021 | Oct. 2021 | **3%** | |
| **Sonic** herbicide | All pack sizes | | | | |

| Soybean herbicides POST stocking | Pack size | Window — EDI | Est. Payment | Stocking incentive | Details |
|---|---|---|---|---|---|
| **Synchrony** XP herbicide | All pack sizes | Jan. 1 – Mar. 15, 2021 | Oct. 2021 | **3%** | |

| Cotton herbicide stocking | Pack size | Window — EDI | Est. Payment | Stocking incentive | Details |
|---|---|---|---|---|---|
| **Staple** LX herbicide | All pack sizes | Jan. 1 – Mar. 15, 2021 | Oct. 2021 | **3%** | |

| Rice herbicides stocking | Pack size | Window — EDI | Est. Payment | Stocking incentive | Details |
|---|---|---|---|---|---|
| **Grasp** SC herbicide | All pack sizes | Oct. 1 – Sep. 30, 2021 **Rate lock:** 70% prior year (Mar. 15, 2021) | Oct. 2021 | **4%** + Rate lock | **Rate lock** EDI 70% of prior year sales (dollars) between Jan. 1 – Mar. 15, 2021 and rate lock 4% on all EDI sales from Jan. 1 – Sep. 30, 2021 |
| **Grasp** Xtra herbicide | All pack sizes | | | | |
| **RebelEX** herbicide | All pack sizes | | | | |

| Plant health stocking | Pack size | Window — EDI | Est. Payment | Offer rate | Details Jan. 1 – Mar. 15, 2021 |
|---|---|---|---|---|---|
| **Aproach** fungicide | All pack sizes | Jan. 1 – Sep. 30, 2021 **Rate lock:** 80% prior year (Mar. 15, 2021) | Oct. 2021 | **5%** + Rate lock | **Rate lock** EDI 80% of prior year sales (dollars) between Jan. 1 – Mar. 15, 2021 and rate lock 5% on all EDI sales from Jan. 1 – Sep. 30, 2021 |
| **Aproach** Prima fungicide | All pack sizes | | | | |



## Program description

Enlist™ Ahead Retail Rewards programs offer incentives to properly steward and support the Enlist™ weed control system and Corteva Agriscience™ crop protection portfolio.

## 2020 – 2021 Enlist Retail programs summary



| Program | Earning |
|---|---|
| Enlist Ahead training | **3%** |
| Enlist herbicide stocking | **3%** |
| Match stocking<br>Corteva Soybean Herbicides | **4%** |
| Total portfolio growth | **1–5%** |
| **Maximum earning potential** | Up to **15%** |

## Enlist™ Ahead training

**Earning potential: 3%**

**Deadline:** Complete online training - Jul. 31, 2021
Submit GPOS data to Corteva - Oct. 15, 2021

**Earned on:** At ship to location level, GPOS volume of Enlist herbicides reported from Oct. 1, 2020 - Sep. 30, 2021

**Requirements:**

1. At least one representative from each participating ship to retail location (earning point) must take the Enlist Ahead online training module and pass the corresponding Knowledge Check found at Enlist.com > Enlist Training link in top menu. Additional qualifying training methods may be available as communicated by your Corteva representative. Training ensures that retailers are enabled to make successful applications and advise growers on getting the most out of the Enlist weed control system.

2. Retailer must report grower point of sale data for participating Enlist Duo® & Enlist One® herbicide products by Oct. 15, 2020, according to the program rules

**Estimated payment date:** Dec. 31, 2021

## Enlist herbicide stocking

**Earning potential: 3%**

**Deadline:** EDI herbicide volume - Dec. 15, 2020
Place orders - Oct. 30, 2020

**Earned on:** At ship to location level, EDI volume of Enlist herbicides reported from Aug. 1, 2020 - Dec. 15, 2020

**Requirements:** Order Enlist One and Enlist Duo by Oct. 30, 2020; EDI the Enlist One and Enlist Duo volume by Dec. 15, 2020. Bulk, repack, 250-gallon totes and 2.5-gallon jugs are eligible.

**Estimated payment date:**
Bulk and repack earnings by May 2021
Tote and jug earnings by Sep. 2021

| Enlist™ herbicides | Pack size | Window | | Est. Payment | Offer rate |
|---|---|---|---|---|---|
| | | Order | EDI | | |
| **Enlist One®** herbicide | Bulk, Repack | | | May 2021 | |
| | 250, 2x2.5 | Aug. 1 – Oct. 30, 2020 | Aug. 1 – Dec. 15, 2020 | Sep. 2021 | **3%** |
| **Enlist Duo®** herbicide | Bulk, Repack | | | May 2021 | |
| | 250, 2x2.5 | | | Sep. 2021 | |

# Match Stocking

**Earning potential: 4%**

## Soybean Herbicide Match (all soybean geographies)

**Deadline:** EDI herbicide volume - Dec. 15, 2020
Report volume GPOS - Oct. 15, 2021

**Earned on:** At rollup level, on Enlist™ herbicide GPOS volume that was EDI'd from Oct. 1 – Dec. 15, 2020 and is matched with GPOS dollars of eligible soybean herbicides also EDI'd in that same timeframe

**Requirements:**

1. Order Enlist One® and Enlist Duo® herbicides by Oct. 30, 2020 EDI the Enlist One and Enlist Duo herbicide by Dec. 15, 2020

2. EDI soybean herbicides between Oct. 1 - Dec. 15, 2020

3. Report GPOS of Enlist and soybean volume by Oct. 15, 2021. Enlist and soybean match calculated on GPOS.

**Qualifying matched products:**

**Afforia®** herbicide **Enlite®** herbicide **LeadOff®** herbicide **Surveil®** herbicide

**Canopy®** DF herbicide **Envive®** herbicide **Sonic®** herbicide **Synchrony®** XP herbicide

**Elevore®** herbicide **EverpreX®** herbicide **Staple®** LX herbicide **Trivence®** herbicide

**Estimated payment date:** By Dec. 31, 2021

## Cotton states stocking bonus (only for AL, AZ, GA, FL, NM, OK, TX)

**Deadline:** EDI Enlist herbicide volume - Dec. 15, 2020
Place orders - Oct. 30, 2020

**Earned on:** At ship to location level, EDI volume of Enlist herbicides reported from Aug. 1, 2020 - Dec. 15, 2020

**Requirements:**
In states where soybeans are not prevalent, this stocking bonus provides an additional opportunity for retail earnings. Bulk, repack, 250-gallon totes and 2.5-gallon jugs are eligible.

**Estimated payment date:**
Bulk and repack earnings by May 2021
Tote and jug earnings by Sep. 2021

---

# Total Portfolio Growth

**Earning potential: 1–5%**

**Deadline:** Sept. 30, 2021

**Earned on:** At roll up level, EDI volume of Enlist herbicides reported from Oct. 1, 2020 - Sep. 30, 2021

**Requirements:** During the 2020 - 21 market year, grow total Corteva crop protection gross sales dollars over 2019 - 20 market year; excluding Enlist One® herbicide, Enlist Duo® herbicide, Durango® DMA® herbcide and Abundit® Edge herbicide gross sales. Portfolio growth is determined using the RAP qualifying products list.

**Estimated payment date:** By Dec. 31, 2021

| Earnings Potential | |
| --- | --- |
| Total Portfolio Gross Dollars Growth | Enlist herbicides EDI Payout |
| $10,000 | 1% |
| $50,000 | 2% |
| $100,000 | 3% |
| $150,000 | 4% |
| $250,000 | 5% |

For more information on the Enlist weed control system, visit **www.enlist.com**
Corteva will make best reasonable efforts to pay each portion of Enlist Ahead program by dates specified.
Enlist herbicides are the only 2,4-D-containing products authorized for use in Enlist crops

# Terms & conditions:

The 2020-2021 Retail Offers are applicable between Oct. 1, 2020 through Sep. 30, 2021. Retailers must abide by the following program rules to be eligible for payment under these offers.

### Orders:

1. Retailers must place order(s) with an authorized Corteva Agriscience distributor, and Corteva must receive the order from the distributor by the specified dates to qualify for program incentives.

2. Any orders that are placed during the Order Period but are subsequently canceled by the retailer are also not eligible for the incentive.

### Shipment:

1. In the event that Corteva elects to defer an initial shipment, the retailer will still qualify for incentives in affect at the time of the order was received by Corteva.

### Delivery:

1. Corteva will schedule and confirm delivery dates with the customer.

2. 250 gallon totes are shipped direct to retailers and are non-returnable.

3. Corteva prepays freight charges for all delivered orders.

### Stewardship for bulk:

1. All retailers must have and maintain an EPA site establishment number for the repack site.

2. A copy of the current repack agreement must be kept on-site during its term for immediate availability.

### Enlist program approved retail match programs

Participating products will only be considered for rebate calculations if GPOS data is reported via Data Dimensions from an authorized Corteva retailer by Oct. 15, 2021 and invoiced between Oct. 1, 2020 – Sep. 30, 2021. Programs are calculated at the rollup level.

### Retail Advantage Program

1. Retailers must have an EDI minimum of Corteva Agriscience™ brand products valued at $50,000 during the program year to earn payment on this program.

2. Corteva may make program progress payments during the 2020-2021 market year:

   **a.** Progress payments are based on 80% of the earnings of participating products calculated from EDI ship-to reported data available to Corteva.

   **b.** Final payment issued by Dec. 31, 2021.

   **c.** Following the program end date and final payment for the 2020-2021 program, any change in an EDI product value resulting in a negative program earning will be deducted from future Retail Advantage Program earnings.

3. Corteva reserves the right to withhold 20% of program earnings in final payment if grower purchase data has not been reported during the program dates.

4. The following products count toward meeting the purchase requirement, but do not participate in any retail payments: Bridger herbicide family, Cadence herbicide family, CleanWave herbicide, Crossbow® herbicide, Eraser® insecticide, Graslan® herbicide, Govern insecticide, Hatchet® insecticide, Overtime® herbicide family, Reclaim® herbicide, Saurus insecticide, Smackdown herbicide, Starane® formulated herbicide family, StareDown® herbicide, Staunch herbicide, Telone® soil fumigants, Threesidual herbicide, Tremor® herbicide family, Trifluence herbicide, Volley® herbicide family, Warhawk insecticide, Whirlwind® insecticide, and Yuma insecticide. Contact your local Corteva territory manager with questions on additional qualifying products.

### Other Terms & Conditions:

1. These programs supersede any previous Corteva retail offers prior to Oct. 1, 2020.

2. Tank monitor for Corteva bulk herbicides program qualifications required for invoice and logistic efficiency.

3. Price and program are based upon delivery date and subject to confirmation of both product availability and delivery.

4. Participation in these programs are subject to any terms, conditions and procedures that Corteva may at its discretion adopt from time to time. Corteva reserves the right to modify or terminate this program at any time without notice.

5. Corteva reserves the right to audit compliance with all conditions and provisions of this program which includes but is not limited to an audit of dealers' books/records and an inspection of facilities. Any distributor or retailer found to have submitted false or fraudulent information will be responsible for the cost of the program audit and forfeiture of all program payments.

6. Corteva reserves the right to deduct reported sales of product outside the retailer's normal service area where sufficient product support (e.g., personnel, warehousing and other facilities) is not available to purchaser from retailer.

7. Corteva reserves the right to withhold program payments with respect to transactions which it believes are not made in good faith, are not made in the ordinary course of business, or are made with the purpose of manipulating program earnings. For example: Corteva will not recognize volume sold to growers in excess of their needs for their own use or sales to entities in the business of reselling agricultural chemicals.

8. All information provided by Corteva regarding individual retail program earnings is a good faith estimate of total earnings potential. Actual total program earnings and payments will be calculated by Corteva, at their sole discretion.

9. Retailer must earn a minimum program payment of $500.00 on each individual program. No checks under $500.00 per program will be issued.

10. In the event a retailer is owned or controlled by distributor customer of Corteva and/or its affiliates, offer payments will be made only when the distributor customer has met its purchase payment obligations to Corteva and/or its affiliates.

11. Where appropriate, participating brands will be paid on distributor reported EDI volumes. Any minimum dollar amount and volumes will be based on eligible product volume as reported via EDI from distributors approved by Corteva. The reported EDI volumes include net reported purchases from approved distributors less any sales to non-growers for the 2020 - 2021 program year. Product returns will be deducted from the overall volume, therefore reducing the program payment. Returns are calculated on the full year from the start of the program. Example: Program dates are Oct. 1, 2020 - Dec. 15, 2020, returns will be included from Oct. 1, 2019 - Sep. 30, 2020 (unless otherwise noted).

12. Where permitted by law, Corteva may deduct from program payments any amount due to Corteva or its affiliates by a distributor customer which owns or controls retail locations, including, but not limited to, past due accounts, late payment fees, and penalties.

13. Corteva reserves the right to invoice customers for any program overpayments that may include, but not limited to, incorrect EDI sales information submissions.

14. No payments shall be paid where participating products were sold pursuant to a bid by any government agency.

Visit us at **corteva.us**

℠ ™ Trademark of Corteva Agriscience and its affiliated companies.

Cinch® ATZ, Cinch® ATZ LITE, Cobalt® Advanced, Eraser®, FulTime® NXT, Govern® 4E, Graslan® L, Grazon® P+D, Hatchet®, Keystone® LA NXT, Keystone® NXT, DuPont™ Lannate® LV, DuPont™ Lannate® SP, Lock-On®, Lorsban® Advanced, MezaVue®, Overtime®, Surmount®, Telone®, Tremor®, Tordon® 22K, Volley®, Vydate® C-LV, Vydate® L, Warhawk®, Whirlwind and Yuma are Restricted Use Pesticides.

FulTime NXT, Keystone LA NXT, Keystone NXT, Resicore®, Slinger®, SureStart® II, Surpass® NXT are not available for sale, distribution or use in Nassau and Suffolk counties in the state of New York. Do not fall-apply anhydrous ammonia south of Highway 16 in the state of Illinois. Enable® is not labeled for use on pecans in New Mexico. State restrictions on the sale and use of Enable, Intrepid® 2F, Remedy® Ultra, Stinger® apply. Consult the label before purchase or use for full details. Enlist One® and Enlist Duo® are the only 2,4-D products authorized for use in Enlist crops. Fontelis® is not labeled for use on peanuts in California. Consult the Strongarm® label for area restrictions for TX, NM and OK. DuPont™ Curzate® 60DF is labeled for use on potatoes, potato seed pieces, tomatoes, cucurbit crops, head lettuce, leaf lettuce, spinach, and hops to preserve yields.

The EPA-registered labels for Lannate SP and Lannate LV contain the following statements: "This product is highly toxic to bees exposed to direct treatment on blooming crops or weeds. Do not apply this product or allow to drift to blooming crops or weeds if bees are foraging in (actively visiting) the treatment area."

Chaparral™, DuraCor® and GrazonNext® HL have no grazing or haying restrictions for any class of livestock, including lactating dairy cows, horses (including lactating mares) and meat animals prior to slaughter. Label precautions apply to forage treated with Chaparral, DuraCor and GrazonNext HL and to manure and urine from animals that have consumed treated forage. Consult the label for full details.

Sequoia® is not registered by U.S. EPA for sale or use on strawberries. Sequoia has Section 18 Specific Emergency Exemption for us on strawberries to treat lygus bugs in the following counties: Fresno, Los Angeles, Madera, Merced, Monterey, Orange, Sacramento, San Benito, San Diego, San Luis Obispo, Santa Barbara, Santa Clara, Santa Cruz, and Ventura. To learn more about Sequoia, to see the limitations on the use of Sequoia under the Section 18 Specific Emergency Exemption labels, and to find a list of retailers that may carry this product under the Section 18 Exemption, call 800-258-3033 or email CustomerInfo@Corteva.com.

Sequoia™ CA and Transform™ CA have not yet received regulatory approval; approvals are pending. The information provided here is not an offer for sale.

Not all products are registered for sale or use in all states. Contact your state pesticide regulatory agency to determine if a product is registered for sale or use in your state. Always read and follow label directions. SPIKE is a registered trademark of Nutrichem used under license. ©2020 Corteva. CA56-000-030 COR (09/20)





2022 National
**Program Summary Guide**

□ ▪ **BASF**
We create chemistry







BASF develops innovative solutions for farming, pest control and landscape management. The following pages feature summaries of our current Retailer and Grower programs. For more information, visit **agriculture.basf.com**.

# Contents

| | |
|---|---|
| Retailer Base Program | 3 |
| Retailer Market Builder Program | 4 |
| Retailer Portfolio Support Program | 5 |
| Retailer Residual Layering Program | 6 |
| Retailer Season Long Program | 7 |
| Grower Finance Program | 8 |
| Retailer Bulk Early Order Program | 9 |
| Retailer Distinct Early Order Program | 9 |
| Grower Engenia® Herbicide Weed Control Guarantee Program | 10 |
| Grower Liberty® Herbicide Weed Control Guarantee Program | 11 |
| Retailer Harvest Aid Program | 12 |
| Retailer Peanut Pair-Up Program | 12 |
| Retailer Rice Herbicide Program | 13 |
| Grower Propi Pair-Up Program | 13 |
| Notes | 14 |

## 2022 Season Program Summary

# Retailer Base Program

**Objective:** Reward retailers for support and loyalty with Grower customers.

## Participating Brands and Incentives on Qualified Adjusted Net Sales

| FUNGICIDES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cabrio® fungicide* | 23% | Sphaerex™ fungicide | 1% | Facet® L herbicide | 25% | Verdict® herbicide | 15% |
| Caramba® fungicide | 20% | Veltyma™ fungicide* | 2% | Liberty® herbicide* | 8% | Zidua® PRO herbicide | 1% |
| Cevya® fungicide | 2% | Vivando® fungicide | 2% | Newpath® herbicide | 2.5% | Zidua SC herbicide | 1% |
| Endura® EG fungicide* | 12% | Zampro® fungicide | 2% | Optill® WG herbicide | 10% | **INSECTICIDES** | |
| Forum® fungicide | 6% | **HERBICIDES** | | Outlook® herbicide | 18% | Altrevin® insecticide | 2% |
| Headline AMP® fungicide* | 2% | Alite™ 27 herbicide | 10% | Poast® herbicide | 9% | Fastac® CS insecticide | 40% |
| Headline® SC fungicide* | 4% | Armezon® herbicide | 22% | Provisia® herbicide | 2.5% | Nealta® insecticide | 2% |
| Merivon® fungicide* | 2% | Armezon PRO herbicide | 5% | Prowl® 3.3 EC herbicide* | 10% | Regent® insecticide | 10% |
| Nexicor™ fungicide* | 3% | Armezon Sugarcane herbicide | 2% | Prowl H2O herbicide* | 5% | Renestra™ insecticide | 5% |
| Priaxor® fungicide* | 5% | Basagran® herbicide | 2% | Pursuit® herbicide | 21% | Sefina® insecticide | 2% |
| Pristine® EG fungicide* | 10% | Beyond® herbicide* | 6% | Raptor® herbicide* | 6% | Versys® insecticide | 2% |
| Provysol® fungicide | 2% | Cadre® herbicide | 3% | Rely® herbicide | 10% | **OTHER** | |
| Revytek® fungicide* | 4% | Clarity® herbicide | 2% | Sharpen® herbicide | 3% | Apogee® PGR | 7% |
| Sercadis® fungicide | 11% | Clearpath® herbicide | 4.5% | Status® herbicide | 2% | Sequestrene micronutrient | 2% |
| Serifel® biofungicide | 2.5% | Distinct® herbicide | 2% | Treevix® herbicide | 2% | | |
| | | Engenia® herbicide | 13% | Varisto® herbicide* | 3% | | |

**\*Active Ingredient (AI) and Share of Wallet (SOW) Loyalty Requirement**

| AI | BRANDS | SOW REQUIREMENT |
|---|---|---|
| Boscalid | **Endura® EG** fungicide, **Pristine® EG** fungicide | 90% |
| F500 | **Cabrio®** fungicide, **Headline AMP®** fungicide, **Headline®** EC fungicide, **Headline SC** fungicide, **Merivon®** fungicide, **Nexicor™** fungicide, **Noventa®** fungicide, **Priaxor®** fungicide, **Pristine® EG** fungicide, **Revytek™** fungicide and **Veltyma™** fungicide | 90% |
| Glufosinate-Ammonium[1,2] | **Liberty®** herbicide and BASF sourced private label Glufosinate-ammonium | 90% |
| | Branded **Liberty** herbicide | 75% |
| Imazamox | **Beyond®** herbicide, **Raptor®** herbicide and **Varisto®** herbicide | 95% |
| Pendimethalin | **Prowl® 3.3 EC** herbicide, **Prowl H2O** herbicide and BASF sourced private label Pendimethalin | 90% |

### Glufosinate-ammonium (GA) Loyalty Requirements

**Step 1:** To qualify for 4% Base incentive rebate for **Liberty** herbicide, a Retailer must purchase a minimum 90% of BASF sourced GA (Branded **Liberty** herbicide, **Noventa** herbicide, and BASF sourced GA Private Label) during the 2022 market year.

**Step 2:** To qualify for an additional 4% Base incentive rebate for **Liberty** herbicide, Retailer must accomplish Step 1 of the GA Loyalty Requirement AND of all GA, a minimum 75% of total branded **Liberty** herbicide during the 2022 market year. **Noventa** herbicide and other BASF sourced GA Private Label can be up to 25% of the total.



**Visit bit.ly/22-BASF-RBP for full program details, examples and terms and conditions.**

**Every application of Engenia herbicide requires the use of an approved pH buffering adjuvant.** Engenia Herbicide, Alite 27 Herbicide, Fastac CS Insecticide and Renestra Insecticide are Restricted Use Pesticides.

*To earn the Base Incentive for the AI Loyalty Brands an Active Ingredient (AI) Share of Wallet (SOW) percentage is required at the thresholds indicated in the table. BASF Authorized Retailer is required to submit SOW % through enrollment tool by **October 15, 2022**. 1: Glufosinate-ammonium loyalty requirement is waived for: AZ, CA, FL, ID, NV, OR, UT and WA. OU's geography will determine the state for all enrollment hierarchy levels. 2: See additional GA Loyalty Requirements.

## 2022 Season Program Summary
# Retailer Market Builder Incentive

**Objective:** Reward retailers for planning to grow the overall fungicide market with BASF Plant Heath products.



### Qualification One

**Early Plan:** OU's enroll 2 Valid Grower Targets per OT with POS in 2019, 2020, and/or 2021 of Participating Brands.

**AND/OR**

### Qualification Two

**3-Year Average:** 2022 POS for Participating Brands must be at least 100% of average valid POS in 2019-2021.



 **Incentive:** BASF Authorized Retailer **earns up to 6% rebate** on Participating BASF Brands. 

## Participating Brands and Incentive on Qualified POS

| PARTICIPATING BRANDS | DEADLINE | REBATE INCENTIVE |
|---|---|---|
| **Headline AMP®** fungicide, **Headline SC** fungicide, **Priaxor®** herbicide, **Revytek™** fungicide and **Veltyma™** fungicide | QUALIFICATION 1 – EARLY PLAN: JANUARY 15, 2022 | 2% |
| | QUALIFICATION 2 – 3-YEAR AVERAGE: SEPTEMBER 30, 2022 | 4% |

### Program Benefits

- Specify retailer's BASF Plant Health target early for 2022 season
- Identify local farmer opportunities in cooperation with BASF field reps
- Ensure farmers and retail reps are advised of latest information from BASF Plant Health team
- Refined planning to ensure Plant Heath market growth versus market variability



Visit **bit.ly/22-BASF-MBIP** for **full program details, examples and terms and conditions.**

## 2022 Season Program Summary
# Retailer Portfolio Support Program

**Objective:** Reward retailers for taking an earlier position on the BASF portfolio of products.



**Qualification**
2022 Qualified Adjusted **Purchases** + 2022 **Beginning Inventory** must exceed Stocking Target % of 2021 Qualified Adjusted **Net Sales** by the Stocking Date.

**Incentive**
Retailer **earns up to 5% rebate** on Qualified Adjusted Net Sales of Participating Brands in Incentive.



### Program Benefits

- Retailers have the flexibility to order the products they need during each stocking period
- Beginning Inventories and Bulk Inventories are calculated in the stocking qualifications
- Not qualifying for one stocking date does not disqualify from earning on another: Earnings can be 0%–5%

### Stocking Dates, Stocking Brands* and Rebate Incentive on Qualified POS

| STOCKING DATE | STOCKING TARGET % | | REBATE INCENTIVE |
|---|---|---|---|
| | PORTFOLIO | FUNGICIDE | |
| NOVEMBER 30, 2021[1] | 50% | — | 2% |
| MARCH 15, 2022[2] | 75% | — | 2% |
| JUNE 15, 2022 | 100% | 100%[3] | 1% |

**PORTFOLIO STOCKING BRANDS:** All BASF Crop Protection Products[4]
**FUNGICIDE STOCKING BRANDS:** All BASF Fungicide Crop Protection Products

### Participating Brands in Incentive

**FUNGICIDES**
Caramba® fungicide
Cevya® fungicide
Endura® EG fungicide
Forum® fungicide
Headline AMP® fungicide
Nexicor™ fungicide
Priaxor® fungicide
Provysol® fungicide

Revytek™ fungicide
Sphaerex™ fungicide
Veltyma™ fungicide

**HERBICIDES**
Alite™ 27 herbicide
Armezon® herbicide
Armezon PRO herbicide
Armezon Sugarcane herbicide
Basagran® herbicide

Beyond® herbicide
Cadre® herbicide
Clarity® herbicide
Clearpath® herbicide
Distinct® herbicide
Engenia® herbicide
Facet® L herbicide
Newpath® herbicide
Optill® WG herbicide

Outlook® herbicide
Provisia® herbicide
Prowl 3.3 EC herbicide
Prowl H2O herbicide
Raptor herbicide
Sharpen® herbicide
Status® herbicide
Varisto® herbicide
Verdict® herbicide

Zidua® PRO herbicide
Zidua SC herbicide

**INSECTICIDES**
Renestra™ insecticide
Sefina® insecticide
Versys® insecticide



**Visit bit.ly/22-BASF-RPSP for full program details, examples and terms and conditions.**

**Every application of Engenia herbicide requires the use of an approved pH buffering adjuvant.** Engenia Herbicide, Alite 27 Herbicide and Renestra Insecticide are Restricted Use Pesticides.
*For a full list of stocking brands required for qualification please see the full program details. 1: Authorized Retail OUs in AL, AR, AZ, FL, GA, KY, LA, MS, NM, NC, OK, SC, TN, TX, VA, and bootheel counties in MO: Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, Sainte Genevieve, St Francis, Stoddard, and Wayne the November 30, 2021 stocking date is extended to January 15, 2022. 2: Authorized Retail OUs in CT, DE, MA, ME, MD, NH, NJ, NY, PA, RI, VT the March 15, 2022 stocking date is extended to April 30, 2022. 3: Authorized Retail OUs in NM, OK, TX are excluded from Fungicide Stocking Target Percentage to earn incentive. 4: **Liberty®** herbicide, **Noventa®** herbicide, **Rely®** herbicide, **Sentris™** buffering technology, and **Aegos™** buffering technology are excluded from Portfolio Stocking Brands.

## 2022 Season Program Summary

# Retailer Residual Layering Program

**Objective:** Reward retailers for matching BASF residual herbicides with **Liberty®** herbicide and **Engenia®** herbicide to combat a broad spectrum of weeds.



### Qualification

Match a qualifiying Residual Brand with one or both of the participating Foundation Brands.

### Incentive

Retailer is eligible to earn **$2/A rebate** on matching acres of the total Foundation Brand acreage and qualifying Residual Brands.



## Participating Brands and Incentive on Matched Acres of Qualified POS

| FOUNDATION BRANDS | RESIDUAL BRANDS | REBATE INCENTIVE |
|---|---|---|
| **Engenia** herbicide<br>**Liberty** herbicide | **Alite 27** herbicide, **Outlook** herbicide*, **Zidua SC** herbicide and **Zidua PRO** herbicide | **$2.00/ACRE** |

### Use Rates for Calculating Qualifying Acres

| RESIDUAL BRANDS | USE RATE PER ACRE |
|---|---|
| **Alite™ 27** herbicide | 2 fl oz/A |
| **Engenia®** herbicide | 12.8 fl oz/A |
| **Liberty®** herbicide | 32 fl oz/A |
| **Outlook®** herbicide* | 10 fl oz/A |
| **Zidua® SC** herbicide | 2.5 fl oz/A |
| **Zidua PRO** herbicide | 6 fl oz/A |

### Program Benefits

- **Weed control** with residuals for a stronger agronomic recommendation
- **Promote proper stewardship** to keep Engenia herbicide and Liberty herbicide working longer
- **Communicate confidence** in the weed control performance of Engenia herbicide, Liberty herbicide, and BASF residual portfolio



**Visit bit.ly/22-BASF-RRLP for full program details, examples and terms and conditions.**

Every application of Engenia herbicide requires the use of an approved pH buffering adjuvant. Engenia Herbicide and Alite 27 Herbicide are Restricted Use Pesticides.

*When Outlook herbicide is paired in cotton geographies, retailers can pair Outlook herbicide at 1.6x the Foundational Brand acres, see full program details.

## 2022 Season Program Summary
# Retailer Season-Long Package Program

**Objective:** Reward retailers for making timely purchases of Participating BASF Brands.



### Qualification

By Stocking Date, Qualified Adjusted **Purchases** + 2022 **Beginning Inventory for all SKUs** must exceed Stocking Target % of 2021 Qualified Adjusted **Net Sales; each Participating Brand evaluated separately.**

### Incentive

Retailer earns season-long **3% or 5% for package SKUs** on Qualified Adjusted Net Sales of Participating BASF Brands.



### Participating Brands by Stocking Date and Incentives on Qualified Adjusted EDI for Package SKUs[1]

| STOCKING DATE | PARTICIPATING BRANDS | STOCKING TARGET % | REBATE INCENTIVE |
|---|---|---|---|
| **NOVEMBER 30, 2021**[2] | **Armezon® PRO** herbicide, **Outlook®** herbicide, **Verdict®** herbicide | 50% | 5% |
| | **Armezon** herbicide, **Armezon Sugarcane** herbicide, **Status®** herbicide, **Zidua® PRO** herbicide and **Zidua SC** herbicide | | 3% |
| **MARCH 15, 2022**[3] | **Engenia®** herbicide | 75% | 5% |
| | **Liberty®** herbicide | 50% | 5% |
| | **Basagran®** herbicide, **Cadre®** herbicide, **Renestra™** insecticide and **Varisto®** herbicide | 75% | 3% |
| | **Sharpen®** herbicide | 50% | 3% |
| **JUNE 15, 2022** | **Endura® EG** fungicide, **Headline AMP®** fungicide[4], **Nexicor™** fungicide, **Priaxor®** fungicide, **Revytek™** fungicide, **Sphaerex™** fungicide and **Veltyma™** fungicide[4] | 75% | 3% |

## Program Benefits

- Opportunity to earn on purchases throughout the 2022 season
- Beginning Inventories and Bulk Inventories are calculated in the stocking qualifications
- Flexible stocking targets and dates
- Maximize earnings for earlier planning on packaged BASF brands



Visit **bit.ly/22-BASF-RSLP** for **full program details, examples and terms and conditions.**

Every application of Engenia herbicide requires the use of an approved pH buffering adjuvant. Engenia Herbicide and Renestra Herbicide are Restricted Use Pesticides.
1: Package SKU's include all non-bulk SKU's. Repackaging articles are included in qualification but do not participate in the incentive. 2: Authorized Retail OUs in AL, AR, AZ, FL, GA, KY, LA, MS, NM, NC, OK, SC, TN, TX, VA, and bootheel counties in MO: Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, Sainte Genevieve, St Francis, Stoddard, and Wayne the November 30, 2021, Stocking Date is extended to January 15, 2022. 3: Authorized Retail OUs in CT, DE, MA, ME, MD, NH, NJ, NY, PA, RI, VT the March 15, 2022, Stocking Date is extended to April 30, 2022. 4: **Headline AMP** fungicide and **Veltyma** fungicide aerial SKUs are excluded from qualification but will participate in the incentive.

## 2022 Season Program Summary

# Grower Finance Program

**Objective:** Provides a Fixed 0%[1] interest rate for BASF products all season long.



### Qualification

Grower makes a qualified minimum purchase of **one or more** BASF Branded Products (Crop Protection, Seed, Seed Treatment) and/or Select BASF Distributed Products* with a total purchase of **$5,000 or more.**[1]

### Incentive

Grower can qualify for fixed 0%*,[1] interest-free financing with no payments due in full until **December 2022.**[†]



### Additional Financing Options

Purchase a BASF fungicide and finance:

- Aerial applications up to $15/A
- Ground applications up to $7.50/A
- Chemigation applications up to $5/A

### Program Benefits

- Get advantages of early purchasing without paying until after your crop is harvested
- Availability across crop protection, seed treatment, and seed products from BASF and select channel partner portfolios
- Free Financing



**Talk to your BASF Authorized Retailer to finance your BASF purchases through John Deere Financial or Rabo AgriFinance.**

---

### John Deere Financial®

Don't have a JDF Multi-Use Account? John Deere Financial gives you easy ways to apply:

- Online at **JohnDeereFinancial.com/MultiUseApply**
- Call 800-356-9033 to have an application mailed to you
- Stop by your local retailer to complete an application

### Rabo AgriFinance®

Rabo AgriFinance gives you convenient processing:

- Online at **Grower.RaboAg.com**
- Call 888-395-8505 to have an application mailed to you
- Email Rabo AgriFinance at **QuickLink@RaboAg.com**
- Stop by your local retailer to complete an application

*Contact John Deere Financial or Rabo AgriFinance for a full list of Participating Brands. 1: Subject to credit approval, terms and conditions. Credit must be approved and transaction submitted by listed program dates in order to qualify for incentive rate. Offer valid on qualifying purchases made between October 1, 2022, to September 30, 2023. Offer limited to Multi-Use Account Agricultural customers with an available Special Terms limit. Subject to the Multi-Use Account credit agreement and approval. Fixed 0% from the date of purchase, which may be prior to delivery, until December 2023, when the entire transaction amount is due in full. Regular Multi-Use Account rates will apply after that date. Offer may be limited to qualifying products. $5,000 minimum purchase required. Subject to merchant participation, see your local merchant for complete details. Multi-Use Accounts are a service of John Deere Financial, f.s.b. Subject to credit approval, terms and conditions. Credit must be approved and transaction submitted by listed program dates in order to qualify for incentive rate. †Cotton seed purchases are due in January 2023.



**Visit bit.ly/22-BASF-GFP for full program details, examples and terms and conditions.**

## 2022 Season Program Summary
# Retailer Bulk Early Order Program

**Objective:** Strengthen strategic business relationships between BASF and retailers by rewarding joint planning early in the season, reducing supply risks through early placement of bulk product and by offering agronomic choice through herbicide enabled trait flexibility.

**Participating Brands by Order Dates, Ship Dates and Incentives on Qualified Bulk Delivery Volumes**

| ORDER DATE | PARTICIPATING BRANDS | SHIP DATES | REBATE INCENTIVE | PURCHASE MINIMUM | ELIGIBLE FOR REFILL |
|---|---|---|---|---|---|
| BY SEPTEMBER 15, 2021 | **Armezon® PRO** herbicide, **Outlook®** herbicide, **Verdict®** herbicide | BY NOVEMBER 30, 2021 | 7% + Difference in 2022 and 2021 Program Redemption Prices | 1,000 GALLONS | YES – 5% |
| | | | | 500 GALLONS | NO |
| | **Engenia®** herbicide | BY NOVEMBER 30, 2021 | 7% + Difference in 2022 and 2021 Program Redemption Prices | 1,000 GALLONS | YES – 5% |
| | | | | 500 GALLONS | NO |
| | **Liberty®** herbicide | SEPTEMBER 1, 2021 – MARCH 15, 2022 | 5% | 2,000 GALLONS | YES – 5% |
| | **Headline AMP®** fungicide[1] and **Veltyma™** fungicide[1] | OCTOBER 1, 2021 – MARCH 15, 2022 | 5% | 1,000 GALLONS | NO |

1: Headline AMP fungicide aerial SKU volume and Veltyma fungicide aerial SKU volume will not be considered for this program.

 **Visit bit.ly/22-BASF-RBEO for full program details, examples and terms and conditions.**

# Retailer Distinct Early Order Program

**Objective:** To reward retailers who purchase Distinct® herbicide early in the 2022 season.

**Participating Brand by Invoice Date and Incentives on Qualified Adjusted EDI**

| INVOICE DATE | PARTICIPATING BRAND | REBATE INCENTIVE |
|---|---|---|
| BY NOVEMBER 30, 2021 | **Distinct®** herbicide | 25% |
| DECEMBER 1, 2021 – JANUARY 31, 2022 | | 20% |

 **Visit bit.ly/22-BASF-RDEO for full program details, examples and terms and conditions.**

Every application of Engenia herbicide requires the use of an approved pH buffering adjuvant. Engenia Herbicide is a Restricted Use Pesticide.

9

*2022 Season Program Summary*

# Engenia® Herbicide Weed Control Guarantee Program

**Objective:** Communicate confidence in the performance of BASF herbicide programs by backing them up with this Weed Control Guarantee Program.

 **Qualification**
Apply Engenia herbicide in accordance with label instructions, BASF recommendations, and state and regional laws, including the use of BASF residual herbicides.

**Incentive**
Up to $15/A to reimburse re-spray costs. 

## Engenia Herbicide Weed Control Guarantee Program

When you apply Engenia herbicide according to label instructions and follow the full program requirements, we guarantee commercially acceptable weed control through our programs.

If within 30 days of the post-emergence application Engenia herbicide, less than commercially acceptable weed control on labeled weeds is experienced, contact your retailer or BASF representative for up to $15/A respray assistance on the affected acre.

 **Visit bit.ly/22-BASF-EWCG for full program details, examples and terms and conditions.**

## Program Requirements

1. Use adequate tillage or labeled burndown product
2. Effective residual program pre-plant or pre-emerge
3. Apply Engenia herbicide plus another residual like Outlook® or Zidua® SC herbicide
4. Follow full program terms and conditions

## Engenia Herbicide Application Requirements

Engenia herbicide is a US EPA Restricted Use Pesticide. EVERY application of Engenia herbicide requires the use of a pH buffering adjuvant such as AEGOS™ Buffering Technology. Additional state restrictions may apply.

**Every application of Engenia herbicide requires the use of an approved pH buffering adjuvant.** Engenia Herbicide is a Restricted Use Pesticide.

*2022 Season Program Summary*

# Liberty® Herbicide Weed Control Guarantee Program

**Objective:** Communicate confidence in the performance of BASF herbicide programs by backing them up with this Weed Control Guarantee Program.



### Qualification
Apply Liberty herbicide in accordance with label instructions, BASF recommendations, and state and regional laws, including the use of BASF residual herbicides.

### Incentive
Up to $15/A to reimburse re-spray costs.



**Liberty Herbicide Weed Control Guarantee Program**

When you apply Liberty herbicide according to label instructions and follow the full program requirements, we guarantee commercially acceptable weed control through our programs.

If within 30 days of the post-emergence application Liberty herbicide, less than commercially acceptable weed control on labeled weeds is experienced, contact your retailer or BASF representative for up to $15/A respray assistance on the affected acre.



**Visit bit.ly/22-BASF-LWCG for full program details, examples and terms and conditions.**

**Program Requirements**

1. Use adequate tillage or labeled burndown product
2. Effective residual program pre-plant or pre-emerge
3. Apply Liberty herbicide plus another residual like Outlook® or Zidua® SC herbicide
4. Follow full program terms and conditions

**Liberty Herbicide S.T.O.P. Application Guidelines**



**S**tart clean and stay clean

**T**arget < 3" weeds

**O**ptimize coverage

**P**air with residuals

## 2022 Season Program Summary

# Retailer Harvest Aid Program

**Objective:** To reward retailers who promote Sharpen® herbicide for harvest aid use.

**Participating Brand by Invoice Date and Incentive on Qualified POS**

| INVOICE DATE | PARTICIPATING BRAND | REBATE INCENTIVE |
|---|---|---|
| OCTOBER 1, 2021 – NOVEMBER 30, 2021 | **Sharpen®** herbicide | 6.5% |



Visit bit.ly/22-BASF-RHAP for full program details, examples and terms and conditions.

# Retailer Peanut Pair-Up Program

**Objective:** To reward retailers for supporting Cadre® herbicide and Provysol™ fungicide in peanut markets.

**Pairing Brands by Effective Area and Incentive for Matching Acres on Qualified POS**

| EFFECTIVE AREA | PAIRING BRANDS | REBATE INCENTIVE |
|---|---|---|
| ALABAMA, FLORIDA, GEORGIA, NORTH CAROLINA, SOUTH CAROLINA AND VIRGINIA | **Cadre®** herbicide and **Provysol™** fungicide | $2.00/ACRE |



Visit bit.ly/22-BASF-RPPP for full program details, examples and terms and conditions.

## 2022 Season Program Summary

# Retailer Rice Herbicide Program

**Objective:** To reward retailers for partnering with growers to support Facet® L herbicide, Prowl® H2O herbicide, and Sharpen® herbicide.

### Pairing Brands by Effective Area and Incentives for Matching Acres on Qualified POS

| EFFECTIVE AREA | PAIRING BRANDS | REBATE INCENTIVE |
|---|---|---|
| ARKANSAS, LOUISIANA, MISSOURI, MISSISSIPPI AND TEXAS | **Facet L** herbicide and **Sharpen** herbicide | **$1.50/A** |
| | **Facet L** herbicide, **Prowl H2O** herbicide and **Sharpen** herbicide | **$0.50/A** |

 Visit **bit.ly/22-BASF-RRHP** for full program details, examples and terms and conditions.

# Grower Propi Pair-Up Program

**Objective:** To promote the use of multiple fungicide products to combat a broad spectrum of diseases in soybeans through the offer of an incentive on qualifying purchases.

### Participating Brand by Effective Area and Incentive for Matching Acres of Qualified Purchases

| EFFECTIVE AREA | PARTICIPATING BRAND | APPROVED PAIRING BRANDS | REBATE INCENTIVE |
|---|---|---|---|
| ALABAMA, ARKANSAS, DELAWARE, ILLINOIS, INDIANA, IOWA, KANSAS, KENTUCKY, LOUISIANA, MARYLAND, MICHIGAN, MISSISSIPPI, MINNESOTA (SPECIFIC COUNTIES), MISSOURI, NEBRASKA, NEW YORK, OHIO, NORTH CAROLINA, SOUTH DAKOTA (SPECIFIC COUNTIES), SOUTH CAROLINA, TENNESSEE, TEXAS AND VIRGINIA | **Priaxor®** fungicide | Any qualifying solo propiconazole containing fungicide labeled for control or suppression of frogeye leaf spot in soybeans. | **$3.00/A** |

 Visit **bit.ly/22-BASF-PPU** for full program details, examples and terms and conditions.

**BASF**

We create chemistry







**This guide is meant as a quick reference only. For complete program details, review the full program documents. Always read and follow label directions.**

Participating BASF brands are trademarks or registered trademarks of BASF. John Deere Financial is a registered trademark of Deere & Company. John Deere Financial multi-use account is a service of John Deere Financial, f.s.b. Rabo AgriFinance is a registered trademark of Rabobank. QuickLink Credit is a service of Rabo AgriFinance, a division of Rabobank. All other trademarks are the property of their respective owners and use of any such trademark does not imply any affiliation with or endorsement by its owner. ©2022 BASF, All Rights Reserved. APN# 20210906LDG National-Program-Summary-2021



We create chemistry

